UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERCED IRRIGATION DISTRICT, on behalf of itself and all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>BARCLAYS BANK PLC<br><br>Defendant | Case No.: _____<br><br>ECF Case<br><br>**<u>CLASS ACTION</u>**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL ANTITRUST LAWS AND <u>STATE LAW</u> _____**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Based upon investigation of counsel from publicly-available information, including but not limited to the Report and Recommendation of the Federal Energy Regulatory Commission ("FERC") Office of Enforcement in the Matter of Barclays Bank PLC, Daniel Brin, Scott Connelly, Karen Levine and Ryan Smith, FERC Docket No 08-0800, dated October 31, 2012 (the "FERC Report"), and the FERC Order Assessing Civil Penalties in FERC Docket No 08-0800, dated July 16, 2013, (the "FERC Order Assessing Civil Penalties"), Plaintiff, Merced Irrigation District, on behalf of itself and all others similarly situated (the "Plaintiff Class," as defined below), and alleging upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, brings this class action for damages and other relief against Defendant pursuant to the federal antitrust laws and applicable state law, and demands a trial by jury.

## I.      NATURE OF THE ACTION

1.      This action arises from a coordinated scheme by Defendant Barclays Bank PLC ("Barclays") through its energy traders Daniel Brin, Scott Connelly, Karen Levine, and Ryan Smith to enter into contracts that unreasonably restrained the markets for trading electricity and electricity-related contracts which set the daily index prices for four major western U.S. trading hubs, published by the Intercontinental Exchange ("ICE") and the daily index prices published by Dow Jones Corporation for the same hubs (collectively "Daily Index Prices"), and by which Barclays acquired and maintained monopoly power over the setting of such Daily Index Prices between approximately November 1, 2006 and December 31, 2008 (the "Class Period").

2.      Barclays' anticompetitive scheme, as described in detail in the FERC Report, consisted of the following:  Barclays entered into electricity-related term contracts (unusually called "swap" contracts by FERC) which settled on each settlement date during the swap period based on the "ICE Daily Index" prices which were calculated by the Intercontinental Exchange ("ICE") based on numerous daily transactions for electricity at specific electricity trading locations in and around California on each settlement day of the swap period.  Barclays then proceeded to intentionally manipulate the ICE Daily Index prices in whichever way (up or down) that benefitted the ICE Daily Index swap contracts it held relating to the specific location, by buying or selling, at a loss and at artificial money-losing prices, large quantities of the underlying next-day fixed-price contracts for physical electricity (called "dailies") at that location on which the ICE Daily Index prices for that location were calculated each day. Because of the large size of Barclays' position in the ICE Daily Index swaps contracts, Barclays more than offset its losses on its money-losing purchases or sales of the underlying dailies contracts which it used to manipulate the ICE Daily Index, by receiving significantly greater revenues under its swap contracts which settled based on the manipulated ICE Daily Index prices.

3.     By way of illustration: if, for example the ICE Daily Index swap contracts Barclays held at a given time were "*long*" -- that is, if Barclays would be paid more under such swap contracts if  the subsequent ICE Daily Index prices were *higher* for each day of the swap's duration --  Barclays would subsequently *buy* the underlying dailies futures contracts on which the ICE Daily Index was calculated at intentionally *inflated* prices, and at a loss to itself, and thereby artificially *increase* the calculated ICE Daily Index for the future settlement dates. Because of the large size of Barclays' position in the ICE Daily Index swap contracts, Barclays' manipulation was profitable on a net basis -- the profits it made under the ICE Daily Index swap contracts which settled at the manipulated inflated ICE Daily Index settlement prices far exceeded its losses on its purchases of the underlying dailies futures contracts at artificially inflated prices through which it inflated the ICE Daily Index price.

4.     Similarly, if Barclays' ICE Daily Index swap contracts were on the other hand "*short*" at a given time -- that is, if Barclays would be paid more under the swaps  if  the subsequent ICE Daily Index prices were *lower* for each day of the swap's duration --  Barclays would **sell** the subsequent underlying dailies futures contracts on which the ICE Daily Index was calculated at intentionally *lower* prices and again at a loss to itself, to thereby artificially *depress* the ICE Daily Index for the future settlement dates.  Because of the large size of Barclays' position in the short swaps contracts, Barclays' manipulations resulted in substantial net profits.  The profits it made under the ICE Daily Index swaps contracts (this time short) which settled at the manipulated depressed ICE Daily Index settlement prices exceeded its losses on its sales of the underlying dailies futures contracts at artificially depressed prices through which it depressed the ICE Daily Index price.

5.     By establishing a large position in swap contracts which would reap profits from a change in the ICE Daily Index which were greater than the losses Barclays would suffer from its purchase or sale of underlying dailies contracts intended to manipulate the resulting ICE Daily Index, and by intentionally engaging in such money-losing purchases and sales of the underlying dailies contracts to manipulate the resulting ICE Daily Index prices in its favor, Barclays intentionally acquired the power to effect and did effect increases or decreases in the ICE Daily Index prices and in the daily index prices published by Dow Jones Corporation for the same hubs, dates and products which moved in lockstep and were inextricably intertwined with the ICE Daily Index prices each day (collectively defined above as the "Daily Index Prices").  The ICE Daily Index swap contracts and daily contracts entered into by Barclays operated to unreasonably restrain trade in the markets in which the Daily Index Prices were determined.   The ICE Daily swap contracts were essential to Barclays' manipulative and anticompetitive scheme in that they enabled Barclays to agree to money-losing daily contracts which manipulated the ICE Daily Index. Specifically, they compensated Barclays for refraining from engaging in conduct dictated by the normal competitive forces of supply and demand, and instead compensated Barclays for engaging in uneconomic conduct to restrain and corrupt, and which did restrain and corrupt, the normal competitive forces of supply and demand in the markets in which the Daily Index Prices and the contract settlement prices based thereon were determined. Under the circumstances in which the ICE Daily Index swap contracts were entered into by Barclays, there were no offsetting pro-competitive purposes or effects sufficient to render the restraint of trade caused by these contracts to be reasonable. As a result, the ICE Daily Index swap contracts and daily contracts entered into by Barclays had

an actual adverse effect on competition in the relevant markets and therefore violated Section

1 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §1.

6.     During the Class Period, Barclays also intentionally acquired and maintained

monopoly power over the Daily Index Prices at the hubs and periods set forth herein, and over

the prices for the sale of electricity under pre-existing contracts that settled against such Daily

Index Prices and the prices payable under financial contracts that settled against such Daily Index

Prices, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.     The persons injured by Barclays' illegal scheme include any person who held any

contract which settled against the Daily Index Prices for peak or non-peak power at the four

Western United States based trading hubs known as Mid-Columbia, Palo Verde, South Path 15

or North Path 15 between November 1, 2006 to December 31, 2008, and was damaged by

movements in such index prices caused by Barclays' unlawful scheme (the "Plaintiff Class").

8.     FERC's Office of Enforcement determined that Barclays profited by in excess of

$34.9 million and caused pecuniary losses to other market participants of at least $139.3 million

from its manipulative and anticompetitive scheme.  According to FERC, this $139.3 million

amount reflects its estimate of the amounts which certain holders of pre-existing contracts that

settled against the ICE Daily Index prices paid in supracompetitive prices or received in

subcompetitive prices, as the case may be, in the relevant markets as a result of Barclays'

manipulation of the ICE Daily Index prices.

9.     Plaintiff brings this action for compensation on behalf of itself and all members of

the Plaintiff Class for the antitrust injury caused by Barclays' illegal scheme in violation of

Section 1 and Section 2 of the Sherman Act.

10.     Plaintiff also brings this action for compensation on behalf of itself and all members of the Plaintiff Sub-Class for the injury caused by Barclays' illegal scheme in violation of § 17200, *et seq.*, of the California Business and Professions Code.

