UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
MERCED IRRIGATION DISTRICT, on behalf   :    No. 1:15-cv-04878-VM-GWG
of itself and all others similarly situated,           :
                                                          :
                                    Plaintiff,         :    ECF Case
                                                          :
v.                                                        :
                                                          :
BARCLAYS BANK PLC,                              :
                                    Defendant.      :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**<u>TO DEFENDANT'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF RELEVANT FACTS ................................................................... 1

ARGUMENT ............................................................................................................. 4

I.     THE COMPLAINT ADEQUATELY PLEADS A SECTION 1 CLAIM ......................... 5

    A.    Merced Has Adequately Alleged the Existence of Contracts In Restraint of Trade ...................................................................................... 5

    B.    Merced Has Adequately Alleged That The ICE Daily Index Swap Contracts and The ICE Daily Contracts Resulted in An Unlawful Restraint of Trade ................ 7

    C.    Merced Has Adequately Alleged Anticompetitive Effects in the Relevant Markets ...................................................................................... 9

II.    THE COMPLAINT ADEQUATELY PLEADS A SECTION 2 CLAIM ......................... 11

    A.    Monopoly Power or a Dangerous Probability of Achieving Monopoly Power Is Adequately Alleged ............................................................ 11

    B.    The Complaint Adequately Alleges that Barclays Engaged in Anticompetitive Conduct to Create or Sustain Its Monopoly Power ....................... 15

III.    MERCED HAS ADEQUATELY PLED ANTITRUST STANDING ............................ 17

IV.    THIS ACTION WAS TIMELY FILED .......................................................... 19

V.    MERCED HAS PROPERLY PLED A CALIFORNIA UNFAIR COMPETITION LAW CLAIM .............................................................................................. 22

VI.    MERCED HAS PROPERLY PLED AN UNJUST ENRICHMENT CLAIM ................ 24

CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*7 West 57th St. Realty Co. v. Citigroup, Inc.*
    2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ................................................. 21

*Abbatiello v. Monsanto Co.*
    522 F. Supp. 2d 524 (S.D.N.Y. 2007) ........................................................... 24

*Allergan, Inc. v. Athena Cosmetics, Inc.,*
    640 F.3d 1377 (Fed. Cir. 2011) .............................................................. 22, 23

*Aryeh v. Canon Bus. Solutions, Inc.*
    292 P.3d 871 (Cal. 2013) ............................................................................. 23

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
    472 U.S. 585 (1985) ..................................................................................... 15

*Atlantic Richfield Co. v. USA Petroleum Co.*
    495 U.S. 328 (1990) ..................................................................................... 18

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ....................................................................................... 4

*Broadcom Corp. v. Qualcomm Inc.*
    501 F.3d 297 (3d Cir. 2007) ......................................................................... 11

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*
    429 U.S. 477 (1977) ..................................................................................... 18

*Cal. ex rel. Harris v. Safeway, Inc.*
    651 F.3d 1118 (9th Cir. 2011) ........................................................................ 8

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*
    996 F.2d 537 (2d Cir.1993) ............................................................................ 9

*Chambers v. Time Warner, Inc.*
    282 F.3d 147 (2d Cir. 2002) ........................................................................... 4

*Citizen Publ'g. Co. v. United States*
    394 U.S. 131 (1969) ....................................................................................... 8

*Clayworth v. Pfizer, Inc.*
    49 Cal. 4th 758 (2010) ................................................................................. 22

*Crimpers Promotions Inc. v. Home Box Office, Inc.*
    724 F.2d 290 (2d Cir. 1993) ......................................................................... 18

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy*, LLP
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) .......................................................... 13

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*
    872 F. Supp. 81 (S.D.N.Y. 1995) ............................................................... 5, 6

*FERC v. Barclays Bank PLC*
    No. 2:13-cv-2093-TLN-DAD, 2015 WL 2448686 (E.D. Cal. May 19, 2015) .................. 4

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*
    711 F.3d 68 (2d Cir. 2013)............................................................................ 17

*Grynberg v. ENI S.P.A.*
    No. 06 Civ. 6495 RLC, 2009 WL 2482181 (S.D.N.Y. Aug. 13, 2009) .......... 25

*Heerwagen v. Clear Channel Commc'ns*
    435 F.3d 219 (2d Cir. 2006).................................................................... 11, 12

*Hinds County, Mississippi v. Wachovia Bank N.A.*
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)............................................................ 22

*In re Adderall XR Antitrust Litig.*
    754 F.3d 128 (2d Cir. 2014)............................................................................ 15

*In re Aluminum Warehousing Antitrust Litig.*
    95 F. Supp. 3d 419 (S.D.N.Y. 2015)................................................... 7, 17, 18

*In re Canon Cameras Litig.*
    2006 WL 1751245 (S.D.N.Y. 2006)............................................................... 25

*In re Copper Antitrust Litigation*
    98 F. Supp. 2d 1039 (W.D.Wis. 2000) .......................................................... 19

*In re Crude Oil Commodity Futures Litig.*
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)........................................... 12, 13, 16, 19

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*
    74 F. Supp. 3d 581 (S.D.N.Y. 2015).............................................................. 9

*In re Initial Pub. Offering Sec. Litig.,*
    383 F. Supp. 2d 566 (S.D.N.Y. 2005).............................................................. 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................ 9, 21

*In re Natural Gas Commodity Litig.*
    337 F. Supp. 2d 498 (S.D.N.Y. 2004)............................................................ 20

*In Re Term Commodities Cotton Futures Litig.*
    No. 12 Civ. 5126 (ALC), 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ........ 14

*In re Tobacco Cases II*
    240 Cal. App. 4th 779 (2015) ........................................................................ 22

*Kaye v. Grossman*
    202 F.3d 611 (2d Cir. 2000)........................................................................... 24

*Kwikset Corp. v. Superior Court*
    51 Cal. 4th 310 (2011) ................................................................................... 22

*Law Offices of Matthew Higbee v. Expungement Assistance Servs.*
    214 Cal. App. 4th 544 (2013) ................................................................... 22, 23

*Loeb Indus. Inc. v. Sumitomo Corp.*
    306 F.3d 469 (7th Cir. 2002) ......................................................................... 19

*McCracken v. Verisma Systems, Inc.*
No. 14-cv-6248 MAT, 2015 WL 5510367 (W.D.N.Y. Sept. 16, 2015) .......................... 24

*McGahee v. Northern Propane Gas Co.*
858 F.2d 1487 (11th Cir. 1988) ................................................................................. 13

*McGhan v. Ebersol*
608 F. Supp. 277 (1985) ........................................................................................... 25

*Meredith Corp. v. SESAC, LLC*
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ............................................................................ 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*
221 A.D. 2d 284, 634 N.Y.S.2d 469 (1ˢᵗ Dep't 1995) .................................................. 24

*National Society of Professional Engineers v. United States*
435 U.S. 679 (1978) ................................................................................................... 6

*Osborn v. VISA Inc.*
797 F.3d 1057 (D.C. Cir. 2015) ................................................................................ 19

*Paramount Film Distrib.Corp. v. State of New York*
30 N.Y.2d 415 (1972) ............................................................................................... 24

*PepsiCo., Inc. v. Coca-Cola Co.*
315 F.3d 101 (2d Cir. 2002) ................................................................................ 12, 13

