UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MERCED IRRIGATION DISTRICT,                     :          15-cv-4878 (VM)
                                                :
                            Plaintiff,          :     **DECISION AND ORDER**
                                                :
        - against -                             :
                                                :
BARCLAYS BANK PLC,                              :
                                                :
                            Defendant.          :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Merced Irrigation District ("Merced") is a state-recognized irrigation district located in Merced, California. On behalf of itself and others similarly situated (the "Proposed Class"), Merced alleges federal antitrust violations against defendant Barclays Bank PLC ("Barclays"), a financial services corporation headquartered in the United Kingdom. Merced's claims arise out of an alleged unlawful conspiracy to manipulate daily index prices for electricity between November 1, 2006 and December 31, 2008 (the "Class Period") in violation of Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. Sections 1, 2 ("Section 1" and "Section 2"), and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Section 17200. Merced also alleges claims of unjust enrichment in its complaint. ("Complaint", Dkt. No. 1.)

Barclays filed a motion to dismiss the Complaint in its

entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"), asserting that Merced fails to state a claim upon which relief may be granted. ("Motion", Dkt. No. 12.) Merced filed opposition papers ("Opposition", Dkt. No. 14) and Barclays replied. ("Reply", Dkt. No. 17.) For the reasons stated below, Barclays' motion is GRANTED in part and DENIED in part.

## I.   FACTUAL BACKGROUND[1]

A.   THE ELECTRICITY MARKET

As an irrigation district engaged in the business of generating, distributing, purchasing, and selling electricity to customers, Merced purchased peak electricity[2] from another California irrigation district during the Class Period. Those contracts settled according to the Dow Jones Daily Index price for peak power at the northern California trading hub known as North Path 15, which is set by averaging market prices for

---

[1] The factual summary below, except where otherwise noted, derives from the Complaint and the documents cited or relied upon for the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except where specifically quoted, no further citation will be made to the Complaint or the documents referred to in it. As discussed infra, documents drawn upon by the Court include the Federal Energy Regulatory Commission's Order Assessing Civil Penalties against Barclays (the "FERC Order"), which is referenced in and integral to the Complaint. See Chambers, 282 F.3d 152-53; Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 71-72 (2d Cir. 1995).

[2] Electricity contracts are traded for both peak and off-peak products. Peak electricity includes power provided Monday through Saturday between the hours of 7:00 a.m. to 10:00 a.m., excluding holidays.

electricity-related contracts at North Path 15. North Path 15 was also one of four western electricity trading hubs (the "Trading Hubs")[3] in which Barclays bought and sold electricity-related contracts through its West Power Desk in New York City.

Two types of electricity-related contracts are relevant to this case: contracts for next-day delivery of physical electricity, or "dailies", and financial "swap" contracts by which parties agree to exchange payments depending on the daily index price on a specified settlement date at a specified location. The prices at which dailies and swap contracts settle are based on the index price published by certain exchanges. Those exchanges calculate index prices based on transactions for electricity at specific trading locations. One of these exchanges is the Intercontinental Exchange ("ICE"), which calculates a Daily Index price based on the weighted average price of all day-ahead fixed-price physical electricity transactions at the relevant location. Dow Jones also calculates prices based on the same dates and trading hub locations, which Merced alleges move in lockstep with the ICE Daily Index price (collectively with the ICE

---

[3] The four Western United States trading hubs that used the Daily Index Prices for peak or non-peak power are known as Mid-Columbia, located in Washington; Palo Verde, located in Arizona; South Path 15, located in southern California; and North Path 15, located in northern California.

Daily Index price, the "Daily Index Prices"). Market participants trading in physical positions have the obligation to deliver or receive electricity at the Daily Index Prices, while those trading in purely financial positions, including swap contracts, have no obligation to deliver or receive physical electricity.

Although Barclays did not have the capability to provide or accept physical electricity, during the Class Period it traded both short-term contracts for physical electricity -- which it then "flattened", or offset, by purchasing or selling physical contracts for an equal volume of electricity in the opposite direction prior to delivery -- and longer-term swap contracts that settled at prices set by the ICE Daily Index. Merced bought peak electricity under contracts settled according to the Dow Jones index price for North Path 15 during the Class Period, including between April and June 2007. The Proposed Class is defined as "any individual or entity that held any contract which settled against the ICE or Dow Jones published daily index prices for peak or non-peak power" at any of the Trading Hubs during the Class Period, and was damaged by movements in index prices caused by Barclays' manipulation. (Dkt. No. 1 at ¶119.)

B.   BARCLAYS' ALLEGED INDEX PRICE MANIPULATION

Merced asserts that Barclays, seeking greater revenues

4

on its financial swap contracts, engaged in trading at noncompetitive prices that purposely inflated or depressed ICE Daily Index prices in the direction that benefited Barclays' swap contracts.

The alleged manipulation had three steps. First, Barclays' traders entered into a swap contract that would settle on a particular date based on the ICE Daily Index price. Then the traders purchased physical electricity contracts in the opposite direction from the swap (i.e. contracts to buy if Barclays was a seller in the swap, or vice versa). Finally, Barclays' traders bought or sold large quantities of underlying daily contracts at artificial money-losing prices, ostensibly for the purpose of flattening the contracts for physical electricity, but also enabling Barclays to trade large volumes of daily contracts that would impact the ICE Daily Index price at which Barclays' swap contract then settled. Although Barclays would lose money on the daily transactions,[4] those losses were more than offset by the profit it accrued by settling the swap contracts at artificial ICE Daily Index prices. Those prices would be either artificially high, if Barclays held a "long" swap contract as a buyer and bought a high volume of daily

---

[4] The FERC Report alleges that Barclays lost money on daily trading at an average of $117,404 per month.

contracts at inflated prices to raise the index price, or artificially low, if Barclays held a "short" swap contract as a seller and sold daily contracts at less-than-market prices to drive down the index price on the settlement date.

As an illustration, if Barclays held a long swap contract to be settled on a particular day at the North Path 15 trading hub, it would create a large short physical position in the daily markets at that hub by entering into contracts to sell electricity. Then, to avoid having to deliver the physical electricity provided for in the daily contracts while simultaneously inflating the Daily Index Prices to generate maximum revenue for its swap contract, Barclays would "flatten" its entire short physical position prior to the contract's settlement date by buying large quantities of next-day physical contracts at higher than market prices, driving up the weighted average price of electricity and, consequently, the Daily Index Prices. When the swap contract settled, Barclays would have made a sizeable profit even after losing money overpaying for the next-day physical contracts.

