**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

**MERCED IRRIGATION DISTRICT, on**            :
**behalf of itself and all others similarly**   :
**situated,**                                   :        **No. 1:15-cv-04878-VM-GWG**
                                                :
                                   **Plaintiff,**   :
                                                :
              **v.**                            :
                                                :
**BARCLAYS BANK PLC,**                          :
                                                :
                                   **Defendant.**   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**PLAINTIFF'S COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,**
**AND FOR AN INCENTIVE AWARD TO THE NAMED PLAINTIFF**

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................ 2

III.    ARGUMENT .................................................................................................. 3

      A.     The Common Fund Doctrine Applies Here ...................................... 3

      B.     As a Percentage of the Settlement Fund, the Requested Fees are Fair and Reasonable ........................................................................ 5

      C.     Application of the Lodestar "Crosscheck" Also Supports the Reasonableness of the Fee Request ................................................. 6

      D.     The *Goldberger* Factors Support the Reasonableness of the Fee Request .............. 9

            1.     Time and Labor Expended by Plaintiff's Counsel (*Goldberger* Factor 1) .................................................. 10

            2.     Magnitude and Complexities of the Litigation (*Goldberger* Factor 2)..... 12

            3.     Risks to the Litigation (*Goldberger* Factor 3)........................... 13

            4.     Quality of Representation (*Goldberger* Factor 4).................... 16

             5.     Requested Fee in Relation to the Settlement (*Goldberger* Factor 5) ........ 18

            6.     Public Policy Considerations (*Goldberger* Factor 6) ............... 19

      E.     Expenses Incurred by Plaintiff's Counsel in This Litigation Should Be Reimbursed ............................................................................. 21

      F.     The Named Plaintiff Should Be Granted a Reasonable Incentive Award............. 22

IV.     CONCLUSION .............................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anwar v. Fairfield Greenwich Ltd.*
   No. 09-CV-118 VM, 2012 WL 1981505 (S.D.N.Y. June 1, 2012) ......................... *passim*

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*
   522 F.3d 182 (2d Cir. 2008) ......................................................................... 7

*Arbuthnot v. Pierson*
   607 F. App'x 73 (2d Cir. 2015) .................................................................... 7

*Boeing Co. v. Van Gemert*
   444 U.S. 472 (1980) ..................................................................................... 4

*City of Detroit v. Grinnell Corp.*
   495 F.2d 448 (2d Cir. 1974) ....................................................................... 13

*City of Providence v. Aeropostale, Inc.*,
   No. 11 CIV. 7132 (CM) (GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..... 7, 20, 22

*Concord Assocs., L.P. v. Entm't Props. Trust*
   817 F.3d 46 (2d Cir. 2016) ........................................................................ 14

*Dial Corp. v. News Corp.*
   317 F.R.D. 426 (S.D.N.Y. 2016) ........................................................... 22, 23

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156 (1974) ................................................................................... 19

*Goldberger v. Integrated Res., Inc.*
   209 F.3d 43 (2d Cir. 2000) ................................................................. *passim*

*Gulino v. Symbol Techs., Inc.*
   No. 06 CV2810 (JG) (AKT), 2007 WL 3036890 (E.D.N.Y. Oct. 17, 2007) ............... 24

*In re Air Cargo Shipping Servs. Antitrust Litig.*
   No. 06-MD-1775 (JG) (VVP), 2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015) ........... 23, 24

*In re Bisys Sec. Litig.*
   No. 04 Civ. 3840(JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ........................ 6

*In re Bristol-Myers Squibb Sec. Litig.*
   361 F. Supp. 2d 229 (S.D.N.Y. 2005) .......................................................... 15

*In re China MediaExpress Holdings, Inc. S'holder Litig.*
   No. 11-CV-0804 (VM), 2015 WL 13639423 (S.D.N.Y. Sept. 18, 2015) ................... 5

*In re DDAVP Direct Purchaser Antitrust Litig.*
   No. 05 Civ. 2237 (CS), 2011 WL 12627961 (S.D.N.Y. Nov. 28, 2011) ..................... 9

*In re DDAVP Indirect Purchaser Antitrust Litig.*
   No. 05 Civ. 2237 (CS), 2013 WL 10114257 (S.D.N.Y. Dec. 18, 2013) ................... 18

*In re Facebook, Inc.*
   674 F. App'x 37 (2d Cir. 2016) .................................................................... 5

## TABLE OF AUTHORITIES

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*
 No. MDL 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ................................ 5, 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
 No. 02-CV-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............. 8, 16

*In re Giant Interactive Group, Inc. Sec. Litig.*
 279 F.R.D. 151 (S.D.N.Y. 2011) ..................................................................................... 21

*In re Global Crossing Sec. & ERISA Litig.*
 225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................................... 21

*In re Hi-Crush Partners L.P. Sec. Litig.*
 No. 12-CIV-8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ................... 20, 22

*In re Initial Pub. Offering Sec. Litig.*
 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................................ 6, 19

*In re Lloyd's Am. Tr. Fund Litig.*
 No. 96 CIV.1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ..................... 4, 6

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*
 No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................... 16, 17

*In re Marsh ERISA Litig.*
 265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................................... 5, 17, 18

*In re Medical X-Ray Film Antitrust Litig.*
 No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ......................................... 18

*In re NASDAQ Market-Makers Antitrust Litig.*
 187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................................... 16

*In re Remeron Direct Purchaser Antitrust Litig.*
 No. Civ. 03-0085 (FSH), 2005 WL 3008808 (D.N.J. Nov. 9, 2005) .............................. 18

*In re Sumitomo Copper Litig.*
 74 F. Supp. 2d 393 (S.D.N.Y. 1999) .................................................................................. 8

*In re Telik, Inc. Sec. Litig.*
 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................................... 13

*In re Visa Check/Mastermoney Antitrust Litig.*
 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................... 4, 15

*In re Vitamin C Antitrust Litig.*
 No. 06-MD-01738 (BMC) (JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ............. 23

*In re WorldCom, Inc. Sec. Litig.*
 388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................................. 9

*In re Zinc Antitrust Litig.*
 No. 14-CV-3728 (KBF), 2016 WL 3167192 (S.D.N.Y. June 6, 2016) ........................... 12

*In the Matter of Cont'l Ill. Sec. Litig.*
 962 F. 2d 566, 568-69 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992) ..... 7

## TABLE OF AUTHORITIES

*Khait v. Whirlpool Corp.*
No. 06-6381 (ALC), 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ...................... 6, 20, 23

*LeBlanc-Sternberg v. Fletcher*
143 F.3d 748 (2d Cir. 1998) ............................................................................................. 7

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*
551 U.S. 877 (2007) ....................................................................................................... 12

*Maley v. Del Glob. Techs. Corp.*
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................................................................... 6, 8, 20