11.     During the Class Period, Plaintiff purchased peak electricity under contracts that settled against the Daily Index Prices relating to the hub known as North Path 15, which is a trading hub manipulated by Barclays, as described herein.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including attorneys fees, against Barclays for the injuries Plaintiff and members of the Plaintiff Class (as defined herein) have sustained as a result of Barclays' violations of Sections 1 and 2 of the Sherman Act and applicable state law.

13.     This Court has subject matter jurisdiction over the federal claims in this matter pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1331 and 1337, and because this action arises under the federal antitrust laws. This Court also has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. §1367(a).

14.     This  Court has personal jurisdiction over Barclays and venue is proper under 28 U.S.C. § 1391(b)(1) and (2) and under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because a substantial portion of the events giving rise to the claims and injuries alleged herein took place in whole or part in this District, and because Barclays' manipulative traders were physically located at the Barclays West Trading Desk offices in this District at the time they committed the unlawful manipulative and anticompetitive acts which are the subject of this action and which injured the Plaintiff and the members of the Plaintiff Class and Plaintiff Sub-Class.

### III.    PARTIES

#### A.    Plaintiff

15.    Plaintiff Merced Irrigation District ("Merced") is a state-recognized irrigation district organized pursuant to the California Irrigation District Law, Cal. Water Code §§ 20500, *et seq*, with its principal offices located in Merced, California. Merced is engaged in the business of generating, distributing, purchasing and selling electricity in and around Merced County, California.  Merced purchased peak electricity during the Class Period, including in April through June of 2007, under pre-existing contracts with another California state-recognized irrigation district which settled against the Dow Jones Daily Index price for peak power delivered in the trading zone known as North Path 15 (referred to herein as "NP").  As a direct result of Barclays' conduct in manipulating upward the Daily Index Prices for peak power delivered at NP, Plaintiff Merced paid supracompetitive market-derived prices for such electricity which it otherwise would not have paid in the absence of Barclays' conduct in violation of the federal antitrust laws and California law.

#### B.    Defendant

16.    Defendant Barclays, together with its subsidiaries, provides financial services in the United Kingdom, Europe, the Americas, Africa, the Middle East, and Asia.  Although headquartered in London, England, during the relevant time, Barclays operated a West Power Desk in New York City, headed by Scott Connelly.  The West Power Desk implemented the manipulative and anticompetitive scheme which is the subject of this action. At all times the traders at the West Power Desk who implemented the manipulative and anticompetitive scheme, including Daniel Brinn, Scott Connelly, Karen Levine and Ryan Smith, identified below, were employed by and acting as agents for and within the scope of their employment by Barclays.

**C.     Barclays' Traders at the West Power Desk**

17.     Daniel Brin resides in Brooklyn, New York.  Brin was employed by Barclays as an energy trader on Barclays' West Power Desk in New York City from July 2006 to 2011.  During the relevant time, Brin reported to Scott Connelly, the head of the Barclays West Power Desk.

18.     Scott Connelly now resides in Canada.  Connelly was employed by Barclays as Director of North American Power and personally headed the West Power Desk in New York City from May 2006 to August 2009.  During the relevant time, Connelly directly supervised traders Brin, Levine and Smith.

19.     Karen Levine now resides in Canada.  Levine was employed by Barclays as an energy trader on Barclays' West Power Desk in New York City from March 2006 to April 2009.  During the relevant time, Levine reported to Connelly.

20.     Ryan Smith resides in Schenectady, New York.  Smith was employed by Barclays as an energy trader on Barclays' West Power Desk in New York City from April 2006 to March 2007.  During the relevant time, Smith reported to Connelly

21.     The individuals described in paragraphs 17 to 20 are not named as Defendants.

## IV.     SUBSTANTIVE ALLEGATIONS

**A.     General Background**

22.     The   FERC   Report   can   be   accessed   in   full   at http://www.ferc.gov/EventCalendar/Files/20121031172428-IN08-8-000.pdf,   and   includes   a detailed description of the manipulative and anticompetitive scheme engaged in by Barclays to control Daily Index Prices for peak and non-peak power at the four western United States trading hubs which are the subject of this action -- i.e., at Mid-Columbia, Palo Verde, South Path 15 and North Path 15 -- between November 1, 2006 and December 31, 2008.

23.    The FERC Report includes a detailed description of the four western U.S. trading hubs, as well as the dates and related energy products relating to the manipulation which is the subject of this action and which the FERC Report organizes into 35 "product months." *See* FERC Report at 6-10. The precise dates, trading hub locations and related energy product descriptions relating to the manipulation are summarized in Table 1 on page 15 of the FERC Report ("FERC Table 1"). (A copy of Table 1 is attached hereto as Exhibit A). The Daily Index Prices were manipulated upward by Barclays in all of the listed product months in Table 1, except those designated by a negative ("-") sign, in which case the Daily Index Prices were manipulated downward.

24.    A more detailed description of the dates, trading hub locations and related energy products relating to the manipulations, as well as of the terminology used in the FERC Report and in the balance of this Complaint, are set forth below. This terminology is intentionally set forth in certain instances in its shorthand form as such terminology was used by Barclays' traders in their communications which evidence their illegal, manipulative and anticompetitive intent, and which are also discussed later in this Complaint.

(i)    **The Four Electricity Trading Hubs Where the Manipulation Occurred: MIDC, PV, SP and NP**

25.    In the western U.S. during the relevant time, electricity was "traded" with reference to specific recognized geographical trading locations.  Four of the most significant trading locations in the western U.S., and the ones where the manipulation described herein occurred, were Mid-Columbia ("MIDC"), Palo Verde ("PV"), South Path 15 ("SP"), and North Path 15 ("NP").

26.    MIDC is a trading location in Washington located around hydroelectric facilities in the Columbia River Basin.  PV is a trading location in Arizona that has a substantial amount of nuclear generation.  NP is a trading zone that encompasses most of northern California, and SP is a trading zone that encompasses most of southern California.

### (ii)  Peak vs. Off-Peak Electricity

27.    Electricity at these locations traded as "peak" and "off-peak." Peak electricity included electricity delivered during the hours 7:00 a.m. to 10:00 p.m. Monday through Saturday but excluding holidays.  Off-peak electricity included electricity delivered all of Sunday, the hours 10:00 p.m. to 7:00 a.m. Monday through Saturday, and all holidays.

28.    Peak electricity was also referred to as "heavy" or "heavy load" and could be abbreviated as "HL" or "hl." Off-peak electricity was also referred to as "light" or "light load" and could be abbreviated as "LL" or "ll."

### (iii) Physical vs. Financial Electricity Contracts

29.    Electricity-related contract transactions could also be called either physical or financial transactions. A physical transaction involved the contractual obligation to actually deliver or receive physical electricity at a particular location during a particular time.  Physical electricity is typically measured in megawatt-hour ("MWh"), although the FERC Report discusses Barclays' aggregate trading position as measured in megawatts-per-hour, ("MW/hr"), i.e., the number of megawatts of electricity Barclays was obligated to deliver or receive during a given hour.  For example, a person with a "long" physical position (*i.e.*, a net buyer) of 100 MW/h of peak electricity at NP for April 2007 had purchased a net volume of 100 MW/h of electricity to be delivered at NP during each peak hour during April 2007, and thus had an obligation to actually take delivery of (i.e., receive) 100 MW/h at NP for each such hour.

30.     Unlike what were called physical positions, electricity related financial positions did not entail physical obligations to deliver or receive electricity. Rather, financial positions, including the fixed-for-floating financial swap contracts ("financial swap") commonly traded by Barclays, were financially settled through an exchange of payments. A net buyer of a financial swap was said to be "long" the swap (or have a "long" financial position) and a net seller was said to be "short" the swap (or have a "short" financial position). A financial swap buyer paid a fixed price and received a floating price on each day of the swap's duration. For example, a buyer of a financial swap for NP peak electricity during April 2007 would pay a fixed price (e.g., $50 per MWh) and receive the floating payment of the ICE Daily Index settlement price for NP peak electricity for each day of the month.