*Philips v. Ford Motor Co.*
No. 14-cv-2989 LHK, 2015 WL 4111448 (N.D. Cal. July 7, 2015) ............................ 23

*Plumlee v. Pfizer, Inc.*
No. 13-cv-414 LHK, 2014 WL 4275519 (N.D. Cal. Aug. 29, 2014) ............................ 23

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*
507 F.3d 117 (2d Cir. 2007) ..................................................................................... 18

*Procaps S.A. v. Patheon Inc.*
36 F. Supp. 3d 1306 (S.D. Fla. 2014) ......................................................................... 6

*Rio Grande Royalty Co. Inc. v. Energy Transfer Partners, L.P.*
786 F. Supp. 2d 1190 (S.D. Tex. 2009) .............................................................. 14, 16, 18

*Sperry v. Crompton Corp.*
8 N.Y.3d 204 (2007) ............................................................................................ 24, 25

*St. John's University, New York v. Bolton*
757 F. Supp. 2d 144 (E.D.N.Y. 2010) ....................................................................... 24

*Strobl v. N.Y. Mercantile Exch.*
768 F.2d 22 (2d Cir. 1985) ........................................................................................ 7

*Thompson's Gas & Electric Service, Inc. v. BP America Inc.*
691 F. Supp. 2d 860 (N.D. Ill. 2010) ........................................................................ 14

*Todd v. Exxon Corp.*
275 F.3d 191 (2d Cir. 2001) ................................................................................. 9, 10

*Tops Mkts., Inc. v. Quality Mkts., Inc.*
    142 F.3d 90 (2d Cir. 1998)..................................................................... 12, 13

*U.S. v. Visa U.S.A. Inc.*
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ........................................................ 8

*United States Football League v. National Football League*
    842 F.2d 1335 (2d Cir. 1988).................................................................. 12

*United States v. Am. Express Co.*
    88 F. Supp. 3d 143 (E.D.N.Y. 2015) ........................................................ 6, 8

*United States v. First Nat'l Bank & Trust Co.*
    376 U.S. 665 (1964)................................................................................ 5

*United States v. Grinnell Corp.*
    384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)............................ 15

*United States v. Keyspan Corp.*
    763 F. Supp. 2d 633 (S.D.N.Y. 2011)....................................................... 8

*United States v. Socony-Vacuum Oil Co. Inc.*
    310 U.S. 150 (U.S. 1940)......................................................................... 7

*United States v. United States Gypsum Co.*
    438 U.S. 422 (1978)................................................................................ 5

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*
    540 U.S. 398 (2004)................................................................................ 15

*Waldman v. New Chapter, Inc.*
    714 F. Supp. 2d 398 (E.D.N.Y. 2010) ...................................................... 24

**Statutes, Rules and Regulations**

California Business and Professions Code
    §17200.................................................................................................... 1, 22

Sherman Act
    Section 1......................................................................................... *passim*

    Section 2................................................................................... 1, 11, 17

United States Code
    15 U.S.C. §1........................................................................... 1, 5, 9, 11

    15 U.S.C. §2.............................................................................................. 1

**Other Authorities**

3 P. Areeda & D. Turner, Antitrust Law 78 (1978)..................................... 15

## PRELIMINARY STATEMENT

Plaintiff Merced Irrigation District ("Plaintiff" or "Merced") submits this memorandum of law in opposition to the motion to dismiss filed by Defendant Barclays Bank PLC ("Barclays" or "Defendant").[1] Plaintiff brings this action on behalf of itself and a class of individuals and entities damaged by Barclays' unlawful scheme to manipulate the daily index prices for four major electricity trading hubs in the United States. To accomplish this scheme, Barclays employed contracts that unreasonably restrained trade in the markets in which the daily index prices were set. It also acquired and exercised monopoly power over the daily index prices, or attempted to acquire monopoly power over them. Barclays' conduct violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, as well as California Business & Professions Code §17200 *et seq*. The conduct also gives rise to a claim for unjust enrichment. As detailed herein, Defendant's motion to dismiss should be denied because it ignores material allegations in the Complaint, relies on arguments that have been rejected by courts in this Circuit, and misstates relevant law.

## STATEMENT OF RELEVANT FACTS

The Complaint alleges in detail Barclays' anticompetitive scheme to unreasonably restrain trade in the setting of the daily index prices in the four western United States electricity trading hubs through prices published by the Intercontinental Exchange ("ICE") and by Dow Jones Corp. (collectively "Daily Index Prices"). ¶¶1-2.[2] Specifically, Barclays engaged in a three-step scheme during the period November 1, 2006 through December 31, 2008 to unreasonably restrain trade by manipulating the Daily Index Prices for its own pecuniary benefit.

---

[1] Defendant's Memorandum of Law in Support of its Motion to Dismiss is referred to herein as "Def. Mem. at __."

[2] References to "¶__" are to paragraphs of the Complaint, filed June 23, 2015.

1

First, Barclays entered into large fixed-for-floating financial swap contracts whose return was dependent on the Daily Index Prices. ¶¶2, 55.[3] Financial swaps were settled against the Daily Index Prices for the four Western electricity trading hubs. ¶2. FERC Report at 8.[4] Barclays took substantial long or short swap positions, then leveraged those positions by moving the Daily Index Prices on each day of the swap contract period in the direction that would maximize its own profit. ¶2. Second, Barclays took large positions in electricity futures contracts in the opposite direction of its net swap contract positions. ¶55. Third, Barclays "flattened" its futures position by executing a large volume of money losing daily contracts, *i.e.*, contracts for delivery or receipt of physical electricity at a specific trading hub and at a fixed price generally on the following day, to offset its electricity delivery or receipt obligations created by the earlier electricity future contracts. ¶¶45, 56, 57; FERC Report at 6. Barclays flattened its position in the direction required to benefit its own swap contract positions. ¶ 59. FERC Report at 23.

Barclays engaged in anticompetitive conduct by, as FERC found, "inject[ing] false and non-competitive prices into the markets for determining Daily Index Prices." ¶65. As alleged by Plaintiff:

> In the alleged manipulation months, Barclays' flattening of its physical positions was not intended to get the best price on those trades. Barclays was not responding to supply and demand fundamentals but rather traded dailies to push daily index settlements up if Barclays was buying dailies and to push them down if it was selling. Barclays' trading in the alleged manipulation months constitutes

---

[3]   They are called "fixed-for-floating" swap contracts because a swap buyer pays a fixed price for the swap but the return floats each day based on a Daily Index Price. ¶30. The swap seller receives the fixed price and is obligated to pay the floating price. *See* FERC Report, 141 FERC ¶61,084 (Oct. 31, 2012); ¶30.

[4]   Federal Regulatory Energy Commission, Enforcement Staff Report and Recommendations of the FERC Office of Enforcement, dated October 31, 2012 http://www.ferc.gov/EventCalendar/Files/20121031172428-IN08-8-000.pdf ("FERC Report").

a pattern of trading significant volumes in the dailies in the direction that
benefited its financial swap positions.

¶63 citing FERC Report at 23; *see also* ¶¶55, 65.