Merced alleges that Barclays' large position in swap contracts and significant trading in daily contracts at anticompetitive prices caused increases or decreases in the ICE Daily Index price as well as the Dow Jones Daily Index, which moved in lockstep with the ICE Daily Index rate.

6

Barclays accumulated a net loss of more than $4 million in dailies contract trading but gained $34.9 million on its swap contracts.

C.   THE FERC INVESTIGATION AND ORDER

After commencing an investigation in 2007, the United States Federal Energy Regulatory Commission ("FERC") Office of Enforcement issued an order to show cause in October 2012 directing Barclays and four individual Barclays traders[5] to show cause why they should not be found to have violated FERC's Anti-Manipulation Rule, 18 C.F.R. Section 1c.2, promulgated under Section 222 of the Federal Power Act ("FPA"), 16 U.S.C. Section 824v(a), by manipulating California electricity markets from November 2006 to December 2008. See Order to Show Cause and Notice of Proposed Penalty, FERC Docket No. 08-0800, 14 FERC ¶ 61,084 (Oct. 31, 2012) ("FERC Report"). Subsequently, FERC issued an order concluding that Barclays and the individual traders violated the Anti-Manipulation Rule through the use of a "coordinated, fraudulent scheme" to manipulate wholesale power markets on

---

[5] The four West Power Desk traders -- Scott Connelly, Daniel Brin, Karen Levine and Ryan Smith -- are named in the Complaint but are not defendants in this action. The traders' deposition testimony, emails, and instant messages were evidence in the FERC investigation, FERC Report, and FERC Order, and are thereby incorporated into the Complaint.

7

655 product days over 35 product months[6] at the Trading Hubs
named in Merced's Complaint. Order Assessing Civil Penalties,
FERC Docket No. 08-0800, 144 FERC ¶ 61, 041 (July 16, 2013)
("FERC Order") at 3. The FERC Order estimated that Merced's
manipulations resulted in net profits of $34.9 million while
causing at least $139.3 million in losses to other market
participants who either paid higher than competitive prices
for electricity or sold electricity at lower than competitive
prices during the Class Period. Although Barclays disputed
that its trading had a material effect on prices, the FERC
Order found that it had, in fact, "distorted market outcomes."
The FERC Order assessed Barclays a civil penalty of $435
million and disgorgement of $34.9 million in profits.

Merced alleges that it did not learn of Barclays' price
manipulation until April 5, 2012, when FERC released a public
notice of Barclays' alleged violations of the FPA. Because
Barclays' unlawful conduct was not revealed until that time,
and because Barclays' traders concealed their price
manipulation during the Class Period and afterward, Merced
argues that the statute of limitations applicable to its
claims should not begin to run until April 5, 2012.

---

[6] "Product days" denote trading of a specific contract related to a
specific trading hub for a specific calendar day. "Product months" refer
to the same information for a specific calendar month.

E. MOTION TO DISMISS

Merced brought the instant case against Barclays, claiming that, through its manipulation of the Daily Index Prices, Barclays unreasonably restrained trade and monopolized prices in violation of federal antitrust law. Barclays filed the instant Motion seeking to dismiss the Complaint pursuant to Rule 12(b)(6). Barclays argues that Merced failed to allege an adequate claim for federal antitrust violations in the Complaint because it has not shown that Barclays: 1) acted in concert with another party or restrained the competitive freedom of anyone to trade electricity-related products, as required for a Section 1 claim, or 2) possessed monopoly power in a relevant market or excluded competitors, as required for a Section 2 claim. Barclays further moves the Court to decline to exercise supplemental jurisdiction over Merced's state law claims and to dismiss Merced's claims for unjust enrichment for failure to plead a contractual or quasi-contractual relationship between Merced and Barclays.

In response, Merced argues that Barclays violated both Section 1 and Section 2, as well as California and New York state law, by entering into daily and longer-term swap contracts that unreasonably restrained trade in the markets in which the Daily Index Prices were set, and by exercising

monopoly power over electricity prices as demonstrated through Barclays' direct control over Daily Index Prices during the Class Period.

## II. **LEGAL STANDARD**

A. 12(b)(6) MOTION TO DISMISS

Under Rule 12(b)(6), a complaint should be dismissed if the plaintiff has not offered sufficient factual allegations that render the claim facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The complaint should not be dismissed if the factual allegations "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The pleadings must include more than "a formulaic recitation of the elements of a cause of action," Twombly, 550 U.S. at 555; it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

The role of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted). A court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable

10

inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Even so, a court should not accept as true any "legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678-79.

Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Where Rule 8(a)'s pleading standard governs, "dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim . . . and 'relief could be granted under [some] set of facts consistent with the allegations.'" In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (alteration in original) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-14 (2002)).

When adjudicating a motion to dismiss, a Court may consider documents incorporated in it by reference. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)(considering "documents possessed by or known to the plaintiff upon which it relied in bringing suit" in a 12(b)(6) motion to dismiss). When a plaintiff chooses not to attach to the complaint or incorporate by reference a document on which it relies and which is integral

11

to the complaint "the court may nevertheless take the document into consideration in deciding the defendants' motion to dismiss, without converting the proceeding to one for summary judgment." Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 71-72 (2d Cir. 1995); see also Chambers, 282 F.3d at 152.

### III.   DISCUSSION

Merced asserts causes of action for violation of Sections 1 and 2 of the Sherman Act, violation of California state law, and unjust enrichment on the basis of Barclays' alleged rate manipulation in the electricity markets described above. Merced argues that Barclays' manipulation of Daily Index Prices in favor of its swap contracts restrained normal market forces of supply and demand, causing Merced and other buyers and sellers during the Class Period to pay supracompetitive prices or to accept subcompetitive prices. Because the FERC Report and FERC Order are public documents integral to and incorporated into Merced's Complaint, the Court considers them in deciding the Motion.

### A.   STANDING

As a threshold matter, the Court must determine whether Merced has established standing to bring a federal antitrust claim. Private plaintiffs suing under either Section 1 or Section 2 of the Sherman Act must bring their claim by way of

12

Section 4 of the Clayton Act, 15 U.S.C. Section 15, which confers standing on any private plaintiff who "shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. For a plaintiff to sue pursuant to the Clayton Act, it must show 1) an antitrust injury and 2) that it is a proper plaintiff in light of four "efficient enforcer" factors. In re DDVAP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009). The Court will consider each of these requirements in turn.