*Maywalt v. Parker & Parsley Petroleum Co.*
963 F. Supp. 310 (S.D.N.Y. 1997) ................................................................................... 6

*Merced Irrig. Dist. v. Barclays Bank PLC*
165 F. Supp. 2d 122 (S.D.N.Y. 2016) ............................................................................ 14

*Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*
No. 06 CIV.4270 (PAC), 2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) .......................... 6

*Morris v. Affinity Health Plan, Inc.*
859 F. Supp. 2d 611 (S.D.N.Y. 2012) .............................................................................. 8

*Odom v. Hazen Transp., Inc.*
275 F.R.D. 400 (W.D.N.Y. 2011) ..................................................................................... 4

*Olick v. Parker & Parsley Petroleum Co.*
145 F.3d 513 (2d Cir. 1998) ............................................................................................. 6

*Reiter v. Sonotone Corp.*
442 U.S. 330 (1979) ....................................................................................................... 19

*Roberts v. Texaco, Inc.*
979 F. Supp. 185 (S.D.N.Y. 1997) ................................................................................. 23

*Seijas v. Republic of Argentina*,
No. 04-cv-400 (TPG), 2017 WL 1511352 (S.D.N.Y. Apr. 27, 2017) ............................... 9

*Springer v. Code Rebel Corp.*
No. 16-CV-3492 (AJN), 2018 WL 1773137 (S.D.N.Y. Apr. 10, 2018) ........................... 8

*Stefaniak v. HSBC Bank USA, N.A.*
No. 1:05-CV-720 S, 2008 WL 7630102 (W.D.N.Y. June 28, 2008) ................................ 6

*Steiner v. Williams*
No. 99 CIV. 10186 (JSM), 2001 WL 604035 (S.D.N.Y. May 31, 2001) ........................ 14

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*
No. 01-CV-11814(MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ........................... 15

*Transmission Agency of N. California v. F.E.R.C.*
628 F.3d 538 (D.C. Cir. 2010) ....................................................................................... 15

*Velez v. Novartis Pharm. Corp.*
No. 04 CIV. 09194 (CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ...................... 22

## TABLE OF AUTHORITIES

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*
   540 U.S. 398 (2004)............................................................................. 12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
   396 F.3d 96 (2d Cir. 2005)............................................ 4, 8, 12, 19

*Weseley v. Spear, Leeds & Kellogg*
   711 F. Supp. 713 (E.D.N.Y. 1989) ............................................ 12

*Woolsey v. J.P. Morgan Ventures Energy Corp.*
   691 F. App'x 308 (9th Cir. 2017) ............................................... 15

*Wright v. Stern*
   553 F. Supp. 2d 337 (S.D.N.Y. 2008) ...................................... 23

**Docketed Cases**

*Gormley v. MagicJack VocalTec Ltd.*, No. 1:16-cv-01869 (VM), slip op. at 1
   (S.D.N.Y. Jan. 19, 2018) (Marrero, J.) ....................................... 5

*In re NYC Bus Tour Antitrust Litig.*, No. 13-CV-0711 (ALC), slip op. at 2
   (GWG) (S.D.N.Y. Oct. 21, 2014) .............................................. 18

*In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264 (RWS), slip op at 10
   (S.D.N.Y. June 10, 2013).............................................................. 5

*In re OxyContin Antitrust Litig.*, No. 1:04-md-01603 (SHS), slip op. at 2, 9
   (S.D.N.Y. Jan. 25, 2011) ............................................................ 18

*In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894-AWT, slip op. at 7
   (D. Conn. Dec. 9, 2014) ............................................................... 8

*In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894-AWT, slip op. at 7-8
   (D. Conn. Dec. 9, 2014) ............................................................. 23

*In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), slip op. at 6
   (D. Conn. Dec. 9, 2014)............................................................... 20

*In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), slip op. at 7
   (D. Conn. Dec. 9, 2014) ............................................................... 5

**Federal Statutes**

15 U.S.C. § 1........................................................................................ 18

15 U.S.C. § 2........................................................................... 14, 18, 20

**Federal Rules**

Federal Rules of Civil Procedure

   Rule 23(g) ....................................................................................... 17

   Rule 30(b)(6)................................................................................... 11

**Other Authorities**

Herbert Hovenkamp, THE ANTITRUST ENTERPRISE: PRINCIPLE AND EXECUTION 105 (2005)...... 12

I.    **INTRODUCTION**

For more than five years, Plaintiff's Counsel[1] have invested substantial time and money investigating and prosecuting, on a fully contingent basis, a unique and complex antitrust class action involving energy trading claims of a type that have generally failed in prior cases.  Indeed, even in the face of an investigation by the Federal Energy Regulatory Commission ("FERC") into Defendant Barclays Back PLC's ("Barclays") alleged manipulation of the daily index prices at four western U.S. electricity trading hubs, not a single other case on behalf of injured market participants was filed anywhere, by anyone.  Given how antitrust class action cases usually proceed, and the fact that there had been a government investigation that resulted in a FERC Order against Barclays, many highly skilled plaintiffs firms decided to avoid the significant risks taken by Plaintiff's Counsel in pursuing this case, and devoted their time and resources elsewhere.  Here, as a result of the skill and tenacity of Plaintiff's Counsel, a $29,000,000 cash settlement with Barclays has been achieved, which represents a 14% to 29% recovery of estimated single damages.  This is an excellent result.  Notably, not a single settlement class member requested exclusion and to date there have been no objections filed.[2]

Plaintiff's Counsel respectfully submits this memorandum of law in support of their motion for an award of attorneys' fees of one-third of the Settlement Fund, reimbursement of the costs and litigation expenses incurred, and payment of an incentive award to the named plaintiff Merced Irrigation District ("Merced") in the amount of $150,000.  Over the course of their investigation and litigation of this matter, Plaintiff's Counsel have expended 10,313 hours of professional and

---

[1]    "Plaintiff's Counsel" consist of the firms Cera LLP and Klafter Olsen & Lesser LLP (collectively, "Settlement Class Counsel"), together with the Law Office of Daniel J. Sponseller and Cairncross & Hempelmann, PS.

[2]    The deadline to object to the Settlement is August 25, 2018.

para-professional time, representing a lodestar of $5,928,128.75.[3]   Additionally, Plaintiff's
Counsel incurred and are obligated for $1,409,616.21 in necessary and heretofore unreimbursed
expenses in the prosecution of this matter.[4]   Further, as set forth in the Declaration of Juan
Sandoval filed concurrently herewith, Merced also incurred expenses and spent considerable time
assisting Plaintiff's Counsel in the investigation and prosecution of this case.   The requested fee
and expense award to Plaintiff's Counsel and the incentive award to Merced are commensurate
with the time and effort spent, the risks undertaken, and the outstanding result achieved.   They are
supported in the law and should be ordered by the Court.