### (iv) Fixed Priced vs. Published Daily Index Priced Transactions

31.     Physical transactions could be priced at either a fixed price agreed to by the counterparties (e.g., $50 per MWh) or at a published index that typically reflected the volume-weighted average price ("VWAP") of certain transactions made by electricity market participants (as determined by the compiler and publisher of the index.)

32.     One of the most commonly used indices, which is directly relevant for this case, was the ICE Daily Index. During the relevant time, much of the electricity-related trading in the western U.S. occurred on ICE. ICE is an electronic trading platform frequently used by market participants, including Barclays' traders, during the relevant time, to trade electricity-related products.

33.     The ICE Daily Index was an index published by ICE each trading day based on the VWAP of all day-ahead fixed-price electricity-related transactions (i.e., "dailies" contracts) at a particular trading location. ICE published a separate daily index price for peak electricity

and off-peak electricity at each trading location.  Many physical electricity transactions and related financial products during the relevant time priced off of or settled against the ICE Daily Index.

34.    The ICE Daily Index was set by a methodology that calculates an index price based on the VWAP of all contributing volumes and prices traded on ICE.  The volumes and prices that ICE used to calculate the daily index price were those trades that occurred in the day-ahead fixed-price physical contracts market, a market commonly referred to as the "cash" or "dailies" market.   In the dailies market, traders bought and sold electricity contracts requiring physical delivery the following day at fixed prices (e.g., 25 MW/h of peak NP electricity for delivery the following day priced at $50 per MWh).  Many traders, such as Barclays and others, never intended to physically generate or take delivery of any electricity, as demonstrated by the fact that they always fully offset ( or "flattened") their purchase and sale obligations by the close of the dailies trading sessions.

35.    The Dow Jones Corporation also published daily index prices for the same dates, trading hub locations and related energy products which are the subject of this action, which moved in lockstep with and were inextricably intertwined with the ICE Daily Index prices. For example, the chart set forth in Exhibit B hereto shows the lockstep movement of the ICE and the Dow Jones daily index prices for peak power at the NP hub for the three month period in which Barclays manipulated those prices, and during which Plaintiff was injured, as alleged herein.

36.    A physical position at index was an electricity-related contract that transacted at an index price as opposed to a fixed price (*e.g*., 25 MW/h of peak MIDC electricity priced at the ICE Daily Index).  Index transactions could be for different lengths of time.  For example, a trader could buy a contract for index electricity for a day (known as "daily index"), for the

remaining trading days in a month (known as "balance of the month" or "BOM" index), for a month (known as "monthly index"), or for longer periods. Index transactions for lengths greater than a day still settled against the applicable daily index but did so each day as the index was set by the VWAP of [in] the dailies. For example, a monthly index product settled against the daily index each trading day during the applicable month. Therefore, the product lasted for a full month, but the profitability was determined on a daily basis.

37.     Market participants also traded "term" fixed-price physical products which were contracts to buy or sell physical power for a period of more than a day (*e.g.*, 200 MW/h of peak MIDC electricity for April 2007 priced at $50 per MWh). Fixed-price term positions had price risk that was equivalent to a financial swap because they established a position at a fixed price (*e.g.*, $50) that could be measured against the ICE Daily Index settlement. However, they also had the physical obligation to make or receive delivery of physical power when those positions went to delivery each day. Therefore, it was common for market participants, including Barclays, to disaggregate the financial and physical components of a fixed-price term position and combine those components with their existing financial and physical positions to determine their total net positions on any given day.

38.     Electricity traders who primarily traded dailies contracts in the dailies market and other contracts that were less than a month in length were known in the electricity trading industry as "cash traders." Electricity traders who traded longer-dated contracts were known as "term" traders.

39.     Market participants also frequently traded the difference -- known as a "spread" -- between two locations by using a combination of financial swaps and/or physical contracts.

This was done by taking a net long position at one location and a net short position at the other location. Each location was known as a "leg" of the spread.

40.     In a spread, the location with a generally higher price was called the "premium" market in relation to the lower priced location.  A trader was "long" the spread when he or she had a net long position in the premium market and a net short position in the other leg of the spread. If a trader had a net short position in the premium market and a net long position in the other leg, he was "short" the spread.

41.     Generally, the trading zones in California had higher prices than the locations outside California in the western U.S., and power generally flowed from PV and Northwestern states to the California zones.

42.     SP was generally a premium location over MIDC, NP, and PV. PV was generally a premium location over MIDC.

43.     For, example, a trader holding a 100 MW/h long financial swap position at SP and a 100 MW/h short financial swap position at NP for a particular month would have a "long" SP to NP (frequently expressed as "SP/NP") spread position because the long leg of the spread (SP) generally traded at a premium to the short leg of the spread (NP).

**B.     FERC Office of Enforcement Investigation and the Markets Manipulated**

44.     According to the FERC Report, FERC Office of Enforcement undertook a non-public investigation of trading activity by Barclays in electricity-related markets in the western U.S. to determine whether Barclays was trading electricity-related products uneconomically in certain markets to affect the ICE Daily Index settlement prices to benefit its related financial positions, the profitability of which were determined by the settlement prices from the ICE indices.  During the investigation, FERC obtained and reviewed in excess of one million pages

of documents and analyzed hundreds of thousands of trades. The documents reviewed included emails, instant message communications ("IMs"), voice-recordings, and other relevant information. FERC also conducted 25 days of investigative depositions of Barclays' current and former employees, including Brin, Connelly, Levine, and Smith, and of certain third parties.

45.     FERC determined Barclays and its traders manipulated electricity-related markets during 35 of what FERC calls "product months" (*i.e.*, trading of a specific contractual product (e.g., contract to buy or sell peak or off-peak electricity) relating to a specific location (e.g., MIDC, PV, SP or NP) for a specific calendar month, such as the cash and index contract markets for peak electricity at NP for April 2007). FERC's Office of Enforcement determined Barclays' traders engaged in a coordinated scheme during those product months to take the physical contractual positions they had built and offset them with daily contracts in the cash markets -- generally at a loss -- to impact the ICE Daily Index settlements to benefit Barclays' related financial positions that settled against those indices. A list of the 35 manipulated product months is set forth in FERC Table 1 (Table 1 at page 15 of the FERC Report, attached hereto as Exhibit A).

46.     FERC determined that Barclays' traders executed their manipulative scheme for contracts for electricity at the primary electricity trading points in the western U.S. at the time: MIDC, SP, NP, and PV.

47.     FERC's determination that Barclays engaged in the manipulative scheme described above was based on extensive review and analysis of the data, documents, and testimony obtained in the investigation. This included, among other things, non-public trading data from Barclays as well as from ICE reflecting the scheme, and non-public communications of Barclays' traders, discussed below, in which they discussed their manipulative trading.

48.     As stated above, FERC Office of Enforcement determined that Barclays has made illegal profits of in excess of $34.9 million and caused pecuniary losses to other market participants of at least $139.3 million by its manipulative scheme in artificially moving the Daily Index Prices.

C.     **BACKGROUND OF BARCLAYS WEST POWER DESK AND TRADING**

49.     The foregoing manipulative and anticompetitive scheme was perpetrated on behalf of Barclays by its West Power Desk which focused on trading contracts for physical and financial electricity-related products in western U.S. and Canadian markets.

50.     The West Power Desk, which was physically located in New York City, consisted of two rows of desks without partitions on the Barclays Commodities Group Trading Floor.

51.     The West Power Desk was headed by Scott Connelly.  Connelly held the title of Managing Director of North American Power at Barclays and was a member of senior management.  In addition to his managerial and supervisory responsibilities, Connelly was also a term trader on the West Power Desk, focusing on term products in western U.S. and Canadian financial and physical electricity markets.