Barclays' execution of a large volume of daily contracts at artificially high or low prices
moved the Daily Index Prices in a direction to benefit Barclays' financial swap positions.  This is
because the index reflects the volume weighted average price of all daily contract transactions at
a particular location.  ¶¶31, 33-35; FERC Report at 23-27.  As FERC found, "[b]y flattening its
physical positions through the cash market in the direction of its financial swaps, Barclays was
able to move the settlement of the daily indices and thereby enhance the value of its financial
swaps."  FERC Report at 34; ¶2.[5]  FERC obtained a huge volume of evidence, including instant
messages, trading records, and other documents, which leaves no doubt that Barclays' traders
intentionally manipulated the Daily Index Prices to benefit Barclays' swap contract positions.
¶¶69-106.

Barclays' misconduct was pervasive.  FERC found that Barclays manipulated prices for
**655 product days for 35 product months**.  FERC Report at 8; ¶¶45, 64, 66.  As shown in Table
1 at page 15 of the FERC Report, Barclays manipulated the ICE Daily Index for its benefit
during days in almost every month over a twenty-five month period by engaging in the anti-
competitive execution of dailies contracts in over **652 trading sessions**.

As FERC found, "there was no legitimate business purpose for this trading behavior."
*Barclays Bank PLC,* 144 FERC ¶ 61,041 at ¶60 (2013).[6]  Barclays incurred net losses of over $4

---

[5]    Manipulation of markets appears to reflect a way of doing business for Barclays.  On May
21, 2015, Barclays and others pled guilty to a U.S. criminal charge and were fined $2.4 billion by
U.S. and British authorities for manipulating foreign exchange rates.
http://uk.reuters.com/article/2015/05/21/uk-banks-forex-settlement-barclays-
idUKKBN0O51QX20150521.

[6]    Available at http://www.ferc.gov/enforcement/enforce-res/144FERC61041.pdf.

million over the 30 months of its scheme.  ¶60; FERC Report at 32.  But these losses allowed Barclays to reap profits under its swap contracts of $34.9 million, dwarfing its daily contracts losses.  ¶48.

FERC has determined that Barclays' manipulation of the Daily Index Prices caused pecuniary losses to other market participants of at least $139.3 million.  ¶¶8, 48, 64.  These are losses suffered by certain holders of, *inter alia*, pre-existing electricity contracts, such as Plaintiff, that settled against the Daily Index Prices, and who paid supra-competitive prices or received sub-competitive prices as a result of Barclays' manipulation of the Daily Index Prices. *Id.*  Based on this evidence, FERC ordered Barclays to pay a civil penalty of $435 million and disgorge $34.9 million of unjust profits, plus interest.  *Barclays Bank PLC,* 144 FERC ¶ 61,041 at ¶8 (2013).  FERC's order is now the subject of litigation in the United States District Court for the Eastern District of California.  *FERC v. Barclays Bank PLC*, No. 2:13-cv-2093-TLN-DAD (E.D. Cal.).  The Court in that action has denied Barclays' motion to dismiss.  *Id.*, 2015 WL 2448686, at *2 (E.D. Cal. May 19, 2015).

## ARGUMENT

A complaint should not be dismissed if the allegations "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff need only plead sufficient facts to "nudg[e]" a claim "across the line from conceivable to plausible."  *Id.* at 570.  The role of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks, citation, and footnote omitted).  A court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

4

## I.      THE COMPLAINT ADEQUATELY PLEADS A SECTION 1 CLAIM

Section 1 of the Sherman Act, 15 U.S.C. §1, expressly prohibits "[e]very contract,

combination ... **or** conspiracy, in restraint of trade or commerce ... ."  (emphasis added).  The

Complaint alleges the existence of such contracts.  ¶¶2, 62-65.  The Complaint alleges that the

ICE Daily Index swap contracts and the daily contracts employed by Barclays operated under the

circumstances of this case to unreasonably restrain trade in the competitive markets in which the

Daily Index Prices were determined for each of the four hubs and periods identified on Exhibit

A, and hence violated Section 1.  ¶62. The Complaint also contains detailed allegations as to

**how** these two types of contracts employed by Barclays in its manipulative scheme resulted in

the restraint of trade that occurred here, *i.e.*, in the targeted interference with the setting of the

Daily Index Prices by free market forces of supply and demand.  ¶¶62-65.

Barclays' arguments (Def. Mem. at 5-10) that the Complaint does not adequately allege

(1) a "cognizable" threshold "agreement" on which a Section 1 claim can be based or (2) that

any actual "restraint" of trade occurred here, are both without merit.

### A.      Merced Has Adequately Alleged the Existence of Contracts In Restraint of Trade

In light of the language of Section 1, it is well settled that "[i]n order to state a cause of

action under section one, **plaintiff simply needs to allege that there was a contract ... and that**

**contract ... resulted in an unreasonable restraint of trade**." *Eskofot A/S v. E.I. Du Pont De*

*Nemours & Co.*, 872 F. Supp. 81, 92-93 (S.D.N.Y. 1995) ("*Eskofot*") (emphasis added), (*citing*

*United States v. First Nat'l Bank & Trust Co.*, 376 U.S. 665, 669-70 (1964) (a combination that

eliminated significant competition was sufficient to constitute an unreasonable restraint of trade

in violation of § 1 of the Sherman Act); *United States v. United States Gypsum Co.,* 438 U.S.

422, 435, 436 n.13 (1978) (an agreement may violate section one of the Sherman Act if it has

either an unlawful purpose **or an anti-competitive effect**). (emphasis added).  *See also Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1319-1320 (S.D. Fla. 2014) ("*Procaps*") ("**By its express terms, section 1 is satisfied when there is a "contract" between the parties.  And there is one here**" (*citing Eskofot* and other authorities) (emphasis added).[7]

Where, as here, the restraint of trade is alleged to have resulted from the operation of undisputed **contracts,** a plaintiff is **not** required to additionally plead that the parties to the contracts also had "a common purpose" or "unity of purpose" to restrain trade, or that the counterparty to the contract "agreed to the illegal activities" of the defendant.  *Eskofot,* 872 F. Supp. at 92-93; *Procaps*, 36 F. Supp. 3d at 1319-1320.  Barclays' argument is based on cases such as *Monsanto*, involving a "conspiracy" to restrain trade, rather than contracts, and is thus inapplicable to this case.  As Judge Leisure explained in *Eskofot*, cases like *Monsanto* are inapplicable because:

> There is **no allegation of conspiracy**; rather, plaintiff alleges that defendants entered into combinations and **contracts** in restraint of trade.  There is **no need to show a common purpose** in order to prove the absence of independent action because the relevant merger or **contract** amply demonstrates that there was no independence of action.  Additionally, there is **no need to demonstrate a unity of purpose to establish conspiracy because conspiracy is not alleged**.

872 F. Supp. at 92-93 (emphasis added).

The holdings in *Eskofot* and *Procaps* are consistent with the well-established rule that an express **contract** that **has the effect** of restraining trade violates section 1, regardless of the intent or motive of either of the parties to such contract.  *See also National Society of Professional Engineers v. United States,* 435 U.S. 679, 690 (1978) (claims **challenging**

---

[7]    *See also United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 167 (E.D.N.Y. 2015) ("As the [allegedly restrictive terms] **are contained in American Express's card acceptance agreements with its merchants—satisfying the "concerted action" element of a Section 1 violation**—the court is left to determine whether **the challenged contractual provisions** qualify as unreasonable restraints on competition.") (emphasis added).