### 1. Antitrust Injury

The Second Circuit described the process for determining whether a plaintiff has suffered an antitrust injury in Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76 (2d Cir. 2013). First, the plaintiff must identify the anticompetitive practice. Second, the court must identify the actual injury the plaintiff alleges. Finally, the court must compare the anticompetitive effect of the practice to the actual injury alleged. Id. at 76. The Circuit Court observed:

> [i]t is not enough for the actual injury to be causally linked to the asserted violation. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.

Id; see also Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). Merced has pled an antitrust injury

13

causally linked to Barclay's practices: it is a purchaser of electricity on the daily markets in which it alleges it paid higher supra-competitive prices or received lower sub-competitive prices as a result of Barclays' rate-manipulation. (See Dkt. No. 1 at ¶ 112.) This is an injury "of the type the antitrust laws were intended to prevent." Id.; see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977).

Conduct similar to the conduct alleged in the Complaint was found sufficient to support antitrust injury in In re Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419 (S.D.N.Y. 2015). In that case, the court found that "the winners and losers of defendants' scheme are not only the counterparties to their trades, but also those who actually need the physical commodity underpinning the trades. . . . [T]his scheme is alleged to have substituted supply and demand-based pricing with pricing driven by the webbed conspiracy described above." Id. at 443. As an electricity distributor, Merced was obligated to purchase electricity at the daily rates to fulfill its contracts with customers. Those daily rates, in turn, were dictated by Barclay's high-volume trading at non-market prices instead of the forces of supply and demand for electricity.

Merced has also demonstrated the connection between

14

Barclays's alleged misconduct and the supracompetitive rates Merced paid for electricity. Barclays argues that it traded only on the Dow Jones index while Merced traded exclusively on the ICE index, and therefore any injury Merced suffered was removed from Barclays's action. That Merced and Barclays traded on different indices is not fatal to Merced's standing, however, because Merced has alleged facts showing that the Dow Jones and ICE indices for peak power at the North Path hub moved in lockstep during the time period in which Barclays manipulated prices. The two indices are "intertwined", Merced alleges, because they published daily index prices for the same dates, trading hub locations and products. (Dkt. No. 1 at ¶35.) The Complaint includes a chart displaying peak power rates for Dow Jones and ICE at North Path 15 for April through June 2007, months during which Barclays allegedly engaged in manipulative trading on that hub. (Dkt. No. 1 at ¶35, Ex. B.) On only two trading days did the peak rate differ by more than one point between the two indices. "[W]hen market prices move in lockstep, . . . the distinction between them is of no consequence to antitrust standing analysis." In re Copper Antitrust Litig., 98 F. Supp. 2d 1039, 1049 (W.D. Wis. 2000). Merced's allegations are sufficient to establish an actual injury caused by Barclays's anticompetitive actions.

2. Efficient Enforcer

In addition to establishing antitrust injury, a plaintiff must also satisfy the four "efficient enforcer factors": 1) the directness or indirectness of the asserted injury; 2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; 3) the speculativeness of the alleged injury; and 4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. In re DDAVP, 585 F.3d at 688 (citing Associated Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 542 (1983)).

Each of the four "efficient enforcer" factors favors granting standing to Merced. As to the first factor -- the directness of the asserted injury -- the chain of causation between Barclays's alleged market restraint and Merced's injury is not so remote as to preclude antitrust standing. Although Barclays argues that Merced's injuries are too "indirect and remote" to confer antitrust standing (Dkt. No. 13 at 13), Merced has alleged facts showing how Barclays's price manipulation had a demonstrable effect on the prices Merced paid for electricity. Second, Merced belongs to an identifiable class -- the very Proposed Class it seeks to

16

certify in this action -- of individuals and entities that were injured by movements in the Daily Index Prices caused by Barclays's manipulative trading during the Class Period, and therefore are motivated to enforce the antitrust laws due to their "natural economic self-interest" in avoiding overpaying for electricity. See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 444 (2d Cir. 2005). Third, the allegations presented in Merced's Complaint, supported by the detailed analysis contained in the FERC Report and FERC Order, are not unduly speculative as to nature or amount of loss during the months that Barclays allegedly manipulated electricity markets. An exact accounting of damages is not required at this stage of the proceedings, "especially . . . when the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." In re DDAVP, 585 F. 3d at 689 (internal quotation omitted). Finally, identifying and apportioning damages would not be prohibitively difficult and would not lead to duplicative recoveries.

The Court is persuaded that Merced has satisfied both factors required for antitrust standing under Section 4 of the Clayton Act, thereby establishing that Merced is a proper plaintiff to bring suit against Barclays for federal antitrust violations.

17

B.   STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

Having determined that Merced has standing to bring a private civil antitrust action under 15 U.S.C. Section 15, the Court will now consider whether those claims and Merced's state law claims are timely filed or, alternatively, whether Merced has sufficiently alleged fraudulent concealment to toll the statute of limitations.

Private civil antitrust actions have a statute of limitations of four years. 15 U.S.C. § 15b. "An antitrust action accrues and the statute of limitations begins to run when the defendant commits an act that injures the plaintiff." In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 191 (S.D.N.Y. 2000). In an alleged price-fixing conspiracy, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Id. at 192. Plaintiffs may only recover damages based on acts falling within the statutory period, and not based on previous acts. See Hinds Cty., Miss. v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009). Merced's state law claims are similarly subject to statutes of limitations: the UCL bars claims brought more than four years after the cause of action accrued, Cal. Bus.  Prof. Code § 17208; and New York law

18

establishes a six-year statute of limitations for unjust enrichment claims, accruing at the time of the wrongful act. See N.Y. C.P.L.R. § 213.

The alleged acts giving rise to the Complaint took place between November 1, 2006 and December 31, 2008. Merced did not file suit until June 23, 2015, more than six years after the last wrongful act alleged. Merced's claims, then, are all based on events outside of the relevant limitations periods. However, Merced argues that the doctrine of fraudulent concealment prevented the statute of limitations from taking effect prior to April 2012, when the FERC first made public its investigation of Barclays's market manipulation.

To show fraudulent concealment, a plaintiff must show: 1) that the defendant concealed the existence of the antitrust violation; 2) that the plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and 3) that the plaintiff's continuing ignorance was not the result of lack of diligence. See Hinds County, 620 F. Supp. 2d at 520; In re Nine West, 80 F. Supp. 2d at 192; State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988). A claim for fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)").