## II.   BACKGROUND

Plaintiff's Counsel initiated their investigation of this complex antitrust class action more
than five years ago.   Joint Decl. ¶15.   By spring of 2014, the investigation expanded to include
Merced, which assisted counsel by providing concrete examples of the financial transactions at
issue and the potential damages to the class members who were affected by the changes to daily
index prices for electricity that were caused by Barclays' alleged conduct.   *Id.* ¶¶95-98.   These
investigative efforts continued for another year, until June 23, 2015, when a comprehensive Class
Action Complaint for Violation of Federal Antitrust Laws and State Laws was filed on behalf of
Merced and all other individuals and entities who were similarly damaged by Barclays' alleged
manipulation of electricity prices at four major Western electricity trading hubs.   ECF No. 1.

---

[3]   *See* ¶¶66-71 of the Joint Declaration of Solomon B. Cera and Jeffrey A. Klafter in Support of
Plaintiff's Motion for Final Approval of Class Action Settlement, Award of Attorneys' Fees,
Reimbursement of Expenses, and for an Incentive Award to the Named Plaintiff ("Joint Decl.")
and Exhibits A-F.   Unless otherwise stated, references herein to "¶__" and "Ex. __" are to
paragraphs within, and exhibits to, the Joint Decl., filed herewith.

[4]   Exhibits B, D, E and F of the Joint Decl. lists each firm's expenses.

2

During the course of prosecuting the Class's claims, Plaintiff's Counsel successfully opposed three challenges to the sufficiency of the Complaint.  Joint Decl. ¶¶17, 19.  Full fact discovery was conducted and completed by the parties, including: the exchange of written discovery and several hundred thousand documents between the parties; eleven depositions of Barclays and Merced employees; and subpoenas for records from nine third parties, including the deposition of one.  *Id*. ¶¶22-37.  The case proceeded to class certification and *Daubert* motions, with both motions fully briefed at the time of the Settlement.  Further, expert reports (including rebuttal reports) and supporting documentation from both parties were exchanged and the experts were deposed.  *Id*. ¶¶20, 21, 38, and 39.  Only after there was a complete understanding of the strengths and weaknesses of each party's positions did the parties participate in a mediation with a nationally recognized neutral, Kenneth R. Feinberg, Esq.  *Id*. ¶¶40-42.  Even after two days of hard-fought, arms' length negotiations with Mr. Feinberg, a settlement was not agreed to, and several days of subsequent telephonic negotiations were necessary before an agreement was reached in principle.  *Id*. ¶43.  Thereafter, considerable time was spent documenting the settlement and developing a Plan of Allocation.  *Id.*

Details of Plaintiff's Counsel's investigation and subsequent litigation of this case, including a summary of the risks undertaken, the obstacles overcome, and the results achieved, are described in detail in the Joint Decl., which is incorporated herein by reference.

## III.   ARGUMENT

### A.      The Common Fund Doctrine Applies Here

The U.S. Supreme Court explained that it "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444

U.S. 472, 478 (1980).  The Second Circuit similarly recognized the "salient exception" to the "American Rule" where "an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  "[T]he attorneys whose efforts created the fund are entitled to a reasonable fee – set by the court – to be taken from the fund." *Id*.

The courts traditionally have used two methods to evaluate the reasonableness of fee requests in common fund cases: (1) the percentage method, in which "the court awards counsel a percentage of the total award received by the [class]"; and (2) the lodestar method, where "the court must multiply the number of hours reasonably billed by the reasonable hourly rate," and then "exercise its discretion to adjust the figure (and apply a multiplier to the lodestar) after considering such factors as the quality of counsel's work, the probability of success of the litigation and the complexity of the issues." *Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 412 (W.D.N.Y. 2011).

Since *Goldberger*, the trend in the Second Circuit is to apply the percentage method.  *See, e.g., In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 520 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) (the percentage-of-the-fund approach "spares the court and the parties the 'cumbersome, enervating, and often surrealistic process' of lodestar computation" (quoting *Goldberger*, 209 F.3d at 50)). The percentage method "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'"  *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (quoting *In re Lloyd's Am. Tr. Fund Litig.*, No. 96 CIV.1262 RWS, 2002 WL 31663577, at \*25 (S.D.N.Y. Nov. 26, 2002).  It also "most closely approximates the manner in which private litigants compensate their attorneys in the marketplace contingency fee model."  *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577 at \*25-26.  However, "the

lodestar remains useful as a baseline even if the percentage method is eventually chosen." *Goldberger*, 209 F.3d at 50; *see also Anwar v. Fairfield Greenwich Ltd.*, No. 09-CV-118 VM, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (Marrero, J.) (noting use of "lodestar/multiplier approach" as a "'cross-check'").

### B.    As a Percentage of the Settlement Fund, the Requested Fees are Fair and Reasonable

As included in the Notice to the members of the Settlement Class, Plaintiff's Counsel requests attorneys' fees in the amount of one-third of the $29 million Settlement Fund, or $9,666,666.66.  ECF No. 89-2.  This Court has awarded attorneys' fees amounting to one-third of the common fund created by class counsel in several instances.   *See, e.g., Anwar*, 2012 WL 1981505, at *3 (33% fee request of the approximate $7.7 million settlement fund "is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations"); *Gormley v. MagicJack VocalTec Ltd.*, No. 1:16-cv-01869 (VM), slip op. at 1 (S.D.N.Y. Jan. 19, 2018) (Marrero, J.), (awarding plaintiff's counsel 33% of $3,650,000 settlement amount); and *In re China MediaExpress Holdings, Inc. S'holder Litig.*, No. 11-CV-0804 (VM), 2015 WL 13639423, at *1 (S.D.N.Y. Sept. 18, 2015) (Marrero, J.) (awarding 33.33% of $12 million settlement fund).

Other courts within the Second Circuit have awarded similar percentages: *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2015 WL 6971424, at *1, *9 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (33% fee of $26.5 million settlement); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), slip op. at 7 (D. Conn. Dec. 9, 2014) (1/3 fee of $297 million settlement fund); *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264 (RWS), slip op at 10 (S.D.N.Y. June 10, 2013) (41% fee of $18.5 million settlement); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 135, 146–47 (S.D.N.Y. 2010)

(33.33% fee of $35 million settlement); *Khait v. Whirlpool Corp.*, No. 06-6381 (ALC), 2010 WL 2025106, at *1, *8 (E.D.N.Y. Jan. 20, 2010) (33% fee of $9.25 million settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (one-third fee of $510 million net settlement recovery); *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 CIV.4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (33% fee of $3.265 million settlement); *Stefaniak v. HSBC Bank USA, N.A.*, No. 1:05-CV-720 S, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (33% fee of $2.9 million settlement); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367–69 (S.D.N.Y. 2002) (33 1/3% of $11.5 million settlement fund); *Newman v. Caribiner Int'l Inc.*, No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001) (33-1/3% awarded from $15 million settlement, as cited in *Maley*, 186 F. Supp. 2d at 368); *Lemmer v. Golden Books Family Entm't Inc.*, No. 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) (1/3 of settlement fund awarded, as cited in *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26); *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997), *aff'd sub nom. Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir. 1998) (33.4% fee request approved on approximately $8.5 million settlement).