52.     Daniel Brin, Karen Levine, and Ryan Smith worked on the West Power Desk under Connelly's direction and supervision.  Brin, Levine, and Smith primarily served as cash traders, focusing on dailies trading and other products of short duration.

53.     Connelly was instrumental in recruiting Brin, Levine, and Smith to Barclays.

54.     Barclays' western U.S. power trading during the alleged manipulation months focused on four of the most significant western U.S. trading locations, discussed above: MIDC, PV, SP, and NP.

### D.   THE DETAILS OF THE MANIPULATIVE AND ANTICOMPETITIVE SCHEME

55.     Barclays' traders' manipulative and anticompetitive scheme involved, for each month of manipulation in which they artificially manipulated the Daily Index Prices, the following: (1) setting up a financial position (typically a contractual swap agreement), (2) purchasing physical futures contracts that established a position that was in the opposite direction of the financial position (i.e., in the opposite direction of the swaps) and, (3) then "flattening" (i.e., "liquidating") the physical futures contracts position through purchasing or selling dailies futures contracts, at artificial prices, resulting in a loss in combination with the physical futures contracts, but which benefitted the financial positions (e.g., the swaps) by causing the Daily Index Prices to increase or decrease as the traders desired. Because of the larger position Barclays held in the swaps (or other financial contractual position) in step 1, which benefitted by the manipulated movement in the Daily Index Prices, Barclays made an overall significant profit on the scheme.

56.     Because Barclays did not own electricity generation resources or serve customer load, Barclays' contracts for physical day-ahead positions (step 2) had to be offset prior to delivery or receipt of the electricity by buying (in the case of a short physical day-ahead position) or selling (in the case of a long physical day-ahead position) futures contracts for an equal volume of electricity (step 3).   The process of purchasing or selling contracts for physical delivery of electricity to fully offset previously acquired day-ahead contracts in the opposite direction (step 3) is called "flattening" the position.

57.     Barclays' contracts for physical positions (step 2) thus enabled Barclays to trade large volumes of dailies (step 3) as a means of flattening the contracts for the physical positions Barclays had built through physical index contracts or term electricity contracts.  For example, a

short physical contract position of 500 MW/h of a particular product going into the day-ahead market allowed Barclays to buy 500 MW/h in dailies contracts to flatten the physical contract position it had built. Those purchases, if intentionally made at inflated prices, would inflate the ICE Daily Index price that was calculated based on such prices.

58.    In other words, because the VWAP of the dailies-market trades set the ICE index, Barclays' flattening of its physical contractual positions in the dailies contracts market allowed Barclays to impact ICE index settlements and benefit its related financial positions, which either paid or received the ICE Daily Index at settlement.

59.    Barclays flattened its physical contracts positions by trading dailies contracts in order to increase or lower the ICE Daily Indices at those points. Put simply, Barclays purchased and sold dailies contracts not in an attempt to profit from the relationship between the market fundamentals of supply and demand, but rather for the manipulative purpose of impacting the ICE Daily Index price at particular points so that Barclays' financial positions at those points would benefit.

60.    Barclays' traders' flattening of their physical contracts positions in the dailies was uneconomic, consistently losing money on a stand-alone basis. Barclays' dailies contract trading during months of manipulation lost money at an average of $117,400 per month, and total net losses from dailies trading in months Barclays manipulated exceeded $4 million.

### E.    RELEVANT MARKETS UNREASONABLY RESTRAINED AND MONOPOLIZED OR ATTEMPTED TO BE MONOPOLIZED

61.    The relevant markets which Barclays unreasonably restrained and monopolized, or attempted to monopolize, are the markets for determining the Daily Index Prices for the hubs, locations, products and periods set forth in FERC Table 1, attached hereto as Exhibit A, ("Relevant Markets"), which index dictated the daily prices for the sale of electricity under pre-

existing contracts that settled against such Daily Index Prices and for making payments due under pre-existing financial contracts that settled against such Daily Index Prices.

### F.   THE ENERGY CONTRACTS BARCLAYS ENTERED INTO UNREASONABLY RESTRAINED COMPETITION IN THE RELEVANT MARKETS

62.   As stated above, the ICE Daily Index swap contracts and daily contracts entered into by Barclays operated to unreasonably restrain trade in the Relevant Markets.  The ICE Daily Index swap contracts were essential to Barclays' manipulative and anticompetitive scheme in that they enabled Barclays to agree to money-losing daily contracts which manipulated the ICE Daily Index. Specifically, they compensated Barclays for refraining from engaging in conduct dictated by the normal competitive forces of supply and demand, and instead compensated Barclays for engaging in uneconomic conduct to restrain and corrupt, and which did restrain and corrupt, the normal competitive forces of supply and demand in the markets in which the Daily Index Prices and the contract settlement prices based thereon were determined.

63.   The manipulative scheme described herein had an actual adverse effect on competition as a whole in the Relevant Markets, as evidenced by, inter alia, the FERC Report which found that Barclay's scheme distorted the normal forces of supply and demand which should have driven the Daily Index Prices:

> During the alleged manipulation months, Barclays was not responding to fundamentals in these cash markets but rather was injecting additional buying or selling pressure to move the daily cash settlement at these locations. Barclays' own witnesses and internal compliance presentations recognized that uneconomic trading was manipulative activity, and this evidence supports staff's conclusion that Barclays' cash trading constitutes fraud. Because Barclays' cash trading was not responding to market fundamentals but rather was designed to move the daily index settlements in directions that benefited Barclays' financial swap positions, staff concludes that Barclays' cash trading in the alleged manipulation months constitutes a fraudulent device, scheme, or artifice.

FERC Report at 37 (footnotes omitted).

64.     As stated in paragraph 8 above, the FERC Report also stated that Barclays caused pecuniary losses to other market participants of at least $139.3 million from its manipulative and anticompetitive scheme.  According to FERC, this $139.3 million amount reflects its estimate of the amounts which certain holders of pre-existing contracts that settled against the ICE Daily Index prices paid in supracompetitive prices or received in subcompetitive prices, as the case may be, in the Relevant Markets as a result of Barclays' manipulation of the ICE Daily Index prices.

65.     Barclays' scheme of acquiring substantial ICE Daily Index swap contracts, and thereafter engaging in artificial, uneconomic and money-losing purchases or sales of dailies contracts at intentionally inflated or deflated prices in the dailies markets to benefit such swap contracts interfered with the normal forces of supply and demand in those markets and injected false and non-competitive prices into the markets for determining Daily Index Prices which were intended to be based exclusively on freely-competitive market transactions entered into pursuant to the normal competitive forces of supply and demand in the Relevant Markets.  By reason of such interference with and destruction of competitive market forces in the Relevant Markets, Plaintiff and the members of the Plaintiff Class have been injured. There were no procompetitive benefits of Barclays' scheme.

### G.     BARCLAYS WILLFULLY ACQUIRED AND MAINTAINED MONOPOLY POWER AND ENGAGED IN ANTICOMPETITIVE CONDUCT WITH A SPECIFIC INTENT TO MONOPOLIZE

66.     Barclays' traders intentionally engaged, on behalf of Barclays, in their unlawful course of conduct from 2006 to 2008 to acquire and maintain monopoly power over, or to attempt to monopolize, the Daily Index Prices which dictated the daily prices payable under pre-existing

contracts that settled against the Daily Index Prices during the 35 product months for the four trading locations listed in FERC Table 1 (Exhibit A hereto).