**contracts** under Section 1 can be "based either (1) **on the nature or character of the contracts, or** (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.  **Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions**.") (emphases added) (footnotes omitted).  Barclays' assertion that Plaintiff has failed to allege the existence of a threshold predicate agreement is without merit and does not support dismissal.

> **B.      Merced Has Adequately Alleged That The ICE Daily Index Swap Contracts and The ICE Daily Contracts Resulted in An Unlawful Restraint of Trade**

An agreement restrains trade under Section 1 where it results in "reduc[ing] the play of the forces of supply and demand" or otherwise "interfering with the free play of market forces." *United States v. Socony-Vacuum Oil Co. Inc.*, 310 U.S. 150 (U.S. 1940). "[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone," and thus restrains trade under Section 1.  *Id*. at 223.  *See also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 443 (S.D.N.Y. 2015) (trade restrained where the challenged conduct resulted in "dysfunction in the price-setting process, driving prices higher").  Given the inherent evil of market price manipulation of any type, it is almost impossible for a person engaged in it to avoid violating the federal antitrust laws.  As the Second Circuit has stated, "[p]rice manipulation is an evil that is always forbidden under every circumstances by both the Commodity Exchange Act **and the antitrust laws**." *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985) (emphasis added).

Consistent with the foregoing, any agreement which has the effect of reducing the incentive of a party to compete under the normal forces of supply and demand in the marketplace

restrains trade.[8]  *See, e.g., Citizen Publ'g. Co. v. United States*, 394 U.S. 131, 135-136 (1969)

(agreement which "reduces incentives to compete" found to run afoul of Section 1); *see also Cal.*

*ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1156 (9th Cir. 2011) (agreement that "arguably"

"reduced incentives to compete" was "not exempt from scrutiny under the Sherman Act… .");

*United States v. Keyspan Corp.,* 763 F. Supp. 2d 633, 636 (S.D.N.Y. 2011) (approving

settlement of government claim alleging that swap agreement violated Section 1 because it

"eliminated Keyspan's incentive to pursue competitive bidding strategies" and "[a]bsent the

[s]wap [agreement], Keyspan" would not have submitted uneconomic bids to corrupt underlying

prices).

The ICE Daily Index swap contracts, which provided the means by which Barclays

profited from manipulating the Daily Index Prices (¶¶62-65), "reduced [Barclays] incentive to

compete" under the normal "forces of supply and demand" in the daily contracts markets, which

determined the ICE Daily Index Prices.  The ICE Daily Index swap contracts incentivized and

compensated Barclays for affirmatively injecting artificially high or low offers and resulting

transactions, unmoored from the fundamentals of supply and demand, into the market

specifically to "interfer[e] with the free play of market forces" and "caus[e] dysfunction in the

price setting process, driving [the Daily Indices'] prices higher."  This was precisely Barclays'

goal in entering into the swaps contracts.  *Id.*[9]

---

[8]     Of course, in order to violate Section 1 any restraint must also be found to be "unreasonable" by the Court, sitting "as fact-finder," under "all of the circumstances." *Am. Express*, 88 F. Supp. 3d. at 168.  But Barclays does not challenge Merced's "unreasonable" allegations, and merely asserts that there was no "restraint" of trade at all.

[9]     *See Am. Express*, 88 F. Supp. 3d at 210-11 (a defendant's intent in procuring a contract is helpful in predicting whether the contract had anticompetitive effects); *U.S. v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 401, 404-05 (S.D.N.Y. 2001) ("*VISA I*")  (defendants' intent in enacting the challenged rules supported rejecting defendant's proffered pro-competitive justifications).

Furthermore, the underlying daily contracts – which Barclays entered into specifically to implement its anticompetitive scheme – also operated under the circumstances here to unreasonably restrain trade.  These Barclays contracts contained false and artificially high (or low) price terms, not reflective of the forces of supply and demand, which manipulated Daily Index Prices.  In addition, these bilateral contracts, executed to generate false prices to manipulate the Daily Index Prices, also prevented the quantity of electricity supply encumbered by them from being available for legitimate purchasers in the day ahead markets under the normal market forces of supply and demand, and thereby also restrained trade in those markets, as well as the Daily Index Prices based thereon.[10]

### C.   Merced Has Adequately Alleged Anticompetitive Effects in the Relevant Markets

Barclays' contention that Merced's Section 1 claim fails to properly allege a "relevant market" is wrong for several reasons.  At the outset, "If a plaintiff can show an actual adverse effect on competition," the Second Circuit "do[es] not require a further showing of market power" to plead a Section 1 claim.  *Todd v. Exxon Corp.,* 275 F.3d 191, 206-07 (2d Cir. 2001) (Sotomayor, J.) (internal quotations and citation omitted).  *See also Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 546 (2d Cir.1993) (explaining that plaintiff may avoid a "'detailed market analysis by offering 'proof of actual detrimental effects," on competition) (citations and internal quotations omitted).  Because Plaintiff has alleged direct

---

[10]   In *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688-89 (S.D.N.Y. 2013) ("*LIBOR I*"), the court stated that "there might have been antitrust injury **if defendants had restrained competition in the ... underlying marke**t for interbank loans," or if the benchmark rates were intended to be set on the basis of competitive transactions, neither of which were present there.  Here, by contrast, both are present.  *See also Simmtech Co. Ltd. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*, 74 F. Supp. 3d 581, 596 (S.D.N.Y. 2015) (denying dismissal based on *LIBOR I* because the manipulated benchmark index price in *Simmtech*, like here, was intended to be based on underlying freely-competitive market transactions).

evidence of Barclays' power to move prices and distort competition, there is no requirement to plead relevant markets or market shares.

In any event, the allegations of the Complaint are more than sufficient, especially because courts "hesitate to grant" motions to dismiss on the "deeply fact-intensive inquiry" of relevant markets. *Todd,* 275 F.3d at 199-200. The industry, Barclays itself, and relevant federal agencies (FERC) recognize the Daily Index markets for each trading hub and underlying markets for day ahead purchases at the particular hubs and time periods involved here as distinct markets: "Industry recognition is well established as a factor that courts consider in defining a market." *Todd,* 275 F.3d at 205.

Further, Barclays' primary contention, that the Complaint fails to address product interchangeability and elasticity of demand, is incorrect. Barclays' scheme was dependent on manipulating the specific daily price indices (the ICE Daily Index price), which is based exclusively on day-ahead purchases of electricity under ICE daily contracts for specific days at specific Western trading hubs. For example, only daily contracts for delivery at North Path 15 are included in the ICE Daily Index for the North Path 15 hub. Contracts for delivery at other hubs are, by definition, excluded from these indices, as are contracts of a shorter or longer duration or pertaining to a different day. Thus, there is no product substitution for daily contracts at the four Western trading hubs on specified days that could defeat the scheme.

Likewise, as the Complaint makes clear (¶ 62), no product substitution by holders of pre-existing electricity contracts could defeat Barclays' anticompetitive conduct because these pre-existing contracts were binding at the time of the undisclosed manipulation by Barclays. The parties to these contracts could not simply replace them with some other product to avoid the injury caused by Barclays. ¶ 62. For this reason it is clear from the facts alleged in the

Complaint that there were no reasonably interchangeable substitutes or alternatives available to the injured parties.  *Id*.  A Section 1 claim has therefore been adequately alleged.