19

See Hinds County, 620 F. Supp. 2d at 520; In re Nine West, 80 F. Supp. 2d at 192. The doctrine of fraudulent concealment also applies to claims under California's Unfair Competition Law, see Yumul v. Smart Balance, Inc., 733 F. Supp. 2d 1117, 1132 (C.D. Cal. 2010), and to claims for unjust enrichment under New York law, see Grynberg v. ENI S.p.A., No. 06 Civ. 6495, 2009 WL 2482181, at *5 (S.D.N.Y. Aug. 13, 2009).

In the Second Circuit, a plaintiff may prove concealment by showing that a defendant "took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature to be self-concealing." In re Natural Gas Commodity Litig., 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004). Allegations of price-fixing conspiracies in violation of antitrust law constitute the type of unlawful activity that is inherently self-concealing. See In re Nine West, 80 F. Supp. 2d at 193 ("By alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and . . . there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of its claim."). Here, Merced has alleged in extensive detail throughout the Complaint the self-concealing nature of Barclays's unlawful price manipulation scheme, which Merced further alleges could only be discerned by access to internal

20

emails and non-public data. (Dkt. No. 1 at ¶ 115.)

Merced must allege the two remaining prongs of the fraudulent concealment test -- ignorance of the violation until sometime within the limitations period and due diligence -- with particularity. See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., No. 00 Civ. 7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004). Merced states in its Complaint that "prior to FERC's staff's April 5, 2012 public notice of alleged violations by Barclays for the course of conduct described herein, Plaintiff did not discover, and could not with reasonable due diligence have discovered, facts indicating Barclays was engaged in the misconduct alleged herein." (Dkt. No. 1 at ¶ 113.) For purposes of this Motion, the Complaint's pinpointing of the precise date when Merced became aware of the violation satisfies the second prong of the test.

Merced must also plead facts supporting the third prong, which requires that the plaintiff's ignorance of the alleged violations before April 2012 was not for a lack of due diligence. As an initial matter, Merced must have been on inquiry notice of some illegality before having a responsibility to respond with reasonable diligence. See In re Nine West, 80 F. Supp. 2d at 193. The Complaint asserts that at no point prior to April 5, 2012 was Merced aware of

Barclays's alleged misconduct. If that is the case, it would not have been "apprised of sufficient facts to put [it] on notice" of Barclays's price manipulation such that it could have known of the manipulation "through the exercise of reasonable diligence". <u>Cerbone v. Int'l Ladies' Garment Workers' Union</u>, 768 F.2d 45, 48 (2d Cir. 1985). Merced alleges that "the nature, existence and extent of unlawful activity could only be discerned and uncovered by access to Barclays's emails and detailed review by qualified experts of immense amounts of non-public data." (Dkt. No. 1 at ¶ 115.) Only with the release of public notice by FERC in April 2012 was Merced alerted to Barclays's manipulation with any specificity, at which point it engaged in investigation and due diligence in preparation to file suit. (Dkt. No. 1 at ¶ 1.)

Barclays argues that a July 2007 article in the "Friday Burrito," a regional energy trade publication, should have alerted Merced to Barclays's alleged manipulation of western electricity markets. The article conjectured about the "specter" of "large physical positions in the [dailies] market," wondering "[w]hat the hell is going on out there?" (Dkt. No. 13 at 16.) But as the Complaint points out, Barclays took action to head off inquiries related to the "Friday Burrito" article, publishing an anonymous response to the "Friday Burrito" article that provided intentionally "false

22

and misleading explanations" for Barclays's large physical trading positions. (Dkt. No. 14 at 20.) The single, speculative "Friday Burrito" article, about which there is no evidence plaintiffs were aware at the time, is an insufficient basis on which to conclude that Merced should have been on notice of Barclays's misconduct. Moreover, in spite of the fact that the Daily Index Prices were published openly, "the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the . . . plaintiffs . . . knew of the alleged conspiracy." In re Issuer, 2004 WL 487222, at *5 (quoting In re Mercedes-Benz Anti-Trust Litig., 157 F. Supp. 2d 355, 373 (D.N.J. 2001)).

At the very least, no facts in the pleadings "conclusively indicate that [Merced] did have or should have had knowledge of the violation within the statute of limitations." In re Natural Gas, 337 F. Supp. 2d at 514. Merced has demonstrated that Barclays engaged in inherently self-concealing conduct, and that questions of fact exist as to whether Merced could have discovered Barclays's unlawful conduct prior to the expiration of the statute of limitations period. "The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss." In re

23

Sumitomo Copper Litig., 120 F. Supp. 2d at 347; see also In re Issuer, 2004 WL 487222, at *5. The Court is persuaded that, for purposes of a motion to dismiss, Merced has pled particularized facts sufficient to make out fraudulent concealment so as to toll the statute of limitations on its federal and state law claims. Accordingly, the Court concludes that dismissal of the Complaint on statute of limitations grounds is unwarranted.

C.   SECTION 1 OF THE SHERMAN ACT

   1. Legal Standard

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim under Section 1, a plaintiff must establish that the defendants "contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy." Laydon v. Mizuho Bank, Ltd., 12 Civ. 3419, 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014).

24

The critical question for purposes of a Section 1 claim is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express." Twombly, 550 U.S. at 553; see also Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2013). The Supreme Court clarified in Copperweld Corp. v. Indep. Tube Corp. that Section 1 of the Sherman Act prohibits only concerted conduct among distinct legal entities and does not reach restraints of trade that are "wholly unilateral." 467 U.S. 752, 768 (1984). Copperweld addressed whether coordinated acts of a company and its wholly owned subsidiary could constitute a "combination or a conspiracy" under Section 1. Answering in the negative, the Supreme Court closed the door to the "intra-enterprise conspiracy doctrine" used by some circuits at the time in favor of a rule that a company and its wholly owned subsidiary are "incapable of conspiring with each other for purposes of Section 1." Id. at 777. Copperweld discussed at length the complementary purposes of Section 1 of the Sherman Act and Section 2, which bars monopolization by a single entity, observing that "[h]ad Congress intended to outlaw unreasonable restraints of trade as such, Section 1's requirement of a contract, combination, or conspiracy would be superfluous, as would the entirety of Section 2." Id. at 775; see also E&L Consulting, Ltd. v. Doman

Indus. Ltd., 472 F.3d 23, 29 (2d Cir. 2006) ("Section 1 generally requires a combination or other form of concerted action between two legally distinct entities resulting in an unreasonable restraint on trade."); In re Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419, 438 (S.D.N.Y. 2015) ("[T]o run afoul of Section 1, the unreasonable restraint must result from an agreement between two or more entities.").