A one-third award is particularly warranted here given the excellent result obtained for the Settlement Class, the complex issues involved, the uniqueness of the claim, and the risks incurred by Plaintiff's Counsel from inception of the case and over the past five years as described further in Section III. D., *infra*, and the Joint Decl.

### C. Application of the Lodestar "Crosscheck" Also Supports the Reasonableness of the Fee Request

Even when not used as the primary means to determine an appropriate fee, "[t]he lodestar method remains highly useful . . . as a 'cross-check' to further ensure reasonableness." *In re Bisys Sec. Litig.*, No. 04 Civ. 3840(JSR), 2007 WL 2049726, at *2 (S.D.N.Y. July 16, 2007).  The

lodestar comprises the number of hours devoted by counsel to the litigation effort multiplied by the current, hourly billing rate of counsel.  As described by the Second Circuit, the lodestar "is the product of hours worked and an hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008).  Courts then "adjust[] that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work." *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 (CM) (GWG), 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).  Further, the *City of Providence* decision explains that "[w]here the lodestar is used as a mere cross-check, the hours document[ed] by counsel need not be exhaustively scrutinized by the district court." *Id.* (internal quotations and citations omitted).

When calculating a lodestar, the use of current market rates is appropriate.  *See Goldberger*, 209 F.3d at 56 (submitted rates are to be based on "prevailing market rates 'for comparable attorneys of comparable skill and standing in the pertinent legal community.'") (citation omitted); *see also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment").  "[T]he hourly billing rate to be applied is the 'market rate,' *i.e.,* the hourly rate that is normally charged in the community where counsel practices." *Anwar*, 2012 WL 1981505, at *3 n.2.  Further, this Court, emphasizing a market basis for fee awards, explained that courts are "'to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.'" *Id.* (quoting *In the Matter of Cont'l Ill. Sec. Litig.*, 962 F. 2d 566, 568-69 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992) (citations omitted).

Plaintiff's Counsel have expended 10,313 hours in the investigation and prosecution of this case which, using current rates divided by the fee sought, gives rise to a lodestar multiplier of 1.63. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *28 (S.D.N.Y. Nov. 8, 2010) ("'Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.'") (citations omitted). The lodestar multiplier here is well within the range of multipliers approved by courts within the Second Circuit, and falls within a multiplier-level previously approved by this Court, which has stated: "[a] multiplier of 2.42 is well within the range of lodestar multipliers approved by courts in the Second Circuit and further demonstrates the reasonableness of the requested fee." *Anwar*, 2012 WL 1981505, at *3 (citing *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999), and noting that "multipliers of 3 to 4.5 [are] common"); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 123 (Second Circuit affirmed district court determination that 3.5 multiplier was reasonable).[5]

Not only does the multiplier here fall within the range of previously approved fee requests, but it is lower than other approved multipliers, which have been described as "modest." *See, e.g., In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894-AWT, slip op. at 7 (D. Conn. Dec. 9, 2014), (33-1/3% fee award approved as supported by 2.23 lodestar multiplier); *Springer v. Code Rebel Corp.*, No. 16-CV-3492 (AJN), 2018 WL 1773137, at *5 (S.D.N.Y. Apr. 10, 2018) (33.3%

---

[5]   Multipliers significantly higher than that sought by Plaintiff's Counsel have been approved in this Circuit. For example, a multiplier of 4.65 was found to be "fair and reasonable" in *Maley*, 186 F. Supp. 2d at 371; *see also Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 623–24 (S.D.N.Y. 2012) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar" in this Circuit; awarding Class Counsel a lodestar based on a one-third attorney fee request that was "3.04 times their own lodestar, and 2.01 times the total of their lodestar and Plaintiff's Counsel's lodestar combined").

fee request approved as supported by 2.02 lodestar-multiplier); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05 Civ. 2237 (CS), 2011 WL 12627961, at *4-5 (S.D.N.Y. Nov. 28, 2011) (33-1/3% fee request approved as supported by 1.9 lodestar multiplier and described by the Court as "modest" and "well within the applicable range of reasonable percentage fund awards . . . ."). The law fully justifies award of the requested multiplier here.

> **D.     The *Goldberger* Factors Support the Reasonableness of the Fee Request**

Irrespective of the method used for determining fees, the awarded fees must be found to be "'reasonable' under the circumstances." *Goldberger*, 209 F.3d at 47 (citation omitted). Of course, "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court, [subject to] an abuse of discretion" standard. *Id.; see also Seijas v. Republic of Argentina*, No. 04-cv-400 (TPG), 2017 WL 1511352, at *9 (S.D.N.Y. Apr. 27, 2017) (reasonableness of fee is within the discretion of the court); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (same). The Second Circuit has instructed that, in the exercise of such discretion:

> [D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Goldberger*, 209 F.3d at 50 (citation omitted); *see also Anwar*, 2012 WL 1981505, at *1 (enumerating and applying the *Goldberger* factors in determining whether the "requested fee . . . is fair under the percentage-of-recovery method").

1.   **Time and Labor Expended by Plaintiff's Counsel**
     (*Goldberger* **Factor 1**)

As detailed in the Joint Decl., Plaintiff's Counsel began to investigate the claims at issue

here five years ago, and filed this case on June 23, 2015.  ECF No. 1.  Plaintiff's Counsel have

spent 10,313 hours on work performed during the course of the litigation, including:

- Conducting an extensive pre-litigation investigation lasting more than two and one-half years of Barclays' conduct with respect to the four Western electricity hubs at issue.  The investigation included an analysis of the FERC Enforcement Staff Report and Recommendations concerning Barclays, extensive communications with Merced analyzing its electricity data beginning in the spring of 2014 and continuing until the filing of the Complaint, consulting experts, and intensively researching applicable law (¶15);

- Drafting a comprehensive and detailed class action complaint alleging violations of federal antitrust laws and state law (¶¶12-14);

- Successfully opposing Barclays' three challenges to the sufficiency of the Complaint (¶¶17, 19);

- Briefing Plaintiff's motion for class certification(¶¶20, 21);

- Opposing Barclays' motion to strike Plaintiff's expert (¶21);

- Developing with Barclays a protocol for the production of hard copy and electronically stored information and a protective order (¶¶22. 23);

- Working extensively with Plaintiff's expert to determine impact and damages from Barclays' alleged conduct, exchanging expert reports and supporting materials with Barclays, defending the Plaintiff's expert and taking the deposition of Barclays' expert (¶¶38-39);

- Propounding requests for documents, interrogatories and requests for admission on Barclays, analyzing the responses, and following up with Barclays where necessary (¶¶24-25);