67.     In essence, by establishing a large position in swap contracts which would reap profits from a change in the ICE Daily Index prices, which profits were greater than the losses Barclays would suffer from its purchase or sale of underlying dailies contracts intended to manipulate the resulting ICE Daily Index prices, and by intentionally engaging in such money-losing purchases and sales of the underlying dailies contracts in order to manipulate the resulting Daily Index prices in their favor,  Barclays' traders intentionally acquired and utilized the power to effect increases or decreases in the ICE and the Dow Jones Daily Index Prices and thereby the prices under all contracts that settled against such Daily Index Prices, and Barclays did effect such anticompetitive increases or decreases, causing direct injury to Plaintiff and the members of the Plaintiff Class.  Barclays' traders therefore acted willfully and with specific intent in acquiring and maintaining monopoly power or in attempting to monopolize the Relevant Markets.

68.     Barclays' traders knew their dailies trading was losing money and that it would prevent free market forces from operating in the Relevant Markets, but they were willing to accept such losses because the uneconomic dailies trading was part of their manipulative scheme to acquire and maintain monopoly power over Daily Index Prices to benefit their related financial positions.

69.     This willfulness and intent of Barclays is further demonstrated through direct evidence, such as emails and Instant Messages ("IMs"), suspicious timing or repetition of transactions, execution of transactions benefiting derivative positions, and trading which would be economically irrational but for the manipulative scheme.  Barclays' traders coordinated their individual and collective actions in furtherance of the manipulative scheme.

70.     There are numerous written communications demonstrating Barclays' traders' knowing participation in the manipulative scheme. These communications are described in detail in the FERC Report. *See* 39-58.  The communications not only describe and substantiate the scheme, but also demonstrate the affirmative, coordinated, concerted, and intentional effort among the Barclays' traders individually and collectively to carry out the scheme.

71.     On November 3, 2006, Smith bragged in an IM to a colleague about how he successfully traded dailies on ICE to move the PV (Palo Verde) peak index up: "I totally fuckked [sic] with the Palo [i.e., PV] m[a]rk[e]t today . . . look at my deals on ICE[.]"  His colleague subsequently asked Smith "how far did you move the index," to which Smith replied "not too far. it had already t[ra]ded about 1200 mws .... shoulda started earlier, but my goal was to keep the sp/palo tighter [.]" Smith's colleague responded "its [sic] trading way in now," to which Smith responded "I know. I just started lifting the piss out of the palo." FERC Report at 39.

72.     Smith's statement that he "totally fuckked [sic] with" the PV market referred to his dailies trading in the PV peak market that day.  Smith, along with Levine, "added significant buying pressure to the PV peak market this day by purchasing a net of 325 MW/h at escalating prices." FERC Report at 40.  Barclays' dailies trading of PV peak electricity this day lost $2,388. Staff Report at 39 - 40. Smith's statement that his "goal was to keep the sp/palo tighter" reveals that the purpose of his dailies trading was to benefit a financial spread position held by Barclays by compressing prices between SP and PV.

73.     On November 9, 2006, Smith told Brin that he "sold a bunch of index cause I'm long palo and that sp/palo keeps getting wider, so I *was* trying to prop up the palo index.  I think it worked well too[.]"

74.     Smith's statement that the "sp/palo keeps getting wider" refers to the SP/PV spread widening and adversely affecting Barclays' long PV financial position.  Smith's statement that he "sold a bunch of index [be]cause [he was] long palo" reveals that the intent of his index sales was to enable Smith to flatten the index position with dailies purchased at PV to benefit Barclays' long financial position at PV, i.e., by "prop[ping] up the [PV] index "through purchases in the PV dailies market.

75.     On November 30, 2006, Brin, in a discussion with a friend at another company, explained that Connelly set up physical contractual positions opposite to his financial positions so that Barclays could trade dailies to benefit the financial positions.  Brin told his friend "its [sic] weird b[e]c[ause] some hubs [Connelly] is oppiste [sic] fin[ancial] /phys[ical], im [sic] doing phys[ical] so i [sic] am trying to drive price in fin[ancial] direction[.]"  Brin explained that Connelly's benefitting financial positions were "much bigger" than the physical contractual positions Brin was flattening.  FERC Report at 47-48.

76.     In this IM, Brin summarizes Barclays' manipulative scheme of setting up opposite financial and physical contractual positions and then trading dailies to benefit the financial positions, i.e., "im [sic] doing phys[ical] so i [sic] am trying to drive price in fin[ancial] direction."

77.     On October 11, 2006, a broker who did work for Connelly and Levine asked Levine "why do you guys trade this stuff."  Levine interpreted "stuff" to mean physical index products. She  responded by saying "we were just having the same conversation."  The broker then posited two reasons for trading physical index: "to  just flatten out next day ahead positions . . . or to try and beat the index."  Levine later responded by agreeing with those two reasons and offering a third:  "here's my take . . . yes on the flattening a big position, yes on the try to beat index, and also to try to protect a position, either bom or prompt."

78.     Levine's statement to the broker about trading to "protect a position" referred to Barclays' manipulative scheme.  BOM and prompt positions are financial positions that respectively refer to the remainder of the month and the following month.  Both settled off the ICE index. Trading index when Barclays held such financial positions allowed Barclays to establish a physical contractual position and then flatten the physical contractual position by trading dailies in the direction of the financial position.  The dailies trading was intended to impact ICE index settlements and benefit, or "protect," Barclays' financial positions.

79.     On December 7, 2006, Smith told Brin "don't buy any sp light index  ... I'm gonna [sic] try to crap on the NP light and it should drive the SP light lower." Brin replied "that is fine."

80.     Smith told Brin not to buy SP off-peak because Smith intended to manipulate the NP off-peak contracts market, which would affect SP off-peak contract prices.  Barclays had financial positions that benefitted from a lower NP off-peak ICE index settlement.  Smith sought to "crap on" the NP off-peak by selling NP off-peak in the dailies to lower the index and benefit Barclays' financial positions.

81.     On December 21, 2006, Smith asked a friend at another company to sell him NP off-peak index.   Smith then told his friend "if you're long NP light I suggest selling it ea[r]ly." Later in the exchange, Smith's friend asked "why you buy index if its [sic] gonna [sic] tank?" to which Smith replied "my lil secret" and "tell you about it later."  Smith then agreed to call his friend on the "bat line," which was a reference to an unrecorded cell phone as opposed to the recorded lines used on trading desks. Staff Report at 41.

82.     In this IM, Smith sought to buy NP off-peak index contracts so that he would be able to sell more NP off-peak dailies contracts to benefit Barclays' short financial position that benefitted from a lower NP off-peak index price.  Smith advised his friend to sell NP off-peak

early if his friend was long because Smith intended his selling activity in the NP off-peak dailies market to lower prices.

83.     Later that day, Smith's friend checked in to see if Smith "cash[ed] in on NP l[igh]t." Smith responded "not too much. did decent vol[ume] and beat [index settlement] by .10 . . . but my goal was more for my B[]OM position . . . didn't want the [off-peak two-day package traded for Christmas] to settle higher than the BOM marks."  Smith then stated "that was pretty low for a [Christmas package] though.  I thought . . . I ran out of NP light [physical power] to sell . . . should [have] done a few more hund[red MW/h of selling in dailies]."

84.     In this IM, Smith again reveals the manipulative intent of his dailies trading.  The "BOM" position Smith referenced was Barclays' financial position that benefitted from Smith's trading in the NP off-peak market.  In stating that his "goal" was for his "BOM position," Smith reveals that he intended his NP off-peak dailies trading to benefit Barclays' financial position.

85.     On January 31, 2007, Levine sent an email to the five main traders on the West Power Desk, including Connelly, Brin, and Smith, about how she would like her positions to be traded while she was out of the office.  In her email, Levine recited a financial position for February 2007 of short at 175 MW/h at SP peak and long 200 MW/h at PV peak and stated  that "[i]f we can keep the PV index up and the SP daily index down somehow that will be good to keep the BOM in."

86.     In this email, Levine asked her colleagues to trade dailies to benefit financial positions. "[K]eep[ing] the BOM in," refers to keeping the BOM spread between SP and PV from expanding so that Levine's short financial position in the SP to PV spread referenced in her email would be more valuable.