## II.   THE COMPLAINT ADEQUATELY PLEADS A SECTION 2 CLAIM

The Complaint alleges that Barclays monopolized or attempted to monopolize the markets in which the Daily Index Prices were set by entering into substantial swap contracts, and building economically irrational substantial physical delivery positions in the opposite direction of the swaps.  ¶¶30, 37, 55.  Taken together these enabled Barclays to reap a huge overall profit even though its purchases or sales under dailies contracts were money losing and therefore economically irrational.  ¶¶56-60; FERC Report at 16-17.  Barclays' execution of significant swap contracts and establishment of opposite physical delivery positions therefore gave it the monopoly power to impair competition in the daily market and thereby override (*i.e.*, control) the competitive setting of the Daily Index Prices for its own pecuniary benefit.  ¶¶133-36.

### A.   Monopoly Power or a Dangerous Probability of Achieving Monopoly Power Is Adequately Alleged

Barclays maintains that Plaintiff has not established that it possessed monopoly power in any relevant market and has therefore failed to plead a Section 2 claim.[11]  Barclays' contention is based on the false premise that monopoly power must be shown by allegations of Barclays' market share, the market share of other market participants, and of barriers to entry.  Def. Mem.

---

[11]   Barclays otherwise incorporates its relevant market, standing, and statute of limitations arguments.  Def. Mem at 17.  For the same reasons discussed above with regard to Plaintiff's Section 1 claim and *infra*, these arguments fail with regard to the Section 2 claims.  *See Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 n.3 (3d Cir. 2007) (in Section 2 cases, "direct proof of monopoly power does not require a definition of the relevant market"); *Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 227 (2d Cir. 2006) (in Section 2 case, "percentage share of the relevant market, is [merely] a 'surrogate' for direct proof of market power"); *PepsiCo., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).

at 19.  To the contrary, it is well established in the Second Circuit that monopoly power can be

established solely by direct evidence of the power to control prices, as is alleged here:

> Monopoly power, also referred to as market power, *see Int'l Distrib. Ctrs., Inc. v.
> Walsh Trucking,* 812 F.2d 786, 791 (2d Cir. 1987), is "the power to control prices
> **or** exclude competition." *United States v. E.I. Du Pont de Nemours & Co.,* 351
> U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956).  It may be proven **directly**
> by evidence of the control of prices **or** the exclusion of competition **or** it may be
> inferred from one firm's large percentage share of the relevant market.  *See
> K.M.B. Warehouse v. Walker Mfg. Co.*, 61 F.3d at 123, 129.

*Tops Mkts.*, 142 F.3d at 97) (emphasis added); *see also Pepsico, Inc.*, 315 F.3d at 107 (same,

citing *Tops Mkts.*); *Heerwagen*, 435 F.3d at 226-27 ("To succeed on her claim, plaintiff must

show that defendant has 'engaged in improper conduct that has or is likely to have the effect of

controlling prices . . ., thus creating or maintaining market power.") citing *PepsiCo*, 315 F.3d at

108.  Evidence of an ability to control prices is direct evidence of monopoly power and where it

is unambiguously alleged, as here, such allegations are sufficient by themselves.  *See United

States Football League v. National Football League*, 842 F.2d 1335, 1362 (2d Cir. 1988) ("An

'unambiguous evidence' instruction regarding the power to control prices or to exclude

competition is appropriate where market share data for the relevant market is lacking."); *In re

Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012) ("There are two

ways a plaintiff can show the possession of monopoly power: (1) through direct evidence of

anticompetitive effects or (2) by defining a relevant market and showing defendants' excess

market share.").  It is only in the absence of evidence of a defendant's ability to control prices **or**

exclude competition, that monopoly power is determined by reference to the "area of effective

competition," which is determined with reference to a specific market.  *PepsiCo*, 315 F.3d at

108.[12]  Moreover, a lesser degree of market power is required for an attempt to monopolize case.  *See Tops Mkts.,* 142 F.3d at 100-101; *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir. 1988).

The Complaint alleges, with unambiguous supporting facts, that Barclays controlled the ICE Daily Index when it wanted to for its own pecuniary benefit by engaging in a coordinated scheme to execute next-day fixed-price physical power contracts to move the ICE Daily index settlements to benefit Barclays' fixed-for-floating financial swap contracts that settled against that index.  FERC found that Barclays engaged in this activity for **655 product days for 35 product months** which caused losses to market participants estimated at $139.3 million.  FERC Report at 8; ¶¶45, 64, 66.

Similar allegations of control over a commodity's prices were held to adequately plead monopoly power in *In re Crude Oil*, 913 F. Supp. 2d at 51-53.  There, the defendant, Parnon, engaged in a scheme by which it artificially inflated the price of NYMEX WTI (West Texas Intermediate grade oil) calendar spreads by taking substantial underlying physical positions in WTI.[13]  And, like Barclays' manipulative scheme, this scheme depended on the defendant engaging in significant money losing physical delivery transactions to benefit its overarching position under a derivative contract.  Specifically, the defendant lost $15 million on its physical WTI transactions in order to realize over $50 million in profits on its calendar spread positions. *Id.* at 50.  Moreover, the allegations of monopoly power were found to have been adequately

---

[12]  Barclays' reliance on *dicta* in *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy*, LLP, 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009) is misplaced.  In that case, unlike here, the plaintiff had failed to offer any evidence of the defendants' actual ability to control prices or exclude competition.  *Id.* at 362.

[13]  Calendar spreads consist of alternating positions in two consecutive futures contracts.  In a long situation, a profit is derived if the price of WTI in the second month goes up as compared to the price of WTI in the first month.  *Id.* at 47-48.

13

pled even though the scheme was only perpetrated over two successive two-month periods.  *Id.*

at 49-51, 54-55.  As the court stated:

> [S]tructural alteration of the market, like temporal duration, is just one measure
> that may be considered in evaluating market power.  The heart of a section 2
> claim remains "whether the defendant has engaged in improper conduct that has
> or is likely to have the effect of controlling prices ... ." *PepsiCo.*, 315 F.3d at 108.
> The Complaint's allegations are sufficient.  If temporal duration and structural
> alteration were rigid requirements, many commodities market manipulations
> would be beyond the reach of the Sherman Act.

*Id.* at 55-56.[14]  *See also In Re Term Commodities Cotton Futures Litig.,* No. 12 Civ. 5126 (ALC),

2013 WL 9815198, at *24-25 (S.D.N.Y. Dec. 20, 2013) (relying principally on direct evidence

of the defendants' ability to manipulate cotton future prices in finding the plaintiff had

adequately alleged monopoly power); *Thompson's Gas & Electric Service, Inc. v. BP America

Inc.*, 691 F. Supp. 2d 860, 866-68 (N.D. Ill. 2010) (finding allegations of a month-long

manipulation of the price of propane to be sufficient to allege claims for both monopolization

and attempt to monopolize).[15]

In the alternative, Barclays' success in manipulating the ICE Daily Index Prices during

**655 product days for 35 product months** constitutes a plausible allegation that it had sufficient

market power to evidence a dangerous probability of achieving monopoly power in those

markets.

---

[14]   It is no less significant that Barclays was able to perpetrate its scheme without a dominant
share of the physical commodity.  In both cases, the physical positions undertaken were
economically irrational and thereby gave the Defendants the market power to adversely impact
competition.