The nature of an agreement required to sustain a Section 1 claim has been defined by the Second Circuit and the Supreme Court. Behavior resulting from "mere interdependence unaided by an advance understanding among the parties" will not suffice. Starr v. Sony BMG Music Entm't, 592 F.3d 314, 322 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 556 n.4). Nor will a series of commercial contracts furthering one parties' alleged unlawful objective, since both parties must have "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012). That meeting of minds may be shown by a contract that eliminates competition or by evidence of a conspiracy to do so. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (conspiracy to maintain prices established by evidence tending to exclude possibility of independent

action); United States v. First Nat. Bank & Trust Co. of Lexington, 376 U.S. 665, 669 (1964) (bank consolidation that eliminated competition was unreasonable restraint on trade despite "predatory purpose").

If a plaintiff establishes the existence of an illegal contract or combination, it must then demonstrate that the alleged agreement unreasonably restrains trade. Certain restraints on trade, such as minimum price fixing, may have "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit" that they are deemed per se unreasonable. State Oil Co. v. Khan, 522 U.S. 3, 17 (1997). Most restraints are analyzed instead under the so-called "rule of reason" which looks to determine whether the alleged restraint is unreasonable because its "anticompetitive effects outweigh its precompetitive benefits." E & L Consulting, Ltd., 472 F.3d at 29.

### 2. Merced's Allegations

Merced claims that Barclays's daily contracts and swap contracts operated to unreasonably restrain trade in the Trading Hubs during the Class Period. Those contracts, Merced argues, "compensated Barclays for engaging in uneconomic conduct to restrain . . . the normal competitive forces of supply and demand" in those markets. (Dkt. No. 1 at ¶¶ 62-65.) By intentionally interfering with competitive market

27

forces through its purchases and sales of daily electricity contracts, Merced argues that Barclays injected "false and non-competitive" prices into markets that were intended to be based "exclusively on freely-competitive market transactions." (Id.)

Barclays argues in its Motion that Merced has failed to allege any entities acting in concert, as required to establish a Section 1 violation. It points out that the Complaint describes no "concerted action between at least two legally distinct economic entities" as required by Copperweld and subsequent Second Circuit cases. See E&L Consulting Ltd., 472 F.3d at 29. Merced responds that to state a Section 1 cause of action it need only allege the existence of a contract which resulted in an unreasonable restraint of trade -- here, Barclays's execution of numerous daily electricity contracts with an aggregated anti-competitive effect. Because its high-volume trading in daily and swap contracts restrained normal forces of supply and demand, it argues, it need not additionally plead that the parties had a common purpose.

A similar argument was rejected in Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P., 786 F. Supp. 2d 1190 (S.D. Tex. 2009). The plaintiff alleged that defendants' below-market rate contracts with natural gas customers

constituted concerted action cognizable under Section 1. The
Rio Grande court found no concerted action, observing that
"the fact that a person accepts the terms of a contract does
not, without more, generate the type of concerted action
necessary to violate Section 1." Id. at 1199. The contracts
at issue here, as in Rio Grande, are trades involving
unidentified buyers and sellers of a commodity. In Rio Grande,
the court found that under such circumstances the plaintiff
had "failed to make sufficient allegations to suggest that
there was no independence of action between Defendants and
their natural gas customers." Id. at 1199.

Merced cites two district court cases, Eskofot A/S v.
E.I. Du Pont De Nemours & Co., 872 F. Supp. 81 (S.D.N.Y. 1995)
and Procaps S.A. v. Patheon Inc., 36 F. Supp. 3d 1306 (S.D.
Fla. 2014) for the proposition that where a plaintiff alleges
a contract or combination in restraint of trade, "there is no
need to show a common purpose in order to prove the absence
of independent action because the relevant merger or contract
amply demonstrates that there was no independence of
action". Eskofot, 872 F. Supp. at 92. Eskofot involved
allegedly anticompetitive merger and supply agreements
between the defendant, a printing equipment supplier, and
third parties. The court discussed the distinction between a
Section 1 conspiracy claim, which requires proof of a common

29

purpose to differentiate independent action from concerted action, and a Section 1 contract claim, which does not require such a showing because the existence of the contract itself demonstrates concerted action. It found that to survive a motion to dismiss, the plaintiff needed only to allege the specific merger agreements and allege that they resulted in an unreasonable restraint of trade. Procaps similarly involved a "collaboration agreement" allocating customers and territories among competitors, which on a summary judgment motion was found to violate Section 1 of the Sherman Act despite one party's lack of specific agreement to unlawful conduct. The Procaps court distinguished conspiracy claims under Section 1, like that in Monsanto, from "situations where an express contract is itself alleged to restrain trade." Procaps, 36 F. Supp. at 1320.

Eskofot, Procaps, and two other decisions Merced cites, National Society of Professional Engineers v. United States, 435 U.S. 679, 690 (1978) and United States v. American Express Co., 88 F. Supp. 3d 143, 167 (E.D.N.Y. 2015), are distinguishable by the fact that in each of those cases the disputed contract 1) demonstrated a lack of independent action and 2) by its terms, created an anti-competitive effect. Each contract on its own operated to diminish competition: by executing a merger, (Eskofot), sharing price

information (National Society of Professional Engineers), defining market share (Procaps), imposing a restrictive pricing provision (American Express) or otherwise restraining trade. Here, by contrast, Merced alleges that the aggregate effect of Barclays's trades at non-market rates with unidentified counterparties restrained market competition. The only "meetings of the minds" alleged in the Complaint, though, are agreements between parties acting independently to buy or sell electricity -- even if Barclays had an ultimately anticompetitive purpose in mind. The terms of an immediate agreement to sell "does not . . . without more, place illicit restrictions on the parties' behavior." Rio Grande, 786 F. Supp. 2d at 1199.

In short, what Merced alleges is the type of unilateral action more properly characterized as a Section 2 claim. The Court is not persuaded that the mere existence of a series of contracts between a defendant and unidentified counterparties in the service of the defendant's unilateral scheme constitutes an agreement to unreasonably restrain trade under Section 1 of the Sherman Act. Accordingly, the Court finds that Merced's Section 1 claim falls short of alleging an agreement or concerted effort in restraint of trade. Because no claim may be brought under Section 1 in the absence of such a cognizable agreement, the Court need not discuss

further whether Merced has pled a restraint of trade or a relevant product market to find that Merced has failed to "raise a right to relief above the speculative level" as to Count One of the Complaint. Twombly, 550 U.S. at 555. Accordingly, the Court grants the Motion with regard to Merced's Section 1 claim.