- Performing targeted searching, review and analysis of over 454,000 documents produced by Barclays containing in excess of 1.1 million pages including the FERC Administrative Record.  Productions included thousands of native Excel files containing massive quantities of electricity trading data and other electricity market information and more than 27,000 audio files of recorded conversations by Barclays' electricity traders (¶25);

- Deposing seven of Barclays' former employees, including the four former traders who were allegedly directly responsible for orchestrating the manipulative scheme at issue (¶26);

- Preparing six document subpoenas to FERC, ICE, Dow Jones, and three brokers who executed purchases and sales of electricity contracts for physical and financial transactions which settled against the Daily Index Prices and analyzing documents received in response (¶¶27-29);

- Preparing responses to Barclays' twenty-eight document requests and twenty-five interrogatories (¶32);

- Working with Merced during several on-site meetings to identify sources of responsive paper and ESI and work with Merced's IT department to collect over 300GB of ESI (¶33);

- Engaging in numerous meet and confer negotiations with Barclays regarding search terms and performing numerous sample tests to reduce the significant number of documents falsely hit, resulting in a review and analysis of more than 63,000 documents, with responsive documents subsequently produced on a rolling basis (¶34);

- Preparing and defending the depositions of two former Merced employees employed in the 2006-2008 timeframe and also two current employees who were proffered in response to Barclays' Fed. R. Civ. P. 30(b)(6) notice (¶¶35, 36);

- Reviewing documents obtained in response to Barclays' subpoenas to Merced's electricity risk consultant (The Energy Authority) and its electricity supplier (Turlock Irrigation District) and participating in the subsequent deposition of an employee of The Energy Authority (¶31);

- Preparing for and participating in a two-day mediation with nationally recognized neutral Kenneth R. Feinberg, Esq., followed by extensive further discussions resulting in a $29 million cash settlement (¶¶40-43);

- Documenting the Settlement and working with Plaintiff's expert to develop the Plan of Allocation (¶43); and

- Responding to class member inquiries and verification of claims (¶9).[6]

---

[6]   If the settlement is approved, Plaintiff's Counsel will also spend considerable time in the future with the Claims Administrator, verifying compliance with the Plan of Allocation.  This will include the review and analysis of supporting information submitted by members of the Class, and communication with members of the Class concerning the processing of their claims and distribution of the Settlement Funds (net of any Court-approved attorneys' fees, expenses, incentive award, and claims administration costs).  Although it is not possible now to quantify

Plaintiff's Counsel's expenditure of time was reasonable given the complex nature of the work performed as set forth above.  This factor supports the requested fee award.

### 2.    Magnitude and Complexities of the Litigation (*Goldberger* Factor 2)

Antitrust cases are well known to be complex and vigorously contested, and this case was no exception.  *See, e.g., Wal-Mart Stores, Inc.*, 396 F.3d at 122 (acknowledging the lower court's finding that "antitrust cases, by their nature, are highly complex"); *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719–720 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought").  If anything, litigating the subset of antitrust cases involving Sherman Act Section Two monopolization claims, as was done here, is an especially complex, costly, and challenging endeavor.  *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (recognition of "the difficulty of identifying and remedying anticompetitive conduct by a single firm"); *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 917 (2007), (Breyer, J., dissenting) (citing and quoting Herbert Hovenkamp, THE ANTITRUST ENTERPRISE: PRINCIPLE AND EXECUTION 105 (2005), "litigating a rule of reason case is 'one of the most costly procedures in antitrust practice'"); *In re Zinc Antitrust Litig.*, No. 14-CV-3728 (KBF), 2016 WL 3167192, at *16 (S.D.N.Y. June 6, 2016) (describing a Sherman Act Section 2 case as involving "a complex and intricate financial market where uncertainty remained as to several aspects of the theory that the plaintiffs would ultimately need to prove to succeed at trial").

---

this time, the attorneys' fees requested are inclusive of the time to be spent on this additional work for the benefit of the Class through the distribution of the net Settlement Fund and the termination of this action.  *See In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 2015 WL 6971424, at *10 (considering class counsel's future efforts to oversee the claims process in awarding a 33% fee).

The alleged manipulation of daily index prices for electricity at four trading hubs over a two year period in 2006-2008 presented uniquely complex and challenging issues.  First, unlike in a typical antitrust class action, the determination of damages was not based on the artificially inflated profits Barclays made from its own trading activity.  Barclays' transactions allegedly manipulated daily index prices that were relied upon by electricity traders, financial institutions and electricity providers such as Merced who may not have entered into any direct transactions with Barclays.  Therefore, this was not a typical disgorgement scenario common in a direct purchaser antitrust class action involving, for example, the direct sales of commodity products.  Second, as shown in the Plan of Allocation, eligible class members may have engaged in multiple types of electricity transactions simultaneously, which present unique challenges to calculating damages and determining the amount and type of offsets that may be required.  These are only two examples of the many challenges facing Plaintiff's Counsel throughout this litigation.

### 3.        Risks to the Litigation (*Goldberger* Factor 3)

The risks faced by Plaintiff's Counsel in pursuing relief for a class also support the reasonableness of the requested fee.  As discussed by the Second Circuit:  "We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining" the reasonableness of a fee request.  *Goldberger*, 209 F.3d at 54 (citations omitted); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) (risk is "pivotal factor" in assessing reasonableness of fee awards); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (recognizing that "despite the most vigorous and competent of efforts, success is never guaranteed").  "It is well-established that litigation risk must be measured as of when the case is filed," not when the fee application is adjudicated.  *Goldberger*, 209 F.3d at 55.

13

Although the Second Circuit has expressed an "overarching concern for moderation" and was reluctant to overemphasize "contingency risk" in *Goldberger*, in this matter, there was significant and real "contingency risk" from the outset. *Goldberger*, 209 F.3d at 53. As analyzed from the date of filing Merced's class action complaint, success at trial or the recovery of a significant settlement was by no means assured. *See, e.g., Concord Assocs., L.P. v. Entm't Props. Trust,* 817 F.3d 46, 51-52, 53 n.5 (2d Cir. 2016) (upholding dismissal of both Sherman Act §§ 1 and 2 claims where "plaintiffs have failed to allege a *per se* violation of the Sherman Act" and "plaintiffs' proposed market definition [was] inherently implausible").