87.     Prior to this email, Barclays had short physical contracts and financial positions for SP peak for February 2007.  Before and after the month's trading began, however, Barclays reversed its short physical contracts position in SP peak electricity to a long physical contracts position through daily and BOM index transactions.  This reversal changed the physical contracts position for SP peak from being aligned with Barclays' financial position to being opposite its

financial position, which enabled Barclays to sell dailies to "keep ... the SP daily index down" as Levine requested.  Similarly, Barclays also reversed its physical contracts position at PV from being aligned with its financial position to being opposite on two days around this time to enable Barclays to buy dailies to "keep the PV index up."

88.     On February 28, 2007, Connelly personally traded MIDC peak dailies, an event which was unusual given his role as a term trader and desk head and which required him to arrive at work earlier than usual.  Connelly's trading engendered commentary in the market.  A former colleague remarked to Connelly that the market was a "shitshow[.]"  Connelly replied "crazy – i love it . . . your boy started crying this morning . . . he sent me an ice message -said he wass [sic] calling FERC ... lol [laughing out loud]."  FERC Order Assessing Penalties at PP 101-102; Staff Report at 54-55.  On this day, Connelly had a financial position that was opposite to the physical contracts position he was flattening in the dailies.  The flattening of that physical contracts position in the dailies generated losses exceeding $40,000.

89.     Later that day, the same former colleague again contacted Connelly.  Connelly revealed he was aware that his trading could move the daily index settlement.  After the former colleague asked Connelly if he was "going to have fun with the index all month[,]"  Connelly replied "no -it isn't going to affect much."

90.     On March 8, 2007, Brin observed what he believed to be manipulative trading by another market participant.  Brin told a friend in an IM conversation that the trading he witnessed "has to be someone wanting to push down index [settlement] tomorw [sic], loading up today to sell it in the mor[n]ing?"  Brin was familiar with such a manipulative strategy because it was the same manipulative strategy employed by Barclays.

91.     On March 21, 2007, Smith told Brin in an IM that he "think[s] [Levine] wants you to run the off peak up (she's long [financially]) not sure why she doesn't do more [dailies]. prob[ably] doesn't want to take the loss daily and pay all the bro[kerage fees.]"  In this IM, Smith discussed Barclays' manipulation of the MIDC off-peak index in March 2007 to benefit a long

financial position at MIDC.  Smith's statement about 'tak[ing] the loss daily" recognized that Barclays' dailies trading was uneconomic.

92.     Later that day, Brin and Smith continued their IM conversation about how Levine wanted their help in manipulating the MIDC off-peak market with Brin saying "she is getting killed on that midc 11, she really wanted someone to try and prop it up." *Id.* at 45.  Brin's statement about Levine "getting killed" referred to Levine's long financial position losing value when the MIDC off-peak index settled lower as the month progressed.  Brin's statement that Levine 'wanted someone to try and prop it up" referred to Levine wanting Barclays' traders to purchase large volumes in the MIDC off-peak  dailies market to impact the index and benefit Levine's financial position.

93.     On the following day, March 22, 2007, Brin and Smith continued to discuss by IM Levine's intent to manipulate the MIDC off-peak market.  In response to Smith's question  of "why does [Levine] tell me to do stuff," Brin responded "b[e]cause she wants to marks [sic] on trades but doesnt [sic] want them herself ... just like she didnt [sic] want daily loss trading midc [off-peak] in her book so  wanted us to trade it." *Id.* at 45-46.  Brin's statement about Levine not wanting a "daily loss" trading MIDC off-peak again referred to the flattening of physical contracts positions in the dailies market losing money.

94.     On April 2, 2007, Levine emailed a colleague, Monal Dhabliawala, about how to trade her positions  while she was out of the office.  Levine told her colleague that "[i]f you can sell a bunch of [PV] index that would be  good to keep the price up."  Order Assessing Civil Penalties at P 92; Staff Report at 52.  Levine's statement about selling index to keep the price up referred to Barclays' flattening of index sales with dailies purchases to impact the index settlement and benefit Barclays' financial position.

95.     In response to Levine's April 2, 2007 email or other conversations with Levine, traders other than Dhabliawala, who was in the process of leaving Barclays, acted on Levine's request to sell index and buy it back in the dailies to keep the PV index settlement price up.  Order Assessing Civil Penalties at P 92; Staff Report at 52.

96.     On July 6, 2007, a trade publication produced by the Western Power Traders Forum called "The Friday Burrito" published a piece stating that "there is a specter haunting the daily screens for those trading physical power in the West. . . . [I]t's clear that people were wondering about large physical positions in the [dailies] market.  What the hell is going on out there?  I don't know what is going on, and the worst thing possible would be one party trying to move the financial markets with large physical positions."

97.     On July 8, 2007 at 7:20 PM, a Sunday night, Connelly sent a lengthy email to the author of "The Friday Burrito" providing numerous purported explanations for the large physical trading volumes.  FERC Report at 56-57.

98.     Connelly's purported explanations for the reasons behind the increase in cash trading volumes were false.  Connelly knew that Barclays was responsible for the increase in cash trading volumes and that it was engaged in the manipulative scheme mentioned in "The Friday Burrito" of "trying to move the financial markets with large physical positions."  Connelly knew the explanations he provided to the author were false, knew that people were talking about him and Barclays manipulating the western U.S. electricity markets, and knew that Barclays had been notified days before that FERC was beginning an investigation.  In his email, Connelly requested that the author of the "Friday Burrito" publish his explanation anonymously.

99.     Barclays' unlawful and predatory intent is also demonstrated by the repeated and avoidable cash trading losses Barclays' traders incurred by flattening the physical contracts positions they had built.

100.     During the months Barclays employed the manipulative scheme, Barclays consistently incurred losses in the dailies trading to flatten their physical contracts positions, net losses which, as stated above, totaled over $4 million.

101.     Barclays' traders individually recognized and accepted that the loss-generating flattening of their physical contracts positions in the dailies was part of the manipulative scheme.

102.     On certain mornings before cash trading began, Barclays' traders increased their physical contracts positions by buying or selling BOM or daily index so that they could trade even

larger volumes of dailies. These BOM or daily index transactions added to the size of Barclays' existing physical contracts position and increased the difficulty of flattening that position profitably.

103.    Barclays' traders at times also reversed existing physical contracts positions to create new physical contracts positions opposite to Barclays' financial positions, thus allowing Barclays to trade dailies in the direction to benefit those financial positions.

104.    Barclays' traders flattening of the physical contracts positions through dailies trading was economically irrational but for Barclays' traders' manipulative scheme and thus also demonstrates their willful monopolistic and anticompetitive intent.

105.    Connelly frequently allowed Brin, Levine, and Smith to transfer the losses from flattening physical contracts positions in the dailies to trading books controlled by him.  Brin, Levine, and Smith transferred or caused to be transferred over $1.4 million of these losses to books controlled by Connelly. Order Assessing Civil Penalties at ¶ 63 n.203; Staff Report at 59.

106.    Brin, Levine, and Smith would not have traded in or transferred losses to books controlled by Connelly without his permission.  Rather, Connelly authorized Brin, Levine, and Smith to transfer the losses incurred from flattening the physical contracts positions in the dailies market to his books or to trade directly in his books.

107.    Barclays' traders knew their scheme was unlawful.

108.    Barclays' compliance documents and training presentations emphasized the need to avoid uneconomic trading to benefit another position, whether physical contracts or financial in nature.

109.    One document summarized uneconomic trading by saying "Uneconomic trading or other market activities (i.e. trades or market conduct that viewed in isolation appear to lack economic sense) may be alleged to evidence intent to manipulate market prices." The first example provided of uneconomic trading was "Intentionally entering into unprofitable trades in order to affect the price of larger volumes of positions held by the firm in the same commodity or derivative." Another compliance document, in explaining a "Prohibited

Activity," warned traders to "not intentionally create a loss in one position to generate a greater benefit in another position in the same or correlated commodities."