[15]   Barclays relies on *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F.
Supp. 2d 1202 (S.D. Tex. 2009) ("*Rio Grande II*") .  Plaintiff here alleges direct evidence of
Barclays' ability to both raise and lower prices, in contrast to *Rio Grande II* where plaintiffs
alleged a predatory pricing scheme.  Here, Plaintiff alleges that Barclays profited from its market
manipulation by artificially increasing its profits under swap contracts that settled on the index
prices it manipulated.  *Id.* at 1211-1214.  *Rio Grande II* is inapplicable.

**B.      The Complaint Adequately Alleges that Barclays Engaged in Anticompetitive Conduct to Create or Sustain Its Monopoly Power**

Barclays further argues that Plaintiff has not adequately alleged anticompetitive conduct because, "none of the alleged conduct eliminated competition or excluded rivals ... ."  Def. Mem. at 20.  There is no requirement, however, that competition be eliminated or that rivals actually be excluded from the market to sustain a monopolization claim, as the decisions relied on by Barclays themselves recognize.  To be exclusionary, the conduct need only impair competition in the relevant market.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (whether conduct may properly be characterized as exclusionary depends on "**whether it has impaired competition in an unnecessarily restrictive way**" citing 3 P. Areeda & D. Turner, Antitrust Law 78 (1978); *see also Meredith Corp. v. SESAC, LLC,* 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("[E]xclusionary [conduct] comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.") (internal quotations and citations omitted).[16]

Barclays plainly did not obtain and maintain its monopoly power – *i.e.*, its ability to control prices – "by growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)).  Rather, it did so by executing significant swap contracts and

---

[16]    Barclays' quote from *Rio Grande II* is also in accord.  Defs. Mem. at 20.  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014) is not to the contrary. It obviously did not overrule *Aspen Skiing* and indeed recognized that an undermining of competition would support a finding of unlawful conduct in stating: "Far from **undermining** existing competition, by entering into the agreements in question, Shire created competition in the market … ."  *Id.* at 135 (emphasis added).

taking physical electricity positions which together gave it the market power to engage in money-losing dailies contract transactions to manipulate Daily Index Prices.  Such manipulative conduct, which was found to be unlawful by FERC, has no valid business purposes and is therefore within the purview of the antitrust laws.

Barclays' conduct here is also clearly alleged to have impeded competition.  It did so by executing dailies contracts at artificially inflated or deflated money-losing prices.  ¶¶5, 62, 65, 111.  This distortion of the normal forces of supply and demand underlying the Daily Index Prices is well-supported by FERC's investigation.  Furthermore, on any given day, as stated above, these dailies contracts, executed to manipulate the Daily Index Prices, also prevented the quantity of electricity supply encumbered by them from being available for purchase by legitimate purchasers in the day ahead markets under the normal market forces of supply and demand (and similarly excluded sellers on the sell side).  That is, Barclays' money losing daily trades displaced purchasers (on the buy side) and sellers (on the sell side) by artificially constraining the market they otherwise could have sold into or bought from.[17]  *See In re Crude Oil*, 913 F. Supp. 2d at 56 (finding allegations of a willful scheme in which defendants acquired a dominant position in physical WTI for the purpose of manipulating prices of WTI derivatives to adequately plead anticompetitive conduct); *In Re Term Commodities Cotton*, 2013 WL 9815198, at *23-25 (finding allegations of an intentionally manipulative trading strategy to

---

[17]   Barclays argues that Plaintiff's allegations of anticompetitive conduct here are no different than those found insufficient in *Rio Grande Royalty Co. Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1195-96 (S.D. Tex. 2009) ("*Rio Grande I*").  Def. Mem. at 20-21.  In that case, unlike here, there were no indicia of "exclusionary conduct," which includes the displacement of other market participants discussed above.  *Id.*  Further, Barclays here drove Daily Index Prices both up and down, and locked in profits from this manipulation through its swap contracts.  There were no comparable allegations in *Rio Grande I.*

artificially inflate the price of cotton futures in order to profit from the defendants' long positions to adequately plead anticompetitive conduct).

In sum, the Complaint adequately pleads a viable claim that Barclays violated Section 2 of the Sherman Act.

## III.   MERCED HAS ADEQUATELY PLED ANTITRUST STANDING

Barclays contends that Plaintiff lacks antitrust standing because its injury is supposedly too indirect. Barclays is wrong. To show standing Plaintiff generally must only allege: (1) a redressable injury in fact; (2) "antitrust injury"; and (3) that it is the proper plaintiff to assert such antitrust claims. *In re Aluminum*, 95 F. Supp. 3d at 444, 456. Barclays challenges only the purported absence of "antitrust injury." Def. Mem. at 14.

Plaintiff adequately alleges "antitrust injury." Defendant's conduct injured Merced and other purchasers (or sellers) of electricity under contracts which settled against Barclays' manipulated Daily Index Prices, who overpaid (or who were undercompensated for their sales) as a direct and proximate result of Defendant's conduct. ¶¶15, 67, 112. Second Circuit courts "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). A plaintiff must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive." *Id*. at 76 (citation and footnote omitted). As discussed above, Plaintiff has clearly done that here. Second, a court must identify the "actual injury" by evaluating how a plaintiff contends it is in a "worse position" due to the consequences of defendant's conduct. *Id*. (citation omitted). Such is also alleged. ¶¶15, 112. A court should compare the "anticompetitive effect" of the practice with plaintiff's actual injury to ensure that the injury is of a nature that the antitrust laws were designed to prevent and flows from that which makes the

conduct anticompetitive.  *Id.*; *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507

F.3d 117, 122 (2d Cir. 2007).  The requisite allegations have been made here.  ¶¶15, 67, 112.

Importantly, contrary to Defendant's out-of-Circuit authority,[18] a plaintiff need not be a customer

or competitor of a defendant to meet the "antitrust injury" test.  *Id.*; *accord Aluminum*, 95 F.

Supp. 3d at 441-444; *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292 (2d

Cir. 1993).

      Defendant contends Plaintiff lacks standing because it did not participate in the market in

which the Daily Index Prices were determined, but a "related market."  Regardless of what

market it participated in, Plaintiff alleges injury flowed directly from the **effect on it** of the

challenged conduct, *i.e.*, paying artificially inflated prices for physical electricity directly

attributable to Barclays' manipulations of the market in which the Daily Index Prices were

determined.  ¶15.  It is hornbook law that such conduct violates the Sherman Act and gives rise

to compensable injury.  *E.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344

(1990) ("a private plaintiff can recover [damages] for [an antitrust] violation only where 'the loss

stems from a competition – reducing aspect **or effect** of the defendant's behavior'") (emphasis

added); *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. 477, 489 (1977) ("Plaintiffs must

prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful.  **The injury should**

**reflect the anticompetitive effect** either of the violation or of anticompetitive acts made

possible by the violation") (first emphasis in original) (second emphasis added).  Such is the case

here, where the Complaint alleges that the **effect** of Defendant's anticompetitive conduct was to

create artificial inflation in the price of physical electricity that Plaintiff purchased, which was

---

[18]  *Rio Grande II,* 786 F. Supp. 2d at 1202, 1205.

supposed to be set by freely-competitive market forces.[19]  Losses stemming from artificially high prices attributable to Barclays' antitrust violations is "a quintessential antitrust injury."  *In re Crude Oil*, 913 F. Supp. 2d at 57.