D.   SECTION 2 OF THE SHERMAN ACT

    1. Legal Standard

Where a Section 1 claim demands a showing of concerted actions, Section 2 of the Sherman Act, 15 U.S.C. Section 2, outlaws "both concerted and unilateral behavior" that threatens actual monopolization. Copperweld, 467 U.S. at 767 n.13. Plaintiffs alleging a claim of monopolization under Section 2 must allege: "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (quoting United States v. Grinnell Corp., 384 U.S. 563, 571 (1966)). The purpose of Section 2 of the Sherman Act is to prevent conduct which "unfairly tends to destroy competition itself" and to protect the public from the failure of the market. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993). "To safeguard

32

the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).

A claim of monopoly power may be alleged by pleading 1) power to control prices or exclude competition, or 2) possession of a predominant share of the relevant market. Grinnell Corp., 384 U.S. at 571; Bonded Concrete, Inc. v. D.A. Collins Constr. Co., 29 F. App'x 725, 726 (2d Cir. 2002); Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998). Monopoly power is more commonly established by showing that the defendant holds a large percentage share of the relevant market. In order to make this type of showing, a plaintiff proceeds by defining the relevant market in geographic terms and alleging the defendants' share of that market relative to other participants. See United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995); see also Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001); AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999). Determining a relevant geographic and product market is a "deeply fact-intensive inquiry," and for that reason courts often hesitate to grant motions to dismiss for failure to plead a relevant product market. Eastman Kodak Co.

33

v. Image Technical Servs., Inc., 504 U.S. 451, 482 (1992);
Todd, 275 F. 3d at 199-200.

    2. Merced's Monopolization Claim

    Merced's Section 2 claims of monopolization and, in the
alternative, attempted monopolization, are premised on
Barclays's intent and ability to dictate the Daily Index
prices on both the ICE and Dow Jones exchanges. By
intentionally engaging in large quantities of money-losing
purchases and sales in the daily markets to reap profits from
its swap contracts, Merced argues, Barclays used its monopoly
power to prevent free markets from operating and control
prices. (Dkt. No. 1 at ¶66-68.) As a result "prices under
contracts that settled against or were tied to the Daily Index
Prices at the manipulated locations during the Class Period
did not result from legitimate market information, supply
factors, and demand factors." (Id. at ¶ 135.)

    Barclays objects, first, that Merced's Section 2 claim
falls short because it does not describe a relevant product
market or barriers to entry for other participants in the
market. (Dkt. No. 13 at 19.) It contends that although courts
may consider ability to control prices in assessing monopoly
power, Merced has not shown that a monopoly can be alleged on
that basis alone. It relies on United States v. E. I. du Pont
de Nemours & Co., 351 U.S. 377, 393 (1956), to argue that

34

analysis of price control makes sense only in the context of other firms' ability to compete.

As Merced points out, though, monopoly power need not be shown through allegations of a defendant's relative market share. (Dkt. No. 14 at 17.) A plaintiff may also establish Section 2 monopoly power by way of direct evidence of a defendants' power to control prices, as the Second Circuit made clear in Tops Markets. Tops Markets held that monopoly power for purposes of a Section 2 claim "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." 142 F.3d at 98 (citing K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 128 (2d Cir. 1995)).

The Second Circuit has repeatedly reaffirmed that pleading a defendant's direct control over prices is an alternative to pleading relevant market share. See Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006); Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 500 (2d Cir. 2004) ("Monopoly power . . . can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."); PepsiCo, Inc., 315 F.3d at 107 (finding "authority to support

35

[plaintiff's] claim that a relevant market definition is not a necessary component of a monopolization claim"). The Circuit Court clarified in Heerwagen that a plaintiff seeking to prove monopoly power by direct evidence must still show that the defendant controlled prices "with reference to a particular market." 435 F.3d at 229. Summarizing Circuit law on the question of direct evidence of monopoly power, a recent district court decision, Shak v. JP Morgan Chase & Co., held that "monopoly power may be established, not only by proof of a defendant's market share in a relevant market, but alternatively by direct evidence of a defendant's price control or exclusion of competitors from a particular market in a manner indicative of its possession of monopoly power." No. 15 Civ. 992, 2016 WL 154119, at *12 (S.D.N.Y. Jan. 12, 2016). Other courts have upheld claims of price manipulation in commodities trading through direct evidence of pricing power. See In re Term Commodities Cotton Futures Litig., No. 12 Civ. 5126, 2013 WL 9815198, at *24 (S.D.N.Y. Dec. 20, 2013) (finding "market anomalies" reasonably suggested Defendants' ability to control prices); In re Crude Oil Commodity Futures Litig., 913 F. Supp. 2d 41, 53 (S.D.N.Y. 2012) (finding plaintiff pled monopolization by showing close correlation between price shifts and defendants' actions).

Under the standard set out in Top Markets and subsequent

case law, Merced presents factual allegations that Barclays did successfully capture market share sufficient to move index prices in its favor. The Complaint incorporates the FERC Report's conclusions that Barclays manipulated the ICE Daily Index Prices during 655 product days over 35 product months. (See Dkt. No. 1 at ¶¶ 45, Ex. A.) The table appended to Merced's Complaint, taken from the FERC Report, offers a detailed breakdown of Barclays's trading by month, trading hub, product, and price. It shows the number of days during each month that Barclays benefited from its alleged manipulative trades: during 27 out of 35 product months in which Barclays is alleged to have engaged in manipulative trades, the number of days in which it benefited was greater than 25. (Dkt. No. 1, Ex. A.) The duration of time during which Barclays engaged in anticompetitive trading, and the correlation between those trades and the ICE Daily Index prices' increases and decreases in response, make out a plausible claim that Barclays engaged in improper conduct that "ha[d] the effect of controlling prices." PepsiCo, 315 F.3d at 108.

Barclays contends that even if it can be shown that it established large trading positions for the purpose of benefiting its financial swaps, Merced has not pled facts showing that it did so through anti-competitive or

exclusionary conduct. (Dkt. No. 13 at 19.) Regardless of
Barclays's trading positions, it argues, no competing traders
were excluded from accessing or trading on the ICE's
electronic platform. Further, it argues, citing Brooke Grp.
v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993),
that proof of above- or below-cost pricing is insufficient to
establish anticompetitive conduct.