Contingency risk has been used in part to justify attorney fee requests in the thirty percent range when Class Counsel adopted a "novel and risky" litigation theory. *Steiner v. Williams*, No. 99 CIV. 10186 (JSM), 2001 WL 604035, at *7 (S.D.N.Y. May 31, 2001) (awarding 30% fee as "counsel took a tremendous risk that, in the end, nothing would be recovered"). In characterizing Barclays' alleged manipulation of various electricity indices as illegal monopolistic behavior in violation of 15 U.S.C. § 2, Plaintiff's Counsel similarly took a tremendous risk that such a novel and risky litigation theory would be rejected, especially in light of various legal hurdles, such a satisfying a "rule of reason" standard. *See Merced Irrig. Dist. v. Barclays Bank PLC,* 165 F. Supp. 2d 122, 138 (S.D.N.Y. 2016). Plaintiff also had to prove monopolistic intent and the possession of monopoly power in the relevant market by Barclays, as well as the willful acquisition or maintenance of that power. *Id.* at 140-43. None of these proofs were guaranteed. Indeed, the risk was especially acute in this case because it involved manipulation of the electricity market, which is extremely complex both because of the physical nature of electricity and the intricate and steadily-evolving system of regulation that governs the purchase and sale of electric power in this country. *See, e.g, Transmission Agency of N. California v. F.E.R.C.*, 628 F.3d 538, 545–47 (D.C.

Cir. 2010) (noting that changes in regulation of the "highly integrated and complex California energy market" have made formerly simple legal questions more complicated); Federal Energy Regulatory Commission, Price Formation in Organized Wholesale Markets, Staff Analysis of Operating-Initiated Commitments in RTO and ISO Markets, Docket No. AD14-14-000 (Dec. 2014)  (https://www.ferc.gov/legal/staff-reports/2014/AD14-14-operator-actions.pdf).    Further, even if Plaintiff succeeded at trial, there was also the potential risk of an appellate court finding that the Filed Rate Doctrine's formidable barrier to suit in cases involving the wholesale electricity market would bar Merced's claims. *See Woolsey v. J.P. Morgan Ventures Energy Corp.*, 691 F. App'x 308, 310 (9th Cir. 2017) (dismissing class action complaint alleging manipulation of California's wholesale electricity market because only remedy was with FERC).  The contingency risk at play in this case certainly falls at the high end of the spectrum. *See Goldberger*, 209 F.3d at 54; *Anwar*, 2012 WL 1981505, at *2 (justifying 33% fee partly because the "Action posed significant risks, making the prospect of a favorable verdict for the Settling Class far from certain").

Despite *Goldberger's* concern that litigation risks may be overemphasized, risk of the litigation is often cited as the "first, and most important, *Goldberger* factor."  *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005); *see also Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk free, and class actions confront even more substantial risks than other forms of litigation.").  Moreover, in antitrust class actions in particular, "[t]he risks of establishing liability and damages at trial, and of maintaining the Class throughout the trial . . . militate in favor of approval [of settlement]." *In re Visa Check/MasterMoney*, 297 F. Supp. 2d at 511.  "In numerous class actions . . . plaintiffs' counsel have expended thousands of hours and

15

advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (discussing litigation risk associated with inability to establish damages and observing that "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal"). The fee request here is appropriate and reasonable in light of the tremendous risk undertaken by Plaintiff's Counsel that, in the end, nothing would be recovered.

### 4.    Quality of Representation (*Goldberger* Factor 4)

As recognized in *Anwar,* "[t]he result achieved and the quality of the services provided are also important factors to be considered" when determining the reasonableness of requested attorney fees. *Anwar*, 2012 WL 1981505, at *2. Based on these important factors, a $29 million recovery to be distributed among members of the Settlement Class demonstrates the high quality of the work of Plaintiff's Counsel in its representation of the Settlement Class. Similar to the finding in *Anwar,* the Plaintiff and the Settlement Class faced "significant risk of no recovery," but were able to secure "a substantial cash settlement . . . for the Settling Class as a result of the legal representation provided by Plaintiffs' Counsel." *Id.*; *see also In re Flag Telecom Holdings Ltd. Sec. Litig.*, 2010 WL 4537550, at *28 (quality of the representation is an important factor that supports reasonableness).

Plaintiff's Counsel have vast experience in complex federal civil litigation, particularly in antitrust and other class actions, as well as specific experience with electricity markets, federal energy regulation, and electricity market manipulation, which is of particular relevance in this case. As a result of this professional expertise, Plaintiff's Counsel adeptly and efficiently analyzed

the facts, legal claims, and defenses in this litigation, employing various strategies to prosecute this matter and, ultimately, to settle this litigation in the most effective manner possible. Plaintiff's Counsel made certain that the settlement was negotiated at arm's length on the sole basis of an informed and realistic weighing of the merits of the claims and the risks of summary judgment and trial. Further, in determining that Solomon B. Cera of Cera LLP and Jeffrey A. Klafter of Klafter Olsen & Lesser LLP satisfied the requirements of Rule 23(g), this Court previously found that Settlement Class Counsel have the requisite qualifications and experience to lead this litigation on behalf the proposed Settlement Class. ECF No. 90. That conclusion has been vindicated by the excellent result achieved.

In addition, courts in the Second Circuit "consider[] the quality and vigor of opposing counsel" when determining the quality of representation under *Goldberger*. *Anwar*, 2012 WL 1981505 at *2; *Marsh & McLennan*, 2009 WL 5178546 at *19 (reasonableness of Lead Counsel's fee request supported by fact that defendants "were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations"); *In re Marsh ERISA Litig.*, 265 F.R.D. at 148 ("[t]he high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement").

Here, Plaintiff's Counsel's fee request is supported by the fact that formidable defense counsel vigorously contested Merced's claims and allegations at every step in the litigation. Defendant Barclays Bank PLC was represented by Skadden, Arps, Slate, Meagher, & Flom LLP, recognized by many as one of the top defense law firms, which deployed several skilled antitrust, class action, and complex litigation attorneys to represent and defend Barclays.

### 5.    Requested Fee in Relation to the Settlement (*Goldberger* Factor 5)

In considering the fee requested in relation to the settlement, the court in *In re Marsh ERISA Litig.*, 265 F.R.D. at 149, determined that a fee of "one-third of the recovery" in an amount of $11,665,500 was "fair and reasonable in relation to the recovery and compares favorably to fee awards in other risky common fund cases in this Circuit and elsewhere."  Courts within the Second Circuit have approved one-third attorney fee requests in several antitrust class action matters (including both Sherman Act Section 1 and Section 2 cases).  *See, e.g., In re Buspirone Antitrust Litig.*, No. 01-CV-7951 (JGK) (S.D.N.Y. Apr. 1, 2003) (counsel awarded 33 1/3 of the settlement funds based on a $220 million settlement, as described in *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 (FSH), 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005)); *In re Medical X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *6-8 (E.D.N.Y. Aug. 7, 1998) (awarding attorney fees of "one-third or 33.33%" on a $39,360,000 settlement fund); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05 Civ. 2237 (CS), 2011 WL 12627961, at *2–4 (S.D.N.Y. Nov. 28, 2011) (33 1/3% award of $20,250,000 gross settlement fund); *In re NYC Bus Tour Antitrust Litig.*, No. 13-CV-0711 (ALC), slip op. at 2 (GWG) (S.D.N.Y. Oct. 21, 2014) (awarding 1/3 fee award on settlement of approximately $18,810,000); *In re DDAVP Indirect Purchaser Antitrust Litig.*, No. 05 Civ. 2237 (CS), 2013 WL 10114257, at *2-4 (S.D.N.Y. Dec. 18, 2013) (awarding attorney fees of 33%  of $4,750,000 settlement fund); and *In re OxyContin Antitrust Litig.*, No. 1:04-md-01603 (SHS), slip op. at 2, 9 (S.D.N.Y. Jan. 25, 2011) (awarding 1/3 fee award on $16,000,000 settlement fund).