110.    Barclays' traders also had been warned by Joseph Gold, Barclays' Managing Director and Head of Commodities, Americas, that uneconomic trading was unacceptable.  Mr. Gold stated that "Uneconomic trading activity was something which I tried to make sure was very clear to all the traders ... The golden rule was always, under no circumstances, lose money on a transaction  for the intention  of making money on another transaction . . . ." Order Assessing Civil Penalties at ¶ 66; Staff Report at 2.

111.    Through its trading scheme, which entailed the trading of dailies contracts at artificially inflated or deflated prices, Barclays traders captured market share sufficient to move index prices in Barclays's favor on the major Western trading hubs, as demonstrated by, *inter alia*, the evidence discussed above, which shows that the Barclays traders themselves understood that they traded daily contracts in volumes and at artificially-inflated or deflated prices sufficient to move market prices in their favor as a result of their anti-competitive conduct.

## H.    ANTITRUST INJURY

112.    As a result of Barclays' interference with and destruction of competition in violation of Section 1 and Section 2 of the Sherman Act through its course of conduct described above, Plaintiff and the members of the Plaintiff Class have been injured in their business or property in the form of paying higher and supracompetitive market-derived prices for electricity under pre-existing contracts that settled based on the market-derived Daily Index Prices which Barclays manipulated, and the other members of the Plaintiff Class have been injured in their business and property during the Class Period in the form of paying higher and supracompetitive market-derived prices, or receiving lower and subcompetitive market-derived prices, as the case may be, under pre-existing contracts that settled based on the market-derived Daily Index Prices which Barclays manipulated during the Class Period. This injury resulted directly from Barclays' intentional interference with the normal competitive forces of supply and demand which otherwise

would have and should have set the prices in the Relevant Markets in the absence of Barclays' wrongful conduct.

## I.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

113.   Barclays concealed its wrongdoing in restraining trade and acquiring and maintaining monopoly power or attempting to obtain monopoly power over the Relevant Markets by manipulating the prices for dailies futures contracts, daily indices, and daily-indexed contracts. Prior to FERC's Staff's April 5, 2012 public notice of alleged violations by Barclays for the course of conduct described herein, Plaintiff did not discover,  and could not with reasonable due diligence have discovered, facts indicating Barclays was engaged in the misconduct alleged herein.

114.   Application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiff and members of the Plaintiff Class. Plaintiff had no knowledge of the unlawful conduct alleged in this Complaint, or of  any facts that could or would have led to the discovery thereof, until at least on or after April 5, 2012.

115.   By its very nature, as alleged herein, the unlawful activity that Barclays  engaged in was  self-concealing. The nature, existence and extent of such unlawful activity could only be discerned and uncovered by access to Barclays' emails and detailed review by qualified experts of immense amounts of non-public data from a variety of sources.

116.   Barclays engaged in specific and calculated acts to conceal their manipulative conduct as alleged herein and to attempt to avoid detection. For example, as set forth above, on July 6, 2007, a trade publication produced by the Western Power Traders Forum called "The Friday Burrito" published a piece stating that "there is a specter haunting the daily screens for those trading physical power in the West. . . . [I]t's clear that people were wondering about large physical positions in the [dailies] market.  What the hell is going on out there?  I don't know what is going on, and the worst thing possible would be one party trying to move the financial markets with large physical positions."  On July 8, 2007 at 7:20 PM, a Sunday night, Barclays' employee

and trader Scott Connelly sent a lengthy email to the author of "The Friday Burrito" providing numerous false and misleading explanations for the large physical trading volumes. Connelly's purported explanations for the reasons behind the increase in cash trading volumes were false. Connelly knew that Barclays was responsible for the increase in cash trading volumes and that it was engaged in the manipulative scheme of "trying to move the financial markets with large physical positions." Connelly knew the explanations he provided to the author were false, knew that people were talking about him and Barclays manipulating the western U.S. electricity markets, and knew that Barclays had been notified days before that FERC was beginning an investigation. In his email, Connelly requested that the author of the "Friday Burrito" publish his explanation anonymously.

117.    Because Barclays employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the members of the Plaintiff Class and Sub-Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on April 5, 2012.

118.    For these reasons, among others including those alleged herein and presently unknown to Plaintiff and members of the Plaintiff Class and Sub-Class, the statute of limitations applicable to Plaintiff and the Plaintiff Class' and Sub-Class claims was tolled and did not begin to run until after April 5, 2012.

## V.    CLASS ALLEGATIONS

119.    Plaintiff brings this action on behalf of itself, and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class consists of: Any individual or entity that held any contract which settled against the ICE or Dow Jones published daily index prices for peak or non-peak power at either Mid-Columbia, Palo Verde, South Path 15 or North Path 15 between November 1, 2006 to December 31, 2008 (the "Class Period"), and was damaged by movements in such index prices caused by Barclays' unlawful scheme (the "Plaintiff Class").  Excluded from the Plaintiff Class are Barclays and any parent, subsidiary, affiliate, agent or employee of Barclays.

120.    Plaintiff also brings this action on behalf of a Sub-Class of Class members who reside or are incorporated in California.

121.    The Plaintiff Class and Plaintiff Sub-Class are so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiff is informed and believes that more than one hundred geographically dispersed Class and Sub-Class members held the relevant contracts during the Class Period.

122.    Common questions of law and fact exist as to all members of the Plaintiff Class and Plaintiff Sub-Class and predominate over any questions that affect only individual members of the Plaintiff Class and Plaintiff Sub-Class.  These common questions of law and fact include, without limitation:

a.    Whether the contracts Barclays entered into in furtherance of the manipulative scheme described herein unreasonably restrained competition in the Relevant Markets;

b.    Whether Barclays acquired or attempted to acquire monopoly power over the Daily Index Prices set in the Relevant Markets in violation of the Sherman Act;

c.      Whether Barclays is liable to the members of the Sub-class under California Business and Professions Code §17200 *et seq.*

d.      Whether such injury or the extent of such artificiality in price may be established by common, class-wide means, including, for example, econometric formula, or other economic tests;

e.      Whether Barclays unjustly enriched itself or is otherwise responsible for disgorgement/restitution under applicable state law;

f.      The operative time period and extent of Barclays' violations; and

g.      The appropriate relief.

123.   Plaintiff's claims are all typical of the claims of the members of the Plaintiff Class and Plaintiff Sub-Class.  Plaintiff and all members of the Plaintiff Class and Plaintiff Sub-Class sustained damages arising out of Barclays' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Plaintiff Class and Plaintiff Sub-Class were directly caused by Barclays' wrongful conduct in violation of law as alleged herein.

124.   Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class and Plaintiff Sub-Class.  Plaintiff is an adequate representatives of the Plaintiff Class and Plaintiff Sub-Class and has no interests which are adverse to the interests of absent Class or Sub-Class members.  Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation, energy market manipulation, Sherman Act Section 1 and Section 2 litigation, and class action litigation in general.

125.   A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Plaintiff Class or members of the Plaintiff Sub-Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Barclays.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### (Contracts in Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

126.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

127.    The contracts entered into by Barclays which included the ICE Daily Index swap contracts (and other similar Daily Index-based financial contracts) and daily contracts unreasonably restrained trade in the Relevant Markets, i.e., the markets for determining the Daily Index Prices for the hubs, products and periods set forth in FERC Table 1, which dictated the daily prices for the sale of electricity under pre-existing contracts that settled against such Daily Index Prices and for making payments due under pre-existing financial contracts that settled against such Daily Index Prices. Barclays' entering into such contracts did unreasonably restrain and corrupt the normal competitive forces of supply and demand in the markets in which the Daily Index Prices and contract settlement prices were determined. The ICE Daily Index swap contracts were integral to the restraint of trade as they compensated Barclays for refraining from engaging in conduct dictated by the normal competitive forces of supply and demand, and instead compensated Barclays for engaging in uneconomic conduct to restrain and corrupt

the normal competitive forces of supply and demand in the markets in which the Daily Index Prices and contract settlement prices were determined.  By virtue of these contracts, Barclays had substantial market power in the Relevant Markets.  Under the circumstances of these contracts, there were no offsetting pro-competitive purposes or effects sufficient to render the restraints of trade caused by these contracts to be reasonable.