Barclays asserts that Merced's injury is too remote because Merced's losses arose from changes in the Dow Jones Daily Index, rather than the ICE Daily Index, which Barclays directly manipulated.  Def. Mem. at 14.  But the Dow Jones Index "moved in lockstep" with the ICE Daily Index (¶35) and when "markets tend to move in lockstep, . . . . the distinction between them is of no consequence to antitrust standing analysis."  *In re Copper Antitrust Litigation*, 98 F. Supp. 2d 1039, 1049 (W.D.Wis. 2000) (internal quotations and citations omitted); *Loeb,* 306 F.3d at 483, 488 (where market prices "tend[ed] to move in lockstep," damages in related market "form a separate and compensable injury" establishing antitrust standing) (citation omitted).

Plaintiff's allegations reflect the requisite directness and causation and are susceptible to proof at trial to establish standing.  *See, e.g., Osborn v. VISA Inc.*, 797 F.3d 1057, 1063-66 (D.C. Cir. 2015).  Defendant's misconduct had a direct and foreseeable impact on the prices Plaintiff paid for physical electricity.  Antitrust standing is therefore adequately alleged.

## IV.    THIS ACTION WAS TIMELY FILED

Barclays argues that Plaintiff's claims are untimely because the Complaint was filed more than four years after the wrongful acts were committed.  Yet the first public disclosure of Barclays' wrongful conduct occurred in April 2012.  Subsequent disclosures revealed that

---

[19]    Moreover, the absence of any direct participation by Plaintiff in the markets for determining daily index prices is of no legal significance insofar as antitrust standing is concerned.  Rather, by participating in a "separate but related" market, *i.e.*, purchasing physical electricity in the electricity market where prices were impacted by Barclays' wrongful conduct, Plaintiff has properly alleged that Defendant's conduct caused antitrust injury.  *See, e.g., Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-484 (7th Cir. 2002) ("different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and…differently situated plaintiffs might be able to raise claims").

Barclays had gone to great lengths to hide its market-manipulation scheme.  Plaintiff sued on June 23, 2015.  Thus, this is a classic case for application of the doctrine of fraudulent concealment, which renders the claims timely filed.

There are two ways to show concealment:  "A plaintiff may show concealment 'by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.'"  *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) (citation omitted).  Plaintiff alleges both.

First, Plaintiff alleges active concealment by Barclays.  ¶¶113, 116.  Plaintiff has further alleged that Barclays' improper conduct was only first publicly revealed on April 5, 2012 with the "public notice" of the FERC Staff's findings.  *Id.*  While Barclays relies on speculation printed in 2007 in a trade publication called the "Friday Burrito" to suggest  Plaintiff was on notice of Barclays' misconduct, Barclays ignores its own employees' efforts to debunk the information contained therein.[20]  Plaintiff alleges that "[o]n July 8, 2007 ... Barclays' employee and trader Scott Connelly sent a lengthy email to the author of 'The Friday Burrito' providing numerous false and misleading explanations for the large physical trading volumes," which he requested the author to publish anonymously.  ¶116.  Plaintiff has also alleged that Barclays' unlawful activity was inherently self-concealing.  ¶115.  The Complaint includes several allegations detailing the "non-public" or "internal" nature of Barclays' wrongful conduct.  ¶¶44, 63.  *See In re Natural Gas*, 337 F. Supp. 2d at 513.[21]

---

[20]   There is no suggestion that Plaintiff actually saw the statements in the "Friday Burrito."

[21]   Defendant argues that "Barclays' allegedly open, uncontested trading of electricity-related products is inconsistent with Merced's assertion of fraudulent concealment." Def. Mem. at 16. However, Barclays misapprehends the nature of what was concealed.  The Defendant's conduct "injected fals[ity]" into the market, making the conduct that led to manipulated electricity prices

With respect to Defendant's concealment efforts, Barclays relies on *7 West 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *22 (S.D.N.Y. Mar. 31, 2015).  In that case, on May 29, 2008, the *Wall Street Journal* published a "detailed" analysis that placed "Plaintiff on inquiry notice of the fact that LIBOR rates may have been manipulated."  *Id.* at *21.  Further, the Court found the conduct in question was **not** "self-concealing" because "Thomson Reuters published daily both the final LIBOR fix and the quotes from each of the panel banks."  *Id.* at *22.  Nothing comparable exists here.

Barclays also cites *LIBOR I,* 935 F. Supp. 2d at 710-711, opting to include, however, only certain aspects of the decision regarding fraudulent concealment.  Defendant's selective summary of *LIBOR I* is misleading.  *LIBOR I* rejected plaintiffs' fraudulent concealment allegation because it **had already found** that the plaintiffs were "on notice no later than May 29, 2008" (when the "detailed" *Wall Street Journal* article about a likely "artificial" LIBOR rate was published), which rendered it unreasonable to rely on reassurances from the Defendant.  Obviously, the *Wall Street Journal* is not comparable to the "Friday Burrito" and any such suggestion is far-fetched.  Further, the report in the "Friday Burrito" was mere speculation, not a definitive analysis such as was presented in the *Wall Street Journal* article.

Similarly, there is no infirmity in Plaintiff's due diligence allegation.  Plaintiff alleges that "[p]rior to FERC's Staff's April 5, 2012 public notice of alleged violations by Barclays for the course of conduct described herein, Plaintiff did not discover and could not with reasonable diligence have discovered, facts indicating Barclays was engaged in the misconduct alleged herein."  ¶113.  Such allegations were found sufficient in *Hinds County, Mississippi v. Wachovia*

---

"inherently self-concealing."  As the electricity-related prices themselves were false, the fact that the trading occurred on a platform that was "not secret" does nothing to negate Plaintiff's allegation that those prices were not suspected to be the product of manipulation.

*Bank N.A.,* 700 F. Supp. 2d 378, 399-400 (S.D.N.Y. 2010).  Moreover, the Complaint begins

with a description of the diligent investigatory efforts of Plaintiff and its counsel.  Plaintiff has

adequately pled fraudulent concealment with sufficient particularity.

## V.  MERCED HAS PROPERLY PLED A CALIFORNIA UNFAIR COMPETITION LAW CLAIM

Barclays challenges the sufficiency of Plaintiff's claim under California's Unfair

Competition Law ("UCL"), California Business & Professions Code §17200 *et seq.*  Def. Mem.

at 22.  To the contrary, the claim has been properly alleged.

With respect to pleading injury for which restitution is an available remedy, relying

extensively on the California Supreme Court's UCL-related decision, *Kwikset Corp. v. Superior

Court*, 51 Cal. 4th 310 (2011) and on *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010), the

Federal Circuit in *Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1379 (Fed. Cir. 2011)

has held that the plaintiffs in a UCL action must only plead "'(1) ... a loss or deprivation of

money or property sufficient to qualify as injury in fact, *i.e.*, **economic injury**, and (2) ... that

[the] economic injury was the result of, *i.e.*, **caused by,** the unfair business practice.' [*Kwikset,*]

120 Cal.Rptr.3d 741, 246 P.3d at 885." *Allergan,* 640 F.3d at 1382.[22]  *See also Law Offices of

Matthew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 557 (2013); *In re

Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015).  Plaintiff's allegations here are sufficient

to meet this test.  ¶¶11, 15, 16, 65, 112, 136, 144-145, 147.