Barclays's narrow definition of anticompetitive or
exclusionary conduct is not supported by Second Circuit law.
The Second Circuit has defined anticompetitive conduct as
"conduct without a legitimate business purpose that make
sense only because it eliminates competition." In re Adderall
XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014); see
also New York ex rel Schneiderman v. Actavis PLC, 787 F.3d
638 (2d Cir. 2015) (finding "willingness to forsake short-
term profits to achieve an anticompetitive end" indicative of
anticompetitive behavior). Conduct may be characterized as
exclusionary if it "does not further competition on the merits
or does so in an unnecessarily restrictive way." Meredith
Corp. v. SESAC, LLC, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014);
see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
472 U.S. 585, 605 (1985) (whether conduct is exclusionary
depends on "whether it has impaired competition in an
unnecessarily restrictive way").

Merced has pled facts showing that Barclays "controlled the ICE Daily Index when it wanted to for its own pecuniary benefit" on its financial swaps, through anticompetitive daily contracts that moved the ICE Daily Index. (Dkt. No. 14 at 13.) Barclays's payment of supra-competitive prices to benefit its financial swaps is the type of conduct that "makes sense only because it eliminates competition." Adderall, 754 F.3d at 133. The Court need not infer Barclays's motive for engaging in money-losing daily contract transactions, however, because Merced has included facts in its Complaint that plainly suggest Barclays's conduct was intended to artificially inflate or deflate market prices and constrain the market for other buyers and sellers of electricity. The allegations in support of Merced's Section 2 claim include specific communications, drawn from the FERC Report, that show Barclays's traders' intentional efforts to achieve and use monopoly power to manipulate prices. For instance, Merced cites one trader telling another via instant message that he was "trying to drive price in fin[ancial] direction" (Dkt. No. 1 at ¶¶ 75-76) and another asking a colleague "how far did you move the index," to which the colleague replied "not too far . . . shoulda started earlier, but my goal was to keep the sp/palo tighter[.]" (Id. at ¶71.) One trader asked the head of the West Power Desk whether he was "going to have

39

fun with the index all month." (Id. at ¶89.)

Not only did Barclays's money-losing trades have no legitimate business purpose, they had an actual exclusionary and anticompetitive effect on the relevant market. Merced alleges in its Complaint that the quantity of electricity available for trading in each Trading Hub is not unlimited, meaning that Barclays's high-volume purchases of daily contracts at money-losing prices, solely for the purpose of maximizing swap contract profits, displaced legitimate purchasers from trading in the supply of electricity encumbered by Barclays. (See Dkt. No. 14 at 16.)

Taking into consideration the preceding allegations of Barclays's ability to distort ordinary forces of supply and demand in setting the Daily Index Prices, and its willful maintenance of that power through uneconomical physical trading positions, the Court is persuaded that Merced has alleged facts sufficient to state a claim for unlawful monopolization under Section 2 of the Sherman Act and denies the Motion as to Counts Two and Three of the Complaint.

E.   CALIFORNIA UNFAIR COMPETITION LAW

1. Legal Standard

California's Unfair Competition Law ("UCL") bans "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200 et seq. To state a claim under

40

the UCL, a plaintiff must show "a loss of deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and that the economic injury was the result of, i.e. caused by, the unfair business practice." Allergan, Inc. v. Athena Cosmetics Inc., 640 F.3d 1377, 1379 (Fed. Cir. 2011).

Under its "unlawful" prong, "the UCL borrows violations from other laws by making them independently actionable as unfair competitive practices." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1143 (Cal. 2003); see also Berryman v. Merit Prop. Mgmt., Inc., 152 Cal. App. 4th 1544, 1554 (Cal. Ct. App. 2007) (quoting Lazar v. Hertz Corp., 69 Cal. App. 4th 1494, 1505 (Cal. Ct. App. 1999). Other federal courts have permitted parties to plead UCL claims predicated on an antitrust violation. See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litigation, No. 11 MDL 2262, 2015 WL 6243526, at *95 (S.D.N.Y. Oct. 20, 2015). However, if a plaintiff fails to plead the claim under the 'borrowed' law, it cannot state a UCL claim either. See Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc., 682 F. Supp. 2d 1003, 1020 (N.D. Cal. 2010).

The statute also proscribes unfair practices not specifically denoted under another law. An act or practice is deemed unfair "if the consumer injury is substantial, is not

41

outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." Berryman, 152 Cal. App. 4th at 1555. California cases look to whether the alleged unfair practice affects customers and the public generally rather than an individual holder of a contract. See, e.g., In re Webkinz Antitrust Litigation, 695 F. Supp. 2d 987, 998-99 (N.D. Cal. 2010) (finding the "central issue" to the UCL to be "whether the public at large, or consumers generally, are affected by the alleged unlawful business practice of defendants.").

The UCL permits a plaintiff to recover only restitution, not general civil damages. See Korea Supply Co., 29 Cal. 4th at 1144. Because recovery is limited to restitution, a plaintiff pleading a violation of the UCL must show that the defendant "obtained something of value to which [it] was not entitled." In re LIBOR, 2015 WL 6243526, at *95. However, this need not be as a result of direct business dealings between the parties. See Law Offices of Matthew Higbee v. Expungement Assistance Servs., 214 Cal. App. 4th 544, 557 (Cal. Ct. App. 2015). Lost market share by a business competitor, for instance, is recognized as an injury sufficient to establish a claim under the UCL. See id. at 565.

## 2. Merced's Allegations under the UCL

In connection with its state law claims, Merced alleges that Barclays' price manipulation constituted "unfair, unconscionable, deceptive or fraudulent acts" causing injury to Merced and other parties trading in the Trading Hubs during the Class Period. Merced seeks restitution under the UCL. (Dkt. No. 1 at ¶¶ 145-48.)

In adjudicating the Motion as it relates to Merced's UCL claim, the Court must first decide whether Merced has pled an economic injury cognizable under the UCL. Merced alleges injury in the form of its payment of supracompetitive prices for physical electricity under contracts that settled based on Daily Index Prices manipulated by Barclays. The California Supreme Court has stated that there are "innumerable" ways in which economic injury from unfair competition may be shown. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323 (Cal. 2011). These ways include overpaying or receiving less in a transaction than a plaintiff otherwise would have. Id.

In its Motion, Barclays takes the position that the UCL's limitation to restitutionary relief, rather than monetary damages, requires Merced to show it lost money directly to Barclays or has an interest in Barclays's earnings on its electricity trades. (See Dkt. No. 13 at 22.) It cites Korea Supply Co.'s holding that "an individual may recover profits

43

unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." 29 Cal. 4th at 1148.