With respect to antitrust matters litigated in the Second Circuit, at one-third of the $29 million Settlement Fund, the proposed fee award and the preliminarily approved settlement are

within both the range of attorney fees and the range of settlements approved by courts in this Circuit.

### 6. Public Policy Considerations (*Goldberger* Factor 6)

As recognized by the U.S. Supreme Court with respect to antitrust class action matters, "private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). In *Anwar,* the court found the requested 1/3 fee to be supported by public policy considerations, noting that "[t]he Supreme Court has recognized that absent a class action, small claimants individually may lack the economic resources to vigorously litigate their rights." *Anwar*, 2012 WL 1981505, at *3 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974)). In addition, "[a]ttorneys who take on class action matters on a contingent fee basis, enabling litigants to pool their claims, provide a service to the judicial process." *Id.* As Plaintiff's Counsel have provided just such a service to the judicial process by bringing the instant private class action claim, it is proper for the Court to recognize the public benefit that has resulted from this judicial service, and to compensate counsel appropriately.

Courts in this Circuit have repeatedly recognized the importance of awarding fees at a level sufficient to encourage plaintiffs' counsel to bring class action cases that supplement the efforts of government regulators. *See, e.g.,* in the antitrust context, *Wal-Mart Stores,* 396 F.3d at 122 ("[I]t is especially important to provide appropriate incentives to attorneys pursuing antitrust actions because public policy relies on private sector enforcement of the antitrust laws."); *In re Medical X-Ray Film Antitrust Litig.*, 1998 WL 661515, at *8 ("an adequate award furthers the public policy of encouraging private lawsuits in protecting against restraint of trade"). *See, e.g.,* in other contexts, *In re Initial Pub. Offering Sec. Litig.,* 671 F. Supp. 2d at 515 ("class actions serve as

19

private enforcement tools when . . . regulatory entities fail to adequately protect [the class]"); *City of Providence*, 2014 WL 1883494, at *11 ("awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons and to discourage alleged misconduct of a similar nature"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 (CM), 2014 WL 7323417, at *17 (S.D.N.Y. Dec. 19, 2014) ("This Court also recently recognized the importance of 'private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis.'" (citations omitted)); *In re U.S. Foodservice, Inc. Pricing Litig.,* No. 3:07-md-1894 (AWT), slip op. at 6 (D. Conn. Dec. 9, 2014) ("Public policy considerations support awarding Class Counsel its requested [one third] fee award"); *Khait*, 2010 WL 2025106, at *8 ("[a]ttorneys who fill the private attorney general role must be adequately compensated for their efforts"); *Maley*, 186 F. Supp. 2d at 374 ("It is . . . imperative that the filing of such contingent lawsuits not be chilled by the imposition of fee awards which fail to adequately compensate counsel for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts.").

As previously noted, not a single other law firm pursued an antitrust case against Barclays based on the facts present here.  Further, FERC's authority in pursuit of its claims against Barclays was limited to disgorgement and penalties, and therefore the only avenue to seek damages for Merced and the class under the antitrust law was through a private action.  The $29 million settlement of a novel and risky Sherman Act § 2 case brought for the benefit of injured class members could not have been achieved absent Plaintiff's Counsel's investment of 10,313 hours of time and $1,409,616.21 in out-of-pocket expenses.  The judicial process has been well served here.  Public policy encourages an appropriately incentivized fee award.  Approval of the requested fees

and expenses herein furthers the public policy of encouraging private lawsuits to deter conduct that improperly and illegally manipulates markets and restrains trade.

*      *      *

Upon application of the *Goldberger* factors and the lodestar/multiplier "cross-check" to the percentage of the Settlement Fund, Plaintiff's Counsel have achieved an excellent settlement with Barclays, and now respectfully submit that the requested fee is fair, reasonable, appropriate and justified under Second Circuit jurisprudence.

### E.      Expenses Incurred by Plaintiff's Counsel in This Litigation Should Be Reimbursed

Plaintiff's Counsel also request reimbursement of all unreimbursed litigation costs and expenses incurred during this litigation, which total $1,409,616.21 and are described in the Joint Decl. filed in support of this application. *See* Joint Decl. ¶¶ 87-89.  The costs that counsel expended in prosecuting this action are precisely the kind that are typically reimbursed as a matter of course. They are also the type of expenses typically billed by attorneys to paying clients in the marketplace, and include such costs as fees paid to experts, notice costs, computer research, document processing and travel in connection with this litigation. *See Anwar*, 2012 WL 1981505, at *3 (ordering reimbursement of "expenses such as mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type 'the paying, arms' length market' reimburses attorneys" (quoting *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 468 (S.D.N.Y. 2004))); *see also In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) ("It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class.").

Plaintiff's Counsel's willingness to put at risk their own resources of $1,409,616.21 where reimbursement was entirely contingent on the success of this litigation, also supports a

determination that the expenditures made by counsel here were reasonable and necessary.[7]  *See Joint Decl.* ¶ 88; *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *19 ("Because the expenses here were incurred with no guarantee of recovery, Lead Counsel had a strong incentive to keep them at a reasonable level, and did so."); *City of Providence*, 2014 WL 1883494, at *19 ("Lead Counsel is entitled to payment for these expenses, plus interest earned on such amounts at the same rate as that earned by the Settlement Fund").  The expenses advanced and incurred by Plaintiff's Counsel are reasonable, appropriate, and should be reimbursed.

### F.  The Named Plaintiff Should Be Granted a Reasonable Incentive Award

Plaintiff's Counsel request that named Plaintiff Merced Irrigation District receive a $150,000 incentive award for the services it rendered that contributed to creation of the $29 million Settlement Fund.

This Court has observed that "[c]ourts consistently approve awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they endure during litigation."  *Anwar*, 2012 WL 1981505, at *3 (awarding $25,000 to class representative). "Incentive awards have been awarded to individual class members in a variety of contexts, including employment discrimination suits, antitrust cases and consumer fraud suits." *Velez v. Novartis Pharm. Corp.*, No. 04 CIV. 09194 (CM), 2010 WL 4877852, at *24 (S.D.N.Y. Nov. 30, 2010) (awarding $3,775,000 in incentive award payments in gender discrimination case in amounts ranging from $25,000 to $150,000 out of a $152.5 million monetary fund).  Of course, "the decision to grant the award, and the amount thereof, rests solely within the discretion of the Court." *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016).

---

[7]   No third party funders were involved in this matter.

In the antitrust context, several courts have approved significant incentive awards, also known as service awards or risk payments. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG) (VVP), 2015 WL 5918273, at *5, *6 (E.D.N.Y. Oct. 9, 2015) (court awarded $90,000 to "each of the six class representatives, totaling $540,000"). In *Dial Corp.*, 317 F.R.D. at 428, the parties settled a class action alleging that "Defendants monopolized the in-store promotion . . . services market." With the parties settling for $244 million, the Court approved "incentive awards in the amount of $50,000 to the six named Class representatives," for an "aggregate amount of $300,000." *Id.* at 438–39; *see also In re Vitamin C Antitrust Litig.*, No. 06-MD-01738 (BMC) (JO), 2012 WL 5289514, at *1, *11 (E.D.N.Y. Oct. 23, 2012) (two $50,000 awards approved on $10.5 million settlement); *In re DDAVP Direct Purchaser Antitrust Litig.*, 2011 WL 12627961, at *1, *5 (three $30,000 incentive awards approved -- for a $90,000 aggregate amount -- on a $20.25 million settlement).[8]

Second Circuit courts "consider the following factors in deciding whether to approve incentive awards," including:

> The existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery.

---

[8]   Several other courts within the Second Circuit have approved significant incentive awards in other types of class actions. In a racial discrimination matter, the court awarded service awards of $50,000 each to the eleven named plaintiffs, for a total of $550,000 on an $11.869 million settlement. *Wright v. Stern*, 553 F. Supp. 2d 337, 342 (S.D.N.Y. 2008); *see also Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 188, 191 (S.D.N.Y. 1997) (approving $212,500 worth of incentive awards on a $115 million settlement, ranging from $2,500 to $85,000); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894-AWT, slip op. at 7-8 (D. Conn. Dec. 9, 2014), (awarding aggregate amount of $180,000 in "incentive and reimbursement payments" in amounts ranging from $20,000 to $40,000 on a $297 million settlement; *Khait*, 2010 WL 2025106, at *1, *9 (approving aggregate amount of $175,000 in incentive awards on a $9.25 million settlement).

*In re Air Cargo,* 2015 WL 5918273, at *4-5 (citing and quoting *Gulino v. Symbol Techs., Inc.*, No. 06 CV2810 (JG) (AKT), 2007 WL 3036890, at *2-3 (E.D.N.Y. Oct. 17, 2007)).

Over the past four years, Merced has been a hands-on participant in this case and has contributed significant time, energy, and expertise for the benefit of the Settlement Class.[9]  Unlike the other class members, Merced spent considerable time with Plaintiff's Counsel for more than a year leading up to the filing of the Complaint, and even incurred expenses it paid to its electricity risk consultant to assist in identifying key financial information regarding its electricity transactions during the 2006-2008 timeframe.  Throughout the litigation, Merced consulted regularly with Plaintiff's Counsel concerning the filing of the action, the status of the case, the content of the pleadings, the progress of settlement negotiations, and the resulting settlement.  Joint Decl. ¶¶94-103.  Several Merced employees assisted with the discovery process, providing information and searching for paper documents and electronically stored information on current and archived/legacy systems.  Joint Decl. ¶¶99-101.  These efforts contributed to the production of thousands of documents in response to document requests from Barclays.  Joint Decl. ¶34.  Significant time and resources were also diverted from Merced's day-to-day operations for the preparation and deposition of two current and two former employees of Merced.  Sandoval Decl. ¶¶8, 12.  Overlaying all of this effort by Merced was the fact that the key employees with institutional knowledge relevant to this litigation had left Merced years before the investigation of this matter began.  Sandoval Decl. ¶11.  The search for documents and information was more time consuming and cumbersome for Merced than it would be in a typical case where employees with institutional knowledge could explain how and why certain decisions were made and quickly direct

---

[9]   *See generally* Declaration of Juan Sandoval in Support of Incentive Award to Named Plaintiff Merced Irrigation District, filed concurrently herewith ("Sandoval Decl.")

counsel to the relevant document sources.  Sandoval Decl. ¶7.

All of these efforts were undertaken by Merced without any assurance that there would be any recovery, let alone a payment to compensate it for not only its time, but to acknowledge the risks that a Plaintiff faces when it puts its name on a class action complaint.  Merced stood up against Barclays for an entire class of individuals and entities who were adversely impacted.  This encourages other entities to similarly stand up in the future.  It weighs heavily in favor of a significant incentive award.[10]

Even with the challenges caused by the long passage of time since the events at issue and the employee departures years before the litigation began, Merced is a sophisticated plaintiff whose expertise in the electricity industry has clearly benefitted the Settlement Class.  In litigating this matter, Merced has spent considerable time and effort particularly with regard to the financial transactions that are involved here.  Based on the special circumstances faced by Merced in litigating this matter, a $150,000 incentive award is appropriate.  Absent the particular insights, knowledge, costs, time, and effort provided by Merced, the Settlement Class would likely not have benefitted from the $29 million settlement fund.  Further, Merced's decision to file, litigate, and monitor this complex Sherman Act § 2 class action helped to bring this matter to its successful conclusion.  A $150,000 incentive award is appropriate under these circumstances.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiff's Counsel respectfully request that this Court award attorneys' fees in the amount of $9,666,666.66, expenses in the amount of $1,409,616.21 and an incentive award to Merced in the amount of $150,000.

---

[10]   The Notice advised Class members that an incentive award to Merced would be requested in the amount now sought.  ECF Nos. 89 and 90.  As of the filing of this motion, no member of the Settlement Class has objected to the proposed incentive award for Merced.

Dated:  August 15, 2018                                        Respectfully submitted,


_____                          _____
Jeffrey A. Klafter                                           Solomon B. Cera
Michael H. Reed                                           Pamela A. Markert
**KLAFTER OLSEN & LESSER LLP**        **CERA LLP**
2 International Drive, Suite 350                       595 Market Street, Suite 2300
Rye Brook, NY 10573                                   San Francisco, CA 94105
Telephone: (914) 934-9200                          Telephone: (415) 777-2230

*Settlement Class Counsel*

Daniel Sponseller                                          Eric Christensen
**LAW OFFICE OF DANIEL J.**               **CAIRNCROSS & HEMPELMANN, PS**
**SPONSELLER**                                          524 Second Ave., Suite 500
409 Broad Street, Suite 200                          Seattle, WA 98104-2323
Sewickley, PA 15143                                     Telephone: (206) 254-4451
Telephone: (412) 741-4422

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I caused a true and correct copy of the foregoing instrument to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Southern District of New York, on all parties registered for CM/ECF in the above captioned matter.

_____
Solomon B. Cera