128.    The wrongful acts and course of conduct of Barclays suppressed competition in the Relevant Markets.

129.    Such contracts in restraint of trade or commerce violated Section 1 of the Sherman Act.

130.    As a result of such violation, Plaintiff and the members of the Plaintiff Class have been injured in their business or property as alleged herein, including but not limited to as alleged in paragraph 112.

### COUNT II
**(Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

131.    Plaintiff re-alleges and incorporates all other paragraphs of this Complaint as though set forth herein.

132.    A market is monopolized when a party possesses monopoly power and that monopoly power has been wilfully acquired or maintained by anticompetitive conduct.

133.    Barclays acquired and maintained monopoly power in the Relevant Markets not through competition on the merits but through the anticompetitive course of conduct alleged herein. It was repeatedly able to override the competitive setting of Daily Index Prices to manipulate them in favor of its large positions in swap contracts, the value of which depended on the value of the Daily Index.  Specifically, Barclays knowingly entered into swap contracts which would benefit from movements in the Daily Index Prices and thereafter engaged in money-losing purchases and

sales of daily contracts for the hubs, products and periods set forth in FERC Table 1 to artificially change the Daily Index Prices and prevent them from being determined by the normal forces of supply and demand which otherwise would have determined such prices in the absence of Barclays' wrongful conduct.  It exercised its monopoly power in order to, and did, control and manipulate the Daily Index Prices during the product months and at the hubs listed on FERC Table 1 in Barclays' favor as desired,  and thereby make overall greater profits from the manipulation of the Daily Index Prices.

134.    Through its wrongful conduct as alleged herein, Barclays willfully acquired, maintained and exercised the power to profitably increase or decrease the Daily Index Prices in the Relevant Markets, and Barclays did profitably increase or decrease such Daily Index Prices, in violation of Section 2 of the Sherman Act.

135.    The areas of trade or commerce which Barclays monopolized and which were unreasonably restrained were the markets for determining the Daily Index Prices for the hubs, products and periods set forth in FERC Table 1, which monopolization prevented a competitive setting of daily prices for the sale of electricity under pre-existing contracts that settled against such Daily Index Prices and the prices payable under financial contracts that settled against such Daily Index Prices.  During the Class Period, prices under contracts that settled against or were tied to the Daily Index Prices at the manipulated locations during the Class Period did not result from legitimate market information, supply factors, and demand factors.  On the contrary, the prices were manipulated by Barclays' misconduct as detailed above.

136.    As a result of Barclays' unlawful course of conduct in violation of Section 2 of the Sherman Act as set forth herein, Plaintiff has been injured in its business or property as alleged herein, including but not limited to as alleged in paragraphs 112.

## COUNT III
**(Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

137.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

138.    This Count is pled as an alternative to Count II.

139.    An attempt to monopolize occurs when a person (a) engages in anticompetitive conduct (b) with a specific intent to monopolize (c) presenting a dangerous probability of achieving monopoly power.

140.    The manipulative course of conduct engaged in by Barclays described herein was anticompetitive in that it prevented the Daily Index Prices from being set by competitive forces by engaging in money losing daily contract transactions which losses it recouped through profits on its swap contracts that were dependent on the Daily Index values.

141.    Barclays had a specific intent to monopolize the Relevant Markets as evidenced by the communications among Barclays traders described above as well as the nature of their trading strategy, as herein alleged.

142.    Such course of conduct had a dangerous probability of achieving monopoly power over the Relevant Markets.  By such conduct, Barclays was able to prevent the Daily Index Prices from being set by freely-competitive forces during 35 product months over a three year period for four of the most significant trading locations in the western U.S. at the time.

143.    Through its course of conduct Barclays, at a minimum, attempted to monopolize the Daily Index Prices in the Relevant Markets, in violation of Section 2 of the Sherman Act.

144.    As  a result of such violation, Plaintiff and the members of the Plaintiff Class have been injured in their business or property as alleged herein, including but not limited to as alleged in paragraph 112.

## COUNT IV
### (Violation of California Business & Professions Code Section 17200, et. seq., )

145.    Barclays' unfair, unconscionable, deceptive or fraudulent acts and practices described in this Complaint directly and proximately caused and were intended to cause Plaintiff and the members of the Plaintiff Sub-Class to pay higher supra-competitive prices, or receive lower and subcompetitive market-derived prices, as the case maybe, under pre-existing contracts that settled based on market-derived Daily Index Prices which Barclays manipulated.  During the Class Period, prices under contracts that settled against or were tied to the Daily Index Prices at the manipulated locations during the Class Period did not result from legitimate market information, supply factors, and demand factors.  On the contrary, the prices were manipulated by Barclays' misconduct as detailed above.

146.    Barclays' unfair, unconscionable, deceptive or fraudulent acts and practices described in this Complaint are in violation of California's consumer protection and unfair competition statute, Business and Professions Code §17200 *et seq.*

147.    As a direct and proximate result of Barclays' unlawful conduct, the members of the Plaintiff Sub-Class have been injured in their business and property as alleged herein.

148.    The Plaintiff Sub-Class members seek restitution and/or monetary recoveries permitted under California law as referenced herein for these injuries.

## COUNT V
### (Unjust Enrichment)

149.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

150.    Barclays has been unjustly enriched as a result of the conduct complained of herein.

151.    It would be inequitable for Barclays to retain the benefit of illicitly obtained monies that were obtained at the expense of the Plaintiff Class members as alleged herein.

152.    Plaintiff and the members of the Class seek restitution with respect to, and/or disgorgement of all illicitly obtained monies and profits obtained by Barclays through its willful acts either as damages or restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against Barclays as follows:

a.    Certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiff as Class Representative and its counsel as Class Counsel in this action;

b.    Adjudging and decreeing that Barclays has engaged in conduct in violation of Sections 1 and  2 of the Sherman Act, 15 U.S.C. §§1 and 2, as well as California Business and Professions Code §17200 *et seq.*;

c.    Awarding against Barclays the damages that Plaintiff and the other members of the Plaintiff Class and Sub-Class have suffered as a result of Barclays' violations, the amount of such damages to be determined at trial, trebled, plus interest, costs and attorneys' fees;

d.    Awarding against Barclays restitution of amounts unlawfully taken from Plaintiff and all other Sub-Class members in connection with Barclays' unlawful scheme in violation of California Business and Professions Code Section 17200, et., seq.;

e.      Awarding Plaintiff and the Class members the amount Barclays is determined to have been unjustly enriched through its unlawful scheme; and

f.      Awarding Plaintiff and the Class members such other and further relief to which they may be legally entitled and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  June 23, 2015

Respectfully submitted,

Jeffrey A. Klafter
KLAFTER OLSEN & LESSER LLP
2 International Drive. Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200

Solomon B. Cera
Louis A. Kessler
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230

Daniel J. Sponseller
LAW OFFICE OF DANIEL J. SPONSELLER
409 Broad Street
Suite 200
Sewickley, PA 15143
Telephone: (412) 741-4422

Eric L. Christensen
CAIRNCROSS & HEMPELMANN
524 Second Ave., Suite 500
Seattle, WA 98104-2323
Telephone: (206) 254-4451

*Attorneys for Plaintiff and the Proposed Class*