Barclays also argues that Plaintiff must plead that the Defendant "took money directly ...

or that it has [a] cognizable interest in Barclays' earnings."  Def. Mem. at 22.  *Allergan*

---

[22]   Both the Federal Circuit and the California Supreme Court recognize "'[t]hat a party may ultimately be unable to **prove** a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them.' *Clayworth*, 111 Cal. Rptr. 3d 666, 233 P.3d at1087 (footnote omitted)] (citations omitted)." *Allergan,* 640 F.3d at 1382 (emphasis added).

specifically rejects this. *Allergan*, 640 F.3d at 1383.  Rather, the Federal Circuit acknowledged

"that there are 'innumerable ways' to show economic injury from unfair competition ... ."  *Id.*

Accordingly, it found the UCL claim to have been appropriately pled based on "'lost sales,

revenue, market share, and asset value."  *Id.* at 1382.  There is no "direct business dealings"

requirement.  *Higbee*, 214 Cal. App. 4th at 563-564.  Nonetheless, as Plaintiff operates a

business focused in part on "generating, distributing, purchasing, and selling electricity (¶5 ) and

as it competes for the same electricity as that traded (and exploited) by Barclays, the two entities

can be said to be "business competitors."  *See Higbee*, 214 Cal. App. 4th at 565.  ¶¶1-11, 15-16,

22-24, 35, 45-48, 62-67, 111-112.[23]  Plaintiff has pled an actionable injury resulting from unfair

competition by paying supracompetitive prices for physical electricity under contracts that

settled based on index prices manipulated by Barclays.  ¶145.  Consistent with the UCL, Plaintiff

has appropriately pled "an economic injury that was the result of an unfair [, unlawful, or

fraudulent] business practice."  *Allergan*, 640 F.3d at 1382.

Barclays asserts that the "claim accrued more than seven years before Merced filed its

complaint... ."  Defs. Mem. at 22-23.  It ignores that "[t]he doctrine of fraudulent concealment

applies to claims under the UCL ... ."  *Philips v. Ford Motor Co.*, No. 14-cv-2989 LHK, 2015

WL 4111448, at *7 (N.D. Cal. July 7, 2015) (citation omitted).  For the reasons discussed above,

fraudulent concealment applies here.[24]

---

[23]   Although Barclays "never intended to physically generate or take delivery of any electricity,"
it nonetheless competed against Plaintiff over the same trading hub for "electricity."  *See* ¶¶15,
22, 34, 46, 54, 79-84.

[24]   One Federal court has recently recognized that "[t]he delayed discovery rule" is also
"available to rebut the presumption and to toll the statute of limitations under the ... UCL ... ."
*Plumlee v. Pfizer, Inc.,* No. 13-cv-414 LHK, 2014 WL 4275519, at *6 (N.D. Cal. Aug. 29,
2014), citing *Aryeh v. Canon Bus. Solutions, Inc.,* 292 P.3d 871, 878 (Cal. 2013) (delayed
discovery rule applies to UCL claims) (footnote omitted).

## VI.    MERCED HAS PROPERLY PLED AN UNJUST ENRICHMENT CLAIM

Barclays does not argue that Plaintiff has failed to plead the substantive elements of an

unjust enrichment claim.  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) describes the

unjust enrichment elements:  "1) that the defendant benefitted; 2) at the plaintiff's expense; and

3) that 'equity and good conscience' require restitution."[25]  These elements have been alleged.

¶¶150-52.  Contrary to Barclays' position "'New York law does not require an unjust enrichment

plaintiff to plead "direct dealing," or an "actual, substantive relationship" with the defendant."

*Waldman v. New Chapter, Inc.,* 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) (quoting *Sperry v.*

*Crompton Corp.*, 8 N.Y.3d 204, 215-16 [(2007)]))"; *McCracken v. Verisma Systems, Inc.*, No.

14-cv-6248 MAT, 2015 WL 5510367, at *10 (W.D.N.Y. Sept. 16, 2015) (footnote omitted) (no

direct dealing or actual substantive relationship required).[26]

The circumstances alleged here are not "too attenuated" to support an unjust enrichment

claim under *Sperry*.  The parties are related through activities involving the same electricity

trading "hub," North Path 15.  Plaintiff purchased peak electricity under contracts that settled

against the North Path 15 Daily Index Prices, which is a trading hub manipulated by Barclays.

---

[25]    In *St. John's University, New York v. Bolton*, 757 F. Supp. 2d 144, 182 (E.D.N.Y. 2010), the
Court noted: "'[t]he essential inquiry in any action for unjust enrichment or restitution is whether
it is against equity and good conscience to permit the defendant to retain what is sought to be
recovered.'  *Paramount Film Distrib.Corp. v. State of New York*, 30 N.Y.2d 415, 421 (1972).
Therefore, in assessing the legal sufficiency of an unjust enrichment claim, courts 'will also look
to see if defendant's conduct was tortious or fraudulent.'  *Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. v. Chipetine,* 221 A.D. 2d 284, 286-87, 634 N.Y.S.2d 469 (1st Dep't 1995)."  Plainly
such conduct is alleged here.

[26]    *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 542-543 (S.D.N.Y. 2007) (Marrero, J.)
held that a contractual or quasi-contractual relationship is required.  However, *Sperry* does not
require such a relationship, only that the relationship not be "too attenuated."

¶¶11, 15.  This is a relationship even closer than the one at issue in *Sperry*, 8 N.Y.3d at 215-216.[27]

The unjust enrichment claim is not time-barred.  Def. Mem. at 24.  An "unjust enrichment claim ... may proceed if the statute of limitations was tolled due to fraudulent concealment."  *Grynberg v. ENI S.P.A.,* No. 06 Civ. 6495 RLC, 2009 WL 2482181, *5 (S.D.N.Y. Aug. 13, 2009).  As shown above, Plaintiff has sufficiently alleged fraudulent concealment.  Equitable tolling also applies.  *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 194 (E.D.N.Y. 2010).  Plaintiff has sufficiently alleged "'fraud, misrepresentation, or deception'" for equitable tolling.  *Id.* at 186 (citation omitted); ¶¶65, 93, 97-98, 113-118. Because of the self-concealing nature of Barclays' conduct, none of Plaintiff's claims, including for unjust enrichment, is time-barred.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied in its entirety.

---

[27]   Alternatively, Plaintiff has sufficiently alleged a quasi-contractual relationship, as discussed in *Abbatiello.*  ¶¶11, 15, 108-110.  Either way, the existence of the benefit received by Defendant or the extent of the relationship are questions of fact, making dismissal inappropriate.  *See In re Canon Cameras Litig.*, 2006 WL 1751245, at *2 (S.D.N.Y. 2006) (whether benefit conferred); *McGhan v. Ebersol,* 608 F. Supp. 277, 285 (1985) (existence of implied agreement; nature of relationship).

Dated: November 9, 2015

Respectfully submitted,

/s/Jeffrey A. Klafter
Jeffrey A. Klafter
KLAFTER OLSEN & LESSER LLP
2 International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200

Solomon B. Cera
Louis A. Kessler
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230

Daniel Sponseller
LAW OFFICES OF DANIEL J. SPONSELLER
409 Broad Street, Suite 200
Sewickley, PA 15143
Telephone: (412) 741-4422

Eric Christensen
CAIRNCROSS & HEMPELMAN
524 Second Ave., Suite 500
Seattle, WA 98104-2323
Telephone: (206) 254-4451