The question of relief, however, is distinct from the question of whether Merced has pled a cognizable claim of unfair competition. Under the UCL, there are "innumerable ways" to show economic injury from unfair competition. Allergan, Inc. v. Athena Cosmetics, Inc., 640 F.3d 1377, 1382 (Fed. Cir. 2011). Allergan rejected a "direct business dealings" requirement, noting that if a complaint sufficiently alleges an injury that was caused by the defendants' unfair business practices, it has satisfied the requirements of the UCL.

Here, Merced has alleged economic injury on behalf of itself and other members of the Proposed Class. By overpaying for electricity, or receiving less than market rates in sales of electricity, Merced and others holding contracts that settled according to the Daily Index Prices were injured. See Clayworth v. Pfizer, Inc., 49 Cal. 4th 758, 788 (Cal. 2010) (finding plaintiffs could bring UCL claim where they paid more than they otherwise would have because of a price-fixing conspiracy in violation of state law); Hall v. Time Inc. 158 Cal. App. 4th 847, 854 (Cal. Ct. App. 2008) (finding UCL standard is satisfied when the plaintiff has "expended money

44

due to the defendant's acts of unfair competition.").

Having concluded that Merced has alleged an economic injury, the Court must also decide whether Merced has alleged facts describing an unlawful practice by Barclays. Upon its findings, supra, that Merced has made out a claim for unlawful monopolization by Barclays in violation of federal antitrust law, the Court is persuaded that Merced has adequately pled an unlawful business practice under the UCL causing the economic injury described above.

Although it remains for discovery to shed light on whether Merced will ultimately be able to prove its entitlement to restitution at trial, this "does not demonstrate that it lacks standing to argue for its entitlement to [it]." Clayworth, 49 Cal. 4th at 789; see also Allergan, 640 F.3d at 1382. The question of whether Merced is entitled to restitution, and how much, is a factual issue not to be decided on a motion to dismiss. Merced's allegations in the Complaint set forth an unlawful act -- Barclays's violations of federal antitrust law -- and an economic injury: Merced and other proposed Class members' overpayment for electricity. These allegations are sufficient to state a claim under the UCL. Accordingly, the Court denies the Motion as to Count IV, violation of the UCL.

F.   UNJUST ENRICHMENT

a. Legal Standard

Under New York choice of law rules, an interest analysis is applied to claims arising in equity, such as claims for unjust enrichment. See In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 149 (S.D.N.Y. 2008) (applying significant contacts test to determine which state law to apply). In their briefing both parties, without conducting an overt interest analysis, address the unjust enrichment cause of action as a claim under New York law. (See Dkt. No. 13 at 23; Dkt. No. 14 at 24.) Therefore, the Court will address the claim under New York law.[7]

To state a claim of unjust enrichment under New York law, the plaintiff must allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or [benefit] to the plaintiff." Golden Pacific Bancorp v. Fed. Deposit Ins. Corp., 273 F.3d 509, 519 (2d Cir. 2001); Kaye v. Grossman, 202 F. 3d 611, 616 (2d Cir. 2000); see also

---

[7] Under such an analysis, it would appear that California might have the most significant contacts as the state in which plaintiffs reside and suffered losses. However, there is no cause of action in California for unjust enrichment. See Grund v. Delaware Charter Guarantee & Trust Co., 788 F. Supp. 2d 226, 251 (S.D.N.Y. 2011) (citing Levine v. Blue Shield of California, 189 Cal. App. 4th 1117, 1138 (Cal. Ct. App. 2010)).

Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d
164, 177 (S.D.N.Y. 2004). Under New York law, "there is no
requirement that the aggrieved party be in privity with the
party enriched at his or her expense," see Sperry v. Crompton
Corp., 8 N.Y. 3d 214, 215 (N.Y. 2007), but an unjust
enrichment claim requires "some type of direct dealing or
actual, substantive relationship" with a defendant. Reading
Int'l, Inc. v. Oaktree Capital Mgmt., 317 F. Supp. 2d 301,
334 (S.D.N.Y. 2003).

    b. Merced's Claims

    Barclays argues in its Motion that Merced fails to allege
facts that, if proven, would establish any direct dealing or
relationship between it and Barclays. Merced responds that
privity is not required under New York law, and that it has
sufficiently alleged a direct relationship between it and
Barclays on the basis of both parties having purchased
electricity on the North Path trading hub. In In re Amaranth,
587 F. Supp. 2d 513 at 547, the court dismissed an unjust
enrichment claim where plaintiff alleged losses based on
defendants' market manipulation because the alleged link
"from defendants' market manipulations to the general natural
gas futures market to plaintiffs' trades" did not make out a
direct relationship, trading or otherwise, between the
parties to support an unjust enrichment claim. Id.

Merced entered into contracts with other California irrigation districts that settled based on market-derived Daily Index Prices. At no time does it allege that it or any members of the proposed Class traded or dealt directly with Barclays in any manner. Since Merced has not pled facts that make out any direct or substantive relationship between itself, or any other members of the purported Class, and Barclays, the facts alleged in the Complaint do not sustain an unjust enrichment claim. Therefore, the Court grants the Motion as to Count Five, Merced's unjust enrichment claim.

G.   LEAVE TO AMEND

Rule 15 of the Federal Rules of Civil Procedure provides that courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should be granted unless there is "any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); see also Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 333 (2d Cir. 2000) (noting that leave to amend is "discretionary" but should be "freely given"); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993) ("The

48

rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.").

The Court has concluded that Plaintiff's allegations fail to state a claim under Section 1 of the Sherman Act and also fail to state a claim for unjust enrichment. The Court is not persuaded that it would be futile for Plaintiff to be given the opportunity to amend its Complaint by adding new factual allegations to restate the claims dismissed. Accordingly, the Court will afford plaintiffs the opportunity to submit a three-page letter to the Court within ten days of the date of this Decision and Order, explaining how it would correct the deficiencies in its Complaint if granted leave to replead.

## IV.   ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Motion (Dkt. No. 12) filed by defendant Barclays Bank PLC to dismiss the Complaint ("Complaint", Dkt. No. 1) of plaintiff Merced Irrigation District ("Plaintiff"), is **GRANTED** as to Counts I and V of the Complaint and **DENIED** as to Counts II, III, and IV of the Complaint, and it is further

**ORDERED** that, should Plaintiff wish to seek leave to

49

file an amended complaint, Plaintiff may submit a letter of
no more than three pages within ten days of the date of this
Decision and Order, setting forth their position as to why
leave to amend would not be futile and should be granted.


**SO ORDERED.**

Dated:      New York, New York
            29 February 2016

                                          Victor Marrero
                                            U.S.D